**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL CHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DRAFTKINGS INC. and GUS III LLC,<br><br>Defendants. | Civil Action No.: 1:26-cv-13442<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff Michael Chan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant DraftKings Inc. and Defendant GUS III LLC d/b/a DraftKings Predictions (together, "Defendants" or "DraftKings") to recover wagers lost to Defendants' illegal sports gambling operation. Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief, including the investigation of counsel, as to all other matters.

## NATURE OF THE ACTION

2.      DraftKings owns and operates an online sports betting platform, DraftKings Sportsbook ("Sportsbook") and an app-based "predictions market," DraftKings Predictions ("Predictions"). In most states that permit online sports betting, DraftKings operates its sportsbook under a license and subject to the oversight of the pertinent state gaming regulators. In states that prohibit online sports betting (and in states that permit it but have not licensed DraftKings to operate) DraftKings has found another way in: it deploys Predictions to evade those states' gambling laws, regulations, and prohibitions, and sells consumers sports bets that are functionally identical to the wagers in its regulated sportsbook. These wagers are identical in substance, identical in risk, and offered through the very same "super" app.

3.      Since *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), returned the power to regulate sports betting to the states in 2018, 16 states have chosen to prohibit online sports betting, judging that it poses a serious public health risk and inflicts real societal harm. DraftKings has overridden that judgment. Beginning in 2025, it deliberately circumvented state gambling laws to deliver sports gambling to their residents under the euphemism of a "predictions market."

4.      DraftKings' sports "predictions" are sports bets masquerading as event contracts. By branding the product as "trading" rather than betting, DraftKings misleads consumers into believing the activity is lawful and safe. It is neither. Indeed, DraftKings' Chief Executive Officer, Jason Robins, recognizes that "***customers don't really even understand the difference***" between betting on sports in Sportsbook versus Predictions.[1]

5.      DraftKings uses this consumer misunderstanding to its advantage, compounding the deception by trading on its reputation as a licensed sportsbook, and marketing to the enormous customer base that reputation built while selling an unlicensed, illegal product. Again, in the words of CEO Robins, "[w]e are confident in Predictions because we increasingly view the capabilities we have built in Sportsbook as a key advantage; ***they serve the same customers in the same live moments and leverage shared underlying infrastructure***."[2]

6.      The scheme has been enormously profitable. Predictions has seen its market share grow explosively since launch, with sports bets driving the overwhelming share of trading volume. On June 26, 2026, DraftKings reported approximately $3.4 billion in annualized consumer volume and approximately $11.3 billion in annualized total trading volume for the week ended June 21,

---

[1] *Earnings Call Transcript: DraftKings Q4 2025 Beats EPS Forecast, Stock Drops*, Investing.com (Feb. 13, 2026) (hereinafter, "Q4 2025 Earnings Call"), https://shorturl.at/zdKKS. Unless otherwise specified, all emphasis herein is added.

[2] DraftKings Inc., *DraftKings Q1 2026 Earnings Presentation,* at 3 (May 7, 2026) (hereinafter, "Q1 2026 Earnings Presentation"), https://shorturl.at/v1TE7.

2026.[3] It is estimated that 66 percent of Predictions' trading volume is from its sports offerings,[4] and of that, nearly 70 percent comes from states where online sports betting is illegal.[5] Given these numbers, DraftKings remains bullish on the future of its sports predictions offering, projecting continued growth through July 2026 driven by "growing adoption of new event contracts a[nd] features such as combinations, and heightened interest surrounding the World Cup."[6] DraftKings also recently announced that Predictions would be expanding its sports offerings, adding MLB coverage along with broader NBA, NHL, and international selections.[7]

7.      By operating an unlicensed online sports betting enterprise in states where online sportsbooks are illegal and in states that permit online gambling but have not licensed DraftKings to operate, DraftKings has violated state gambling prohibitions and consumer protection laws by engaging in unlawful, unfair, and deceptive conduct. It has also unjustly enriched itself at the expense of thousands of consumers. Plaintiff, on behalf of Plaintiff and the Class, brings this action to recover those consumers' wagers, together with costs and attorneys' fees.[8]

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),  provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a

---

[3] News Release, *DraftKings Launches Proprietary Exchange to Bolster Differentiated Predictions Experience*, DraftKings (June 26, 2026) (hereinafter "Predictions Press Release"), https://shorturl.at/L3lYe.

[4] *What Is DKeX? Inside DraftKings' Move to Own Its Prediction Market*, BettingPros (June 29, 2026) (hereinafter, "What Is DKeX"), https://shorturl.at/Pa17L.

[5] Q1 2026 Earnings Presentation, *supra* n.2, at 8.

[6] Predictions Press Release *supra* n.3.

[7] *Id.*

[8] To be clear, while Predictions offers sports betting in additional states, the states for which Plaintiff seek to secure relief are Alabama, California, Florida, Georgia, Minnesota, New Mexico, South Carolina, and Texas (collectively, "Illegal Operation States").

citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are more than $5,000,000.00 in the aggregate, exclusive of interest and costs.

9. This Court has personal jurisdiction over Defendants because they have continuous and systematic contacts with this forum, maintain their corporate headquarters in this District, and the events giving rise to this matter arose of those contacts.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in and emanated from this District. Defendants also have their headquarters in this District.

## **PARTIES**

11. **Plaintiff Michael Chan** is a natural person and a citizen of the state of California. He signed up for Predictions in California through the DraftKings app. Mr. Chan was not informed by DraftKings that Predictions is an unlicensed sportsbook when he wagered and lost money on the app.

12. **Defendant DraftKings Inc.** is a Nevada corporation with its principal place of business and headquarters at 222 Berkeley St., 5th Floor, Boston, Massachusetts 02116. Founded in 2012 as a Daily Fantasy Sports provider, DraftKings has since expanded into a publicly traded (Nasdaq: DKNG) platform offering online sports betting, iGaming (online casinos), digital lottery courier services, and prediction markets.

13. **Defendant GUS III LLC** d/b/a DraftKings Predictions is a wholly owned subsidiary of DraftKings Inc. that operates as an Introducing Broker registered with the Commodity Futures Trading Commission ("CFTC") and is a registered member of the National

Futures Association. It operates out of DraftKings' headquarters at 222 Berkeley St., 5th Floor, Boston, Massachusetts 02116.

## FACTUAL ALLEGATIONS

**A.    By DraftKings' Own Admissions, Predictions Is an Online Sportsbook Rebranded for the States That Banned It.**

14.    DraftKings is a Massachusetts-based digital sports entertainment and gaming company that rose to prominence offering consumers daily fantasy sports. As states legalized online sports betting in the wake of *Murphy*, DraftKings expanded its offerings to include an online sportsbook. Today, Sportsbook is available to customers in 27 states and the District of Columbia, subject to each jurisdiction's specific gambling regulations.[9]

15.    Sportsbook has been wildly successful. DraftKings controls about 34 percent of the U.S. online sportsbook market and is the number two operator nationwide.[10] In the final quarter of 2025, DraftKings reported sports betting revenue of $1.3 billion, a 63 percent year-over-year increase.[11]

16.    More recently, a new form of sports betting (known as sports predictions) has emerged, threatening DraftKings' continued success and prompting it to move into the market itself. A "prediction market" allows for the purchase and sale of "event contracts." Event contracts are "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). Prediction markets offer event contracts across a range of subjects, including politics, economic indicators, and culture. But at

---

[9] *Where Is DraftKings Sports Available?*, DraftKings, (hereinafter, "DraftKings Availability"), https://tinyurl.com/yc6rmvrt (last visited, July 27, 2026).

[10] *US Sportsbook Market Share 2026*, SportBot AI (Mar. 11, 2026), https://shorturl.at/padQh.

[11] *DraftKings Finishes 2025 on High Note*, Yahoo! Finance (Feb. 12, 2026), https://shorturl.at/oLqHG.

issue here is a specific sub-category: sports event contracts, which pay out based on the outcome of a sporting event or an athlete's performance. Like a traditional sports bet, a sports event contract only pays out if the wagered-on result does (or does not) occur.

17.    In December 2025, DraftKings introduced Predictions. On June 26, 2026, DraftKings launched DKeX, its own proprietary CFTC-regulated exchange, allowing it to integrate the predictions market directly into its existing gaming app.[12] DraftKings runs this exchange in-house, using technology and a license acquired from Railbird Technologies.[13] On July 14, 2026, the National Futures Association approved Predictions as a Futures Commission Merchant.[14]

18.    In investor communications, DraftKings has explained its strategy regarding Predictions as positioning it to compete head-to-head with Kalshi, Polymarket, and similar platforms, with the goal of "establish[ing] a leadership position in" the predictions market by the end of 2026. While Predictions offers customers futures contracts on events, politics, commodities, culture, the market focus has always been sports: "[p]redictions, *especially in Sports*, is a strategic priority for DraftKings."[15]

19.    Furthermore, as stated by CEO Robins, DraftKings is focused on using Predictions to introduce sports betting to "*states that don't have legal online sports betting*." In states it already has Sportsbook Robins does not see "much financial opportunity. . . So why go there when

---

[12] What Is DKeX, *supra* n.4.

[13] *Id.*

[14] *DraftKings Is Turning Sports Betting Into Wall Street Trading—and Regulators Just Cleared the Path*, Inc. (July 16, 2026) (hereinafter, "Regulators Just Cleared the Path"), https://tinyurl.com/yc2bb9e7.

[15] DraftKings Inc., *Q1 2026 Letter to Shareholders* (May 7, 2026), (hereinafter, "Q1 2026 Letter") https://tinyurl.com/3bmkxjw4 (last visited, July 27, 2026).

it's just going to upset regulators that we have great relationships with?"[16] As such, DraftKings views Predictions as "a massive, incremental opportunity" to acquire "millions of customers."[17]

20.    DraftKings acknowledges that, as it relates to sports, Predictions is no different from Sportsbook. Indeed, Predictions, like Sportsbook, operates within DraftKings' single "super app,"[18] operating basically as an extension of its sportsbook: "We are confident in Predictions because we increasingly view the capabilities we have built in Sportsbook as a key advantage; ***they serve the same customers in the same live moments and leverage shared underlying infrastructure***."[19] Thus, because DraftKings offers both products through a single app, it can automatically move consumers between bets and "contracts" according to their location and the purported legality of each offering.

21.    Further evidence that Predictions and Sportsbooks are a distinction without a difference comes from DraftKings' recent announcement to investors that it would only report a single combined "Sports" revenue figure, encompassing both Sportsbook and Predictions revenue. Thus, in DraftKings' own accounting, the two products are viewed as one business.[20]

22.    The same message has saturated DraftKings' communications with consumers. Following the December 2025 launch, DraftKings proclaimed that users can now legally place sports bets in all 50 states.[21]

---

[16] *Jason Robins: Prediction Markets Are a Gamble, iCasino on Upswing, and More*, InGame (Nov. 7, 2025) (hereinafter, "Prediction Markets are a Gamble"), https://www.ingame.com/jason-robins-draftkings-interview/.

[17] *DraftKings Shares Lofty Prediction Markets Goals in 2026 Outlook*, Wall St. J. (Feb. 13, 2026), https://tinyurl.com/2j7bsbju.

[18] In June 2026, DraftKings consolidated its online casino, sportsbook, prediction markets, and lotteries into a single app, which it calls a "super app." *See DraftKings "Super App" Launches, Combining Casino, Sportsbook, Predictions and Lotteries*, SportsLine (June 12, 2026), https://tinyurl.com/e25pwbbj.

[19] Q1 2026 Earnings Presentation, *supra* n.2, at 3.

[20] Q1 2026 Letter, *supra* n.15.

[21] DraftKings Availability, *supra* n.9.



23.     Like its financial reporting, DraftKings' advertisements draw no distinction between Sportsbook and Predictions, and such advertisements have run nationally during major sporting events, including the NBA playoffs and the World Cup, before audiences of millions.[22]

24.     All of this is intentional and designed to deceive users into thinking that sports predictions bets in Illegal Operation States are legal. Indeed, CEO Robins admits that:

> *[C]ustomers don't really even understand the difference* [between the two products]. So I think the national marketing footprint is a big advantage because we can drive people towards our product, and we can use it in ways that we can rotate messages and have slightly different things, but in essence, it's the same general message to the customer. And I think that provides us a ton of leverage and synergy.[23]

25.     It therefore follows that the sports betting offerings on both Sportsbook and Predictions are basically equivalent. As discussed in further detail below, both products allow consumers to wager on the outcomes of specific sporting events, individual player metrics, team results, futures, and combinations (parlays). DraftKings likewise advertises new-user promotions for the predictions market that mirror those on Sportsbook. Typically, consumers experience these as rewards on the first bet that are designed to entice familiarity and continued betting.

---

[22] DraftKings Availability, *supra* n.9.

[23] Q4 2025 Earnings Call, *supra* n.1.



26.     Even the user interfaces are nearly indistinguishable: both Sportsbook and Predictions present sporting events to wager on, display the odds, and state the cost of the wager. Both offer similar odds, payouts, and spread options.

27.     Again, these similarities are all by design as the only real distinction between the two is that Sportsbook focuses on consumers who reside in states where online gambling is legal while Predictions focuses on consumers who reside in states where online sports betting is illegal. Indeed, CEO Robins has admitted that:

> Predictions and Sportsbook are "**so similar . . . And that's why we don't see much cannibalization from prediction operators in the states that we have been in**. So really, for us, it's about incremental customers and **other states**. Some of the biggest states in the country like California, Texas, Florida, we were not present in with [online sports betting], and we have Predictions there now. So there's opportunities for us. It was about half the country population-wise, that we were able to launch Predictions. And so that's something really exciting."[24]

Mr. Robins has reiterated this point on multiple occasions, explaining that "**the most common theme we're seeing with prediction players is they tend to be Californians and Texans . . . Otherwise, they look a lot like our existing customers**."[25]

---

[24] *Id*.

[25] *Id*.

28.     DraftKings' scheme to illegally enter states that prohibit sports betting by masquerading sports bets as events contracts has been wildly successful for it and detrimental to its customers. On June 26, 2026, DraftKings reported approximately $3.4 billion in annualized consumer volume and approximately $11.3 billion in annualized total trading volume for the week ended June 21, 2026.[26] It is estimated that 66 percent of Predictions' trading volume is from its sports offerings.[27] And most telling of all: nearly 70 percent of Predictions' sports volume comes from states where online sports betting is illegal.[28]

**B.     The States Have Long Held the Power to Prohibit Sports Gambling, and Sixteen Have Exercised It – DraftKings Overrides Their Judgment Anyway.**

29.     State regulation of gambling and sportsbooks has been a cornerstone of U.S. public policy, rooted in the exercise of States' police power to protect the health, safety and welfare of its citizens. *See e.g. Champion v. Ames*, 188 U.S. 321, 356 (1903).

30.     After a series of twentieth-century scandals, corruption, and assaults on the integrity of American sports (driven by criminal syndicates that had become the primary operators of sports gambling schemes nationwide), Congress passed a series of statutes to reinforce the States' power to regulate gambling within their own borders. *See, e.g.*, 18 U.S.C. § 1084 (prohibiting the use of wire communications to transmit sports wagers across state lines, for the stated purpose of helping state authorities fight organized crime by disrupting its sports gambling businesses); 18 U.S.C. § 1952 (prohibiting use of the mail or any facility of interstate commerce to carry on unlawful activity, likewise aimed at assisting state authorities in combatting organized crime's control of illegal gaming); 18 U.S.C. § 1953 (criminalizing the interstate or foreign transportation of sports gambling paraphernalia, to the same end).

---

[26] What Is DKeX, *supra* n.4.

[27] *Id*.

[28] Q1 2026 Earnings Presentation, *supra* n.2, at 8.

31.     The one exception to this state-centered approach was the Professional and Amateur Sports Protection Act ("PASPA"), enacted in 1992, which barred nearly every state from sanctioning sports gambling. Testifying in favor of the bill were the commissioners of the National Football League, Major League Baseball, the National Basketball Association, and the National Hockey League, alongside athletes, physicians, and religious leaders.[29]

32.     PASPA's legislative history confirms that Congress enacted the legislation to protect the integrity of sports leagues and to confront the growing risk of teenage gambling.[30] Preventing the societal ills that follow sports betting – addiction and financial ruin chief among them – was a central concern then, and it remains one now.[31]

33.     In 2018, the Supreme Court struck down PASPA in *Murphy*, 584 U.S. 453, holding that it violated the Tenth Amendment's anti-commandeering doctrine. Justice Alito, writing for the majority, emphasized: "It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id*. at 474. With *Murphy*, the power to permit or prohibit sports gambling returned to where it had always belonged, the States.

34.     The States then made their choices, but not without significant pressure from sports leagues themselves and other self-interested parties.[32] Today, online sports gambling has been

---

[29] J. Goodall, *Bringing Down the House: An Examination of the Law and Policy Underpinning the Professional and Amateur Sports Protection Act of 1992*, 67 Rutgers U. L. Rev. 1097, 1105 (2015).

[30] S. Rep. No. 102-248, at 5 (1991), as reprinted in 1992 U.S.C.C.A.N. 3553, 3556.

[31] Congress believed the establishment of legal gambling would "initiat[e] a process that would inevitably cause a domino effect of moral erosion among the states," necessitating its intervention. Goodall, *supra* n.29, at 1106.

[32] *Massachusetts Legislature Passes Bill to Legalize Sports Betting in the Commonwealth*, Nelson Mullins (Aug. 4, 2022), https://tinyurl.com/3jj7v9j5; *The Story Behind the Sports Betting Boom*, NPR (Apr. 6, 2023), https://tinyurl.com/vzmc2f54.

legalized (in some form) in 34 states plus the District of Columbia.[33] Operators in those states are required to comply with certain consumer guardrails to limit the industry's long-documented susceptibility to fraud, addiction, financial ruin, and corruption.

35.     DraftKings' Sportsbook is available to consumers in 27 of the 34 legalized sports gambling states, plus the District of Columbia.[34] *See* Exhibit A. In jurisdictions where Sportsbook is available, DraftKings complies with local laws and regulations, including those focused on consumer protection. Meanwhile, 16 states continue to prohibit online sports gambling, having concluded that no regulation is strong enough to contain its societal harms. *Id*. DraftKings offers Predictions in 15 of these states.[35] Additionally, in 5 states, DraftKings offers customers a "free-to-play" sports contest, as neither Sportsbook nor Predictions is available to customers in these jurisdictions.[36] Thus, between Sportsbook, Predictions, and its free-to-play product, DraftKings markets that it offers sports betting in all 50 states plus the District of Columbia.[37]

36.     Some states that continue to prohibit online sports betting have chosen to do so after the considered judgment of the states' citizens themselves. In California, for example, Predictions is available even though voters resoundingly rejected two sports betting initiatives in November 2022: Proposition 26 would have legalized in-person sports betting on tribal land while Proposition 27 would have legalized online sports betting. Californians soundly rejected both measures with

---

[33] Sports gambling is allowed in 40 jurisdictions (39 states and Washington D.C.) and prohibited in 11 jurisdictions. *See U.S. Sports Betting: Where All 50 States Stand On Online Sports Betting Sites*, CBS Sports, https://tinyurl.com/bdzjfta3.

[34] Of the states that have legalized online sportsbooks, 3 states (Delaware, Florida, and Rhode Island) allow online sports gambling but only permit a single operator that is not DraftKings. Another 3 states (Montana, Washington, and Wisconsin) only allow tribal operators.

[35] Predictions is available in a total of 18 states. *See* Exhibit A.

[36] *See* Exhibit A. DraftKings "free to play" contests, also known as Pools, are risk-free games (*i.e.*, customers do not make any monetary wager) where users compete against other players by answering predictive questions or making prop picks without paying an entry fee. Winnings are typically awarded as cash prizes or site credits based on a leaderboard.

[37] *See* Exhibit A; *see also* DraftKings Availability, *supra* n.9.

67 percent voting "no" on Proposition 26 and 82 percent voting "no" on Proposition 27, making the latter the largest margin of defeat in California ballot proposition history. Notably, this defeat came after DraftKings, as well as other online sportsbooks, "contributed $95 million toward supporting the [ ] measure, and the industry ultimately spent $150 million on political ads."[38] But DraftKings has ignored California state legislature and people by offering Californians online sports betting through its functionally equivalent prediction market.

37.    Predictions is also available in Alabama, California, Minnesota, New Mexico, and South Carolina, among others, even though the legislature has not legalized online sports betting and the Attorneys General of those states have uniformly rejected any distinction between sportsbook bets and prediction market bets, calling it "illusory," and explaining, "On so-called 'prediction markets,' users can make all the same wagers they can make at a traditional sportsbook."[39] The Attorneys General of those states have further cautioned that sports gambling poses serious risks to public health and financial security, with millions of Americans qualifying as problematic or pathological gamblers, and that the states are best equipped to protect their residents from the associated harms.[40]

38.    In Utah, Governor Spencer Cox put it plainly: "These prediction markets … are gambling – pure and simple…[t]hey are destroying the lives of families and countless Americans, especially young men."

39.    Even in states where sports gambling is legal, courts have rejected the fiction that sports "prediction" contracts are something else. For example, in Massachusetts, DraftKings'

---

[38] G. Garcia-Roberts, *Inside the $400 million fight to control California sports betting*, Wash. Post. (Nov. 3, 2022), https://tinyurl.com/3e9w557p.

[39] Letter from A. G. Brown, Att'y Gen. of Md., *et al.*, to C. J. Kirkpatrick, Sec'y, Commodity Futures Trading Comm'n, *Re: Advance Notice of Proposed Rulemaking on Prediction Markets*, Docket No. 2026-05105 (Apr. 30, 2026), https://tinyurl.com/yc4fha3t.

[40] *Id*.

home state, a court recently enjoined sports event contract operators from offering such contracts within the Commonwealth precisely because those contracts are virtually indistinguishable from sports betting.

40.    By operating an illegal sportsbook disguised as "sports predictions," DraftKings has intentionally defied the public policy of the Illegal Operation States while simultaneously engaging in unfair business acts and practices that trick consumers into believing: the operation of its gambling website is lawful, when it is not; and that they are not gambling against the House, when they are. The damage resulting from Defendants' conduct to the Class amounts to hundreds of millions of dollars.

**C.    DraftKings Designed Predictions to Be Indistinguishable from Its Sportsbook, and Profits from Consumers' Inability to Tell Them Apart.**

41.    DraftKings has built one integrated sports betting "super app," treating its state-regulated sportsbook and its online prediction market as one product. As CEO Robins explains,

> Predictions and Sportsbook serve the same customers in the same live moments and leverage a shared underlying infrastructure. Whether the customer experience is structured as a bet or a contract, success still comes down to compelling markets, pricing, liquidity, trust, and a seamless customer experience. That is why our sustainable advantages made us a leader in Sportsbook and position us to lead in Sports Predictions too.[41]

42.    It is therefore unsurprising that on the back end, Predictions works almost exactly like Sportsbook. Specifically, in traditional sports betting, consumers wager against a bookmaker ("the House") on the performance of athletes or teams. The House sets the betting lines, and consumers bet either side of it. The House is highly sophisticated, and it sets odds calculated to give itself the best chance of profit. It also charges "vigorish" (or "the vig"), a fee for accepting the wager, so that a sportsbook pays out less on a winning bet than it collects on a losing one.

---

[41] DraftKings, Inc., *Q1 2026 Earnings Call Transcript* (May 8, 2026), The Motley Fool (June 1, 2026) (hereinafter, "Q1 2026 Earnings Call"), https://tinyurl.com/ksfv9smj (last visited July 27, 2026).

Together, the vig and the accuracy of the House's lines make it very difficult for consumers to profit over the long run.

43.     Predictions operates no differently. Like Sportsbook, DraftKings takes the opposite side of a consumer's bet ("YES" or "NO"), so that the two positions total $1. If a user wants to buy "NO" shares and there are not enough buyers on the "YES" side, DraftKings steps in and buys the "YES" shares itself. At that point the user is no longer trading against the crowd. Once DraftKings intervenes to "ensure liquidity," it is operating as the House and helping set the line. And like the House, DraftKings charges for the privilege: a tiered, flat-rate transaction fee on every contract bought or sold, which is the functional equivalent of the vig it collects on its sportsbook.

44.     In short, DraftKings uses its internal market maker and its partners to set betting lines drawn from data and market projections – often similar to the lines on Sportsbook – and profits from the fees, exactly as it does on Sportsbook. DraftKings effectively concedes this point, as CEO Robins admitted to investors that it is "irresponsibly" misleading for prediction market operators to claim their product differs from an online sportsbook, because "***most of the money is being put up, most liquidity is being put up by professional market makers***, institutions, things like that."[42]

45.     While candid to its investors, DraftKings nevertheless misrepresents how it makes money to customers and regulators. For example, it tells consumers that its prediction market eliminates the charges the House traditionally imposes on sports bets, and that it instead earns a transaction fee like a broker, with no stake in the outcome of any contract. That is false. As a market maker, DraftKings holds positions and therefore has a preferred outcome, and it earns more when consumers buy the popular side of a contract.

---

[42] *Id.*

46.    DraftKings' Predictions platform also offers many of the same style bets as available in its sportsbook. For example, in Predictions, consumers can make traditional one-sided wagers on the outcome of an event that are nearly indistinguishable from the sportsbook offering.

47.    Moreover, like a traditional sportsbook, Predictions offers "combo" bets (a "parlay" in its sportsbook). Combos/Parlays provide enhanced odds because they require multiple correct bets to win. Combos/Parlays are heavily demanded by users with more than 30 percent of Predictions bets placed being "combo" bets.[43] Combos/Parlays are also critical to the profitability of the House because such bets are only correct 3.1 percent of the time.[44]

48.    Notably, for "combo" bets, DraftKings and its market makers control the odds. When a consumer places a combo bet, the request goes to DraftKings, and within milliseconds market makers (including DraftKings) quote a line through an anonymous bidding system built into a back-end platform that only DraftKings can access. Taking the other side of a combo bet is not something an ordinary user can do. It requires approved access to that back-end system, working knowledge of DraftKings' API and coding language, and software capable of quoting prices in a split second. Thus, in practice, DraftKings' process of matching retail customers with institutional market makers (or itself) is functionally indistinguishable from a parlay at any other sportsbook.

49.    The parallels extend well beyond simple wagers and parlays. For example, on both Sportsbook and Predictions, consumers can bet on individual player propositions, such as whether a quarterback will exceed a specified passing yardage, whether a batter will record a hit, whether a player will score in a given match. Both offer "futures," allowing users to wager months in

---

[43] Predictions Press Release, *supra* n.3.

[44] E. Gianbalvo *et al.*, *Americans Can't Stop Betting Parlays. Sportsbooks are cashing in*, The Washington Post (Oct. 9, 2025), https://tinyurl.com/5t2p5zeb.

advance on which team will win a championship, which player will claim an individual award, or how many games a team will win over a season. Both permit wagers on team results and margins of victory, on aggregate scoring totals, and on in-game outcomes as they unfold live. In each case, the consumer is doing the same thing: staking money on the uncertain future performance of an athlete or team, with a fixed payout if the bet proves correct and a total loss if it does not. The only meaningful difference is the label DraftKings attaches to the transaction, which differs solely based on whether the jurisdiction where the bet is being offered allows (or prohibits) Sportsbook.

50.    Furthermore, Predictions, like Sportsbook, capitalizes on information asymmetry. To maximize returns, market makers (including DraftKings) employ dedicated research teams, proprietary statistical models, and superior data and software. Additionally, market makers (including DraftKings) benefit from their unique contractual and technological integration with prediction markets, which provide them with financial benefits, reduced (or zero) fees, differing position limits, and enhanced access. These advantages greatly reduce market makers' (or DraftKings') financial exposure, much like the House in the sportsbook. Indeed, these advantages are further enhanced because in making these decisions, DraftKings' Predictions relies on vast amounts of data from its Sportsbook. DraftKings itself has acknowledged as much, stating it expects it to be "the best [market maker], given [its] modeling capabilities."[45]

51.    The result is that consumers in the Illegal Operation States do not understand that they are placing illegal sports bets while using Predictions. DraftKings knows this, counts on this, and profits from this. Asked how it would market Predictions nationally when Sportsbook is legal in only half the country, CEO Robins told investors that consumer confusion is "actually a huge

---

[45] B. Horney, *DraftKings, FanDuel Push Further Into Prediction Markets*, Yahoo! Finance (May 8, 2026), https://tinyurl.com/4yxm494r.

advantage of ours," because "[m]ost customers don't really even understand the difference."[46] He explained that "the product is so similar" that DraftKings sees little cannibalization between the two products, such that a single marketing message is able to serve both.[47]

52.     That confusion is not incidental to DraftKings' business model, it is the mechanism by which the model works. Consumers who believe they are using a licensed, regulated sportsbook do not know to ask whether the activity is lawful where they live, whether the operator is accountable to any state regulator, or whether the consumer protections they associate with the DraftKings brand (*i.e.*, the deposit limits, the addiction resources, the age restrictions their own legislatures required) apply at all. They do not. DraftKings has taken the trust it built as a licensed operator and used it to sell an unlicensed product to consumers who cannot tell the difference, in states that prohibited the activity precisely to protect them.

**D.     DraftKings Knowingly Exposes Consumers in the Illegal Operation States to the Precise Harms Those States Prohibited Online Sports Betting to Prevent.**

i.     *DraftKings Deliberately Targeted the States That Prohibit Online Sports Betting, and Said So.*

53.     DraftKings believes it is above state gambling laws, willfully embracing the deception it inflicts on its customers to their detriment.[48] Indeed, CEO Robins admits that Prediction is no different from Sportsbook except that Predictions focuses on "***states that don't have legal online sports betting***" because there is not "much financial opportunity in places where we already have online sports betting. So why go there when it's just going to upset regulators that we have great relationships with?"[49]

---

[46] Q4 2025 Earnings Call, *supra* n.1.

[47] *Id*.

[48] B. Josheph, *States with Legal Sports Betting Eye Prop Bets*, LexisNexis (Aug. 19, 2025), https://tinyurl.com/2kdzb5z6.

[49] Prediction Markets are a Gamble, *supra* n.16.

54.    CEO Robins further candidly admits that the DraftKings' customer base in prediction states are "*a lot like our existing customers*" with the only difference being that prediction customers "tend to be Californians and Texans."[50] According to CEO Robins, "*If you look at kind of who these customers are demographically, what their spend patterns are, what sports, it's actually quite similar.*"[51]

55.    CEO Robins has further explained that:

> Some of the biggest states in the country like California, Texas, Florida, we were not present in with [online sports betting], and we have Predictions there now. So there's opportunities for us. It was about half the country population-wise, that we were able to launch Predictions. And so that's something really exciting. In some ways, I think of it as like even though it's not exactly the same thing, but just to sort of paint the picture of why we're excited. It would be like if you told me we opened up the rest of the U.S. overnight to some lesser version, but still very strong version of sports product that could really monetize the customers and engage the customers in ways that we never were able to with Fantasy Sports.[52]

56.    And, in responding to an investor question about his expectations regarding Predictions and the World Cup, CEO Robins doubled down on this explanation: "I think it'll be absolutely tremendous for customer acquisition, starting with these prediction states. You know, about half the U.S., including large states like California, Texas, and Florida, we have never had a World Cup, never had, you know, any major marketing event in terms of, you know, something like this, in those states. We're gonna really go for it."[53]

57.    CEO Robins' statements inadvertently make clear that not only are Defendants intentionally circumventing state gambling laws, but Defendants are doing so without regard to the harm unregulated gambling can impose on citizen populations.

---

[50] Q4 2025 Earnings Call, *supra* n.1.

[51] Q1 2026 Earnings Call, *supra* n.41.

[52] Q4 2025 Earnings Call, *supra* n.1.

[53] Q1 2026 Earnings Call, *supra* n.41.

ii.    *Predictions Exposes Consumers to the Well-Documented Harms of Sports Gambling While Withholding the Protections Sportsbook Provides.*

58.    It is well recognized in the scientific community that gambling is highly addictive; it stimulates the brain's reward system, driving individuals toward increasingly risky behavior in pursuit of the high of a winning bet. Its consequences are also recognized to be quite severe. The rate of suicide among gamblers is an estimated fifteen times that of the general population. Online gambling is associated with cardiovascular disease, hypertension, peptic ulcer disease, and sleep loss, and research suggests links to dementia and Parkinson's disease. Gambling losses now exceed $115 billion annually in the U.S.

59.    These harms reach a vast number of Americans. More than 2.5 million adults meet the criteria for a severe gambling problem in any given year, and another five to eight million experience mild or moderate problems. Research further shows that gambling advertising causes serious gamblers to gamble more and correlates with higher gambling frequency.

60.    Young people are especially vulnerable. Sports betting and sports predictions are extremely popular among young adults, who face heightened addiction risk because their brains are not fully developed when they begin betting. Most of DraftKings' users are under forty.[54] And while Sportsbook must adhere to state consumer protection laws regarding gambling in the states where it is licensed to operate, the same protections do not apply to Predictions.

61.    Ironically, DraftKings once represented that these protections reflected a moral corporate commitment, rather than mere regulatory compliance, and pointed to them as proof that licensed sports betting was safer than the alternatives. In announcing DraftKings' platinum membership in the National Council on Problem Gambling ("NCPG") in December 2019, its then-chief compliance officer, Tim Dent, stated: "From the moment someone registers a DraftKings

---

[54] J. Nolan, *Online Betting Demographics: Who is using what app?*, Lab Market Research (Jun. 5, 2026), https://tinyurl.com/n7pz83z8.

account, our top priority is ensuring every user has an engaging, fun and, ***most importantly, a safe experience*** . . . We are proud to partner with a leading responsible gaming organization like the NCPG to ensure our internal efforts are informed by independent experts."[55] But before launching Predictions, DraftKings abandoned that commitment as it became commercially inconvenient, and has since withdrawn from the American Gaming Association altogether.[56]

62.    DraftKings' retreat on the dangers posed by its predictions market is compounded by the fact that DraftKings offers both products through a single app, moving consumers between bets and "contracts" according to their location and the legality of each offering. Consumers thus encounter the unlicensed predictions market through the same interface, brand, and account they associate with a regulated sportsbook, and are understandably confused by the difference between betting on sports in Sportsbook versus Prediction, as recognized by CEO Robins.

63.    Worse still, recent research indicates that prediction markets may be more addictive and problematic than traditional sportsbooks, causing consumers to bet more and lose more money.[57] Specifically, the research found that in July 2025, the median return for a prediction market user was −8 percent, compared with −5 percent for sportsbook users. The research also suggests that losses fall hardest on small bettors as users wagering more than $500,000 saw an average return of 2.6 percent, while those wagering under $100 saw −26.8 percent.[58] DraftKings itself acknowledges this phenomenon, attributing it to the fact that prediction market bets are made against experts and professional market makers, putting consumers at a distinct disadvantage.[59]

---

[55] News Release, NCPG Welcomes DraftKings as a Platinum Member, NCPG (Dec. 6, 2019), https://tinyurl.com/axnt7yyt.

[56] C. Brewer, *Gambling FanDuel, DraftKings abandon AGA trade group as rift over sports prediction markets grows*, CNBC (Nov. 18, 2025), https://tinyurl.com/yc4ja9rw.

[57] S. Reynolds, *Retail traders fare worse on prediction markets than sportsbooks*, CoinDesk (May 24, 2026), https://tinyurl.com/2s3jj8jk.

[58] *Id*.

[59] Q1 2026 Earnings Call, *supra* n.41.

64.    The false nomenclature used by Predictions further compounds the danger to consumers by disguising it. As Shane Kraus, director of the Behavioral Addictions Lab at the University of Nevada, Las Vegas, has explained: "If consumers hear 'trading' rather than 'betting,' some may perceive the activity as more legitimate or financially sophisticated, even though they are really still risking their money on uncertain outcomes."[60] Indeed, a recent study drawing on the transaction data of more than 180,000 households seems to confirm this, finding "[r]isky bets crowd out positive expected value investments," like buying a house or investing for retirement, and that "a sizable share of bettors . . . say[ing] they view [sports] betting as an investment strategy."[61] A separate study found that for every dollar wagered on sports, net investment in stocks and other financial instruments fell by just over two dollars, suggesting that consumers are frittering away money that could go toward building long-term wealth.[62]

65.    Regardless of the label ("betting" versus "trading"), it is all still gambling. Indeed, the NCPG, a "leading responsible gaming organization," according to DraftKings, has explained that buying and selling event contracts is functionally gambling (particularly when the contracts are tied to sports), and that the legal classification of prediction markets is irrelevant to whether they can cause a gambling problem. NCPG's former executive director has likewise stated that there are no meaningful psychological distinctions between sportsbooks and prediction markets where addiction risk is concerned. The NCPG therefore has urged prediction market operators to adopt the same core safeguards required of licensed sportsbooks.

66.    But as previously discussed, DraftKings has not adopted those safeguards and has even withdrawn its support from responsible gaming organizations like the NCPG. Indeed, when

---

[60] Regulators Just Cleared the Path, *supra* n.14.

[61] J. Angelo, *Sports betting takes a financial toll*, Semafor (Jul. 23, 2026), https://tinyurl.com/37dedzbr.

[62] *Id*.

Predictions launched in December 2025, DraftKings only carried over *some* of the anti-addiction tools from its licensed sportsbook: users can set deposit limits, take a cool-off period, and self-exclude but DraftKings does not provide gambling addiction hotline information, session time data, or the betting history visualizations available on the Sportsbook.

67.     The omissions are not oversights. Under the Commodity Exchange Act, the CFTC may not permit event contracts based on "gaming." An operator that implemented a full suite of gambling addiction tools would risk conceding that its product is gaming and therefore outside the CFTC's jurisdiction. DraftKings' legal position thus depends on withholding from consumers the very protection that may help them because a gaming classification would place its product outside the CFTC's jurisdiction and squarely within the state prohibitions it is evading.

68.     Consistent with that strategy, DraftKings avoids the words "gambling" and "gaming," describing customers on Predictions as "trading" rather than betting. It similarly made this change in its November 2025 shareholder letter referred to "responsible engagement" and "responsible trading" rather than responsible gaming. Of course, this is all for show, as DraftKings has already acknowledged that its customers for Predictions and Sportsbook are functionally equivalent, the only difference being whether the state has legalized online sports betting (or not).

> iii.     *The Professional Sports Leagues and the NCAA Treat Prediction Markets as Sports Betting and Bar Their Participants from Using Them.*

69.     Prediction markets operating as unregulated sportsbooks risk the integrity of sports. Importantly, professional sports leagues treat prediction markets as sports betting, not "trading," even though those same leagues have long permitted players to participate in traditional financial futures markets. For example, Major League Baseball ("MLB") sent a memo directly to its players

prohibiting engagement with baseball event contracts, framing participation as a violation of its long-standing sports betting policies.[63]

70.     The National Basketball Association ("NBA") similarly prohibits its players from engaging in sports betting on prediction markets. It has specifically raised concerns to regulators that prediction markets are not required to report suspicious trades to the leagues or cooperate with league-run investigations, warning that in the absence of such controls, leagues have little ability to monitor integrity risks.[64] The NBA has also advocated for the prohibition of bets involving player transactions, injuries, officiating and disciplinary decisions, as well as requiring prediction markets to consult professional sports leagues before introducing new sports contracts, share trading information with league investigators, and block athletes and other prohibited insiders from participating.[65]

71.     The National Football League ("NFL") has expressed similar concerns, stating that it views prediction markets the same way it views traditional sports betting, raising serious concerns about league integrity and compliance. According to the NFL, prediction markets are potentially more dangerous to league integrity and compliance because those markets are not subject to the same strict oversight as legalized sports betting.[66] Players and league personnel therefore are not allowed to use prediction markets to bet on sports.[67]

---

[63] *See* B. Davis, *MLB Sent Memo Warning Players About Prediction Markets*, Front Office Sports (Dec. 5, 2025), https://tinyurl.com/3w896c84.

[64] *See* D. Bernstein, *NBA Sends CFTC 'Integrity Risks' Letter With Scandals Still Fresh*, Sportico (May 2, 2025), https://tinyurl.com/yc7c87pm.

[65] *See* R. Maese, *The hottest market on Kalshi is one the NBA doesn't think should exist*, The Washington Post (July 23, 2026), https://tinyurl.com/5es6etat.

[66] *See* B. Horney, *NFL Warns Prediction Markets Are Sports Betting With Less Oversight*, Front Office Sports (Aug. 25, 2025), https://tinyurl.com/2s79mjt6.

[67]*Id*.

72.     Like the professional sports leagues, college sports are similarly opposed to prediction markets. NCAA President Charlie Baker has stated that "The NCAA vehemently opposes college sports prediction markets. It is already bad enough that student-athletes face harassment and abuse for lost bets on game performance, and now Kalshi wants to offer bets on their transfer decisions and status. This is absolutely unacceptable and would place even greater pressure on student-athletes while threatening competition integrity and recruiting processes."[68] Baker added, "Their decisions and future should not be gambled with, especially in an unregulated marketplace that does not follow any rules of legitimate sports betting operators."[69]

73.     That every major sports league and the NCAA independently concluded that prediction markets are sports betting, and have barred their own participants accordingly, confirms what DraftKings understands and tells its investors but obscures from the market when commercially convenient: these are not novel financial instruments; they are sports wagers. Yet the very integrity safeguards these leagues demand (*i.e.*, suspicious-activity reporting, insider restrictions, league oversight) are the same protections DraftKings denies its customers on the other side of these trades, leaving them exposed to the risks the leagues (and regulators) have taken pains to guard against.

      iv.     *Prediction Markets Are Demonstrably Vulnerable to Insider Trading and Manipulation, and DraftKings Has Done Nothing to Prevent It.*

74.     Market manipulation and insider betting are not hypothetical risks on prediction markets but documented features of them. In October 2025, Coinbase CEO Brian Armstrong closed an earnings call by reciting a list of words ("Bitcoin, Ethereum, blockchain, staking, and Web3") precisely because prediction markets had opened contracts on which words he would

---

[68] *See* D. Purdum, *Prediction market Kalshi self-certifies transfer portal trading*, ESPN (Dec. 17, 2025), https://tinyurl.com/5fpwf2d2.

[69] *Id*.

say.[70] Former Representative George Santos was investigated for wagering against his own attendance at a State of the Union address and then announcing his absence on social media to move the odds.[71] The CFTC investigated a presidential teleprompter operator who placed suspicious wagers on Kalshi based on statements President Trump had not yet made, netting more than $90,000 before the platform froze the funds.[72] A U.S. Special Forces soldier was arrested after earning over $400,000 trading on classified information about a covert operation in Venezuela.[73] Traders manipulated real-world streaming activity to push specific songs up the Spotify charts and cashed out their contracts before the fraud was detected.[74] Analytics platforms have even flagged roughly $200 million in Polymarket transactions bearing the signatures of insider trading and coordinated cluster-betting.[75]

75.    These incidents share a common structure, and it is the same structure DraftKings has imported into sports. In each case, a person with advance knowledge of an outcome (or the power to determine or influence it) converted that knowledge into profit at the expense of ordinary consumers. Sports contracts are more exposed to this abuse, not less. The universe of individuals who know an injury designation, a lineup decision, a rest day, or a coaching change before the public does is vast: players, trainers, medical staff, equipment personnel, agents, front-office

---

[70] *See* E. Nicolle & J. Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), https://tinyurl.com/3326bzk7.

[71] *See* D. Yaffe-Bellany & S. LaFranier, *U.S. Is Said to Be Investigating George Santos Over Kalshi Betting*, The New York Times (June 2, 2026), https://tinyurl.com/2xukmdfh.

[72] D. Mangan *et. al.*, *Trump suspends teleprompter operator over Kalshi bets allegations, White House says*, CNBC (July 16, 2026), https://tinyurl.com/2rcrdpy3.

[73] M. De Witte, *Prediction markets are surging – here's what you need to know*, Stanford Report (Apr. 28, 2026), https://tinyurl.com/mry93dah.

[74] B. Lipton & T. Odusola, *How Prediction Markets Are Shaping Real-World Events and Eroding Public Trust*, Roosevelt Institute (July 22, 2026) https://tinyurl.com/py269wka.

[75] Denis O., *Polymarket Sees $200M in Trades Flagged as Possible Insider Activity: Bloomberg*, Bitcoin Foundation (Jul. 21, 2026), https://tinyurl.com/5cs768br.

employees, and league officials, across thousands of games each season. DraftKings has implemented no safeguard that would keep such individuals out of the markets they can influence.

76. Furthermore, DraftKings does not merely host a marketplace; as alleged above, it takes the other side of consumer positions and sets the lines itself. Consumers thus face the worst of both arrangements. They are exposed to informed traders who possess material nonpublic information about the events on which they wager. And the operator quoting their prices profits on volume regardless of who wins, all while holding sophisticated positions of its own. CEO Robins has indirectly acknowledged this disadvantage, explaining that losses are worse for consumers in prediction markets because event contract markets place "experts" or market makers on one side of retail trade adverse to consumers, leaving operators to "protect the ecosystem as best as you can."[76] DraftKings has not done so.

*   *   *

77. In the Illegal Operation States, DraftKings makes unlawful gambling widely available to the public, exposing broad swaths of the population to the attendant risks even though these states (and citizens) have chosen to continue to prohibit online sports gambling specifically due to those risks. The harm is compounded because the population wagering on these unlawful contracts skews young, the sums at stake are substantial, and the deck is stacked against them as consumers face off against insiders, experts, and market makers. On top of that, DraftKings deceives those consumers into believing they are engaging in safe, regulated activity while withholding routine protection that would guard against the very harm it is creating.

---

[76] Q1 2026 Earnings Call, *supra* n.41.

## CLASS ALLEGATIONS

78.     Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(2), (b)(3), and (c)(5) Plaintiff brings this action on behalf of himself and a Multistate Class and California Class (collectively, "the Classes"), defined as follows:

> **Multistate Class: All persons in the Illegal Operation States who spent money wagering on sports on DraftKings Predictions.**
>
> **California Class: All persons in California who spent money wagering on sports on DraftKings Predictions.**

79.     The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80.     Plaintiff explicitly reserves his right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

81.     **Numerosity**: On information and belief, thousands of consumers fall into the definition of the Classes. Members of the Classes can be identified through Defendants' records, discovery, and other third-party sources.

82.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

a.    Whether Defendants have been unjustly enriched because of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Classes;

b.    Whether Defendants' conduct was illegal, unfair, deceptive, and/or misleading under applicable law;

c.    Whether Plaintiff and the Classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages; and

d.    Whether Plaintiff and each member of the Classes lost money or anything of value on DraftKings.

83.    **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendants' wrongful conduct.

84.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Classes, as Plaintiff and each member of the Classes bet on games of chance. Plaintiff also has no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Classes.

85.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be

difficult if not impossible for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

86.    The prerequisites to maintaining a class action for equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate equitable relief with respect to the Classes as a whole.

87.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Classes even where certain Class Members are not parties to such actions.

## CLAIMS FOR RELIEF

### COUNT I
### UNJUST ENRICHMENT
### (Multistate Class)

88.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

89.    Plaintiff and Class Members conferred benefit upon Defendants by paying Defendants to participate in their unlawful betting and wagering scheme.

90. Defendants appreciated or had knowledge of the benefits they received from Plaintiff and Class Members.

91. Plaintiff and Class Members reasonably understood that Defendant offered lawful consumer-to-consumer markets.

92. Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

93. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' benefits conferred.

94. Plaintiff and Class Members have no adequate remedy at law.

95. Defendants should be compelled to disgorge into a common fund (for the benefit of Plaintiff and Class Members) all unlawful or inequitable proceeds that they received because of their misconduct.

## COUNT II
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")
### (California Class)

96. Plaintiff repeats and re-alleges all allegations in the foregoing paragraphs 1 to 87 as if fully set herein.

97. Defendants and Plaintiff are "persons" within the meaning of the California UCL.

98. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

99. Defendants violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, inter alia, the following laws:

a)      California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*): Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Defendants have not applied for or obtained any state gambling license, and therefore, violates California's Gambling Control Act. As the California legislature reaffirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

b)      California Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . any banking or percentage game played with . . . any device, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330. A "banking game" refers to a situation where the "House" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants but is not directly involved in game play. *See id*. at 679. Defendants operate both illegal banking games when it trades as the House through its market makers and illegal percentage games when it takes fees on bets made by consumers.

c)      California Penal Code Section 337a, which prohibits additional conduct, including: i) "Pool selling or bookmaking, with or without writing, at any time or place." CAL. PENAL CODE § 337a(a)(1); ii) "[R]eceiv[ing], hold[ing], or forward[ing] . . . in any manner

- 32 -

whatsoever, any money . . . staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id*. at (a)(3). "[A]t any time or place, record[ing], or register[ing] any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id*. at (a)(4). Defendants act as a bookmaker and accept pooled bets on the results of sports events.

d)   California Penal Code § 337j(a)(2): Defendants violate Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Defendants directly receive compensation by taking a share of consumers' bets.

100.   DraftKings' operation of Predictions is also unlawful within the meaning of the UCL because DraftKings has violated the CLRA, as alleged below.

101.   DraftKings' operation of Predictions is also unlawful within the meaning of the UCL because DraftKings has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

102.   The acts and practices of DraftKings as alleged herein also constitute "unfair" business acts and practices under the UCL because DraftKings' conduct is unconscionable,

- 33 -

immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of DraftKings' conduct outweighs any conceivable benefit of such conduct

103. Defendants have, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing the operation of its gambling website is lawful in California, when it is not, and has further tricked consumers into believing they are not gambling against the House, causing Plaintiff and the Class to be tricked out of millions of dollars.

104. Plaintiff and the Class have suffered injury in fact as a result of DraftKings' conduct in the form of all amounts paid to DraftKings and/or the total of net losses on the sports prediction markets run by DraftKings as a result of DraftKings' unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

105. Plaintiff and the Class seek an order providing restitution and disgorgement in the form of all amounts paid to DraftKings by Plaintiff and the Class and/or the total of net losses on Predictions by Plaintiff and the Class.

106. Plaintiff and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

## **PRAYER FOR RELIEF**

107. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as representative of the Class, and appointing his counsel as class counsel;

b)      Declaring that Defendants' conduct violates the law and statutes referenced herein;

c)      Entering judgment against Defendants, in the amount of the losses suffered by Plaintiff and each member of the Classes;

d)      Enjoining Defendants from continuing the challenged conduct;

e)      Awarding damages to Plaintiff and the Class Members in an amount to be determined at trial;

f)      Awarding restitution to Plaintiff and Class Members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendants unjustly received;

g)      Awarding reasonable attorneys' fees and expenses;

h)      Awarding pre- and post-judgment interest, to the extent allowable;

i)      Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Classes; and

j)      Awarding such other and further relief as equity and justice requires.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 28, 2026

Respectfully submitted,

**BERMAN TABACCO**

By: */s/ Kathleen M. Donovan-Maher*
       Kathleen M. Donovan-Maher

Kathleen M. Donovan-Maher (BBO# 558947)
Steven J. Buttacavoli (BBO# 651440)
One Liberty Square
Boston, MA 02109
Tel: 617-542-8300
Email: *kdonovanmaher@bermantabacco.com*
      *sbuttacavoli@bermantabacco.com*

*Local Counsel for Proposed Lead Plaintiff
Chan and the Proposed Class*

**KAPLAN FOX & KILSHEIMER LLP**
Aaron Schwartz (*pro hac vice* forthcoming)
Clara Owens (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
Email: *aschwartz@kaplanfox.com*
      *cowens@kaplanfox.com*

Laurence D. King (*pro hac vice* forthcoming)
Sophia V. Pintar (*pro hac vice* forthcoming)
1999 Harrison Street, Suite 1501
Oakland, CA  94612
Telephone: 415-772-4700
Facsimile:  415-772-4707
Email: *lking@kaplanfox.com*
      *spintar@kaplanfox.com*

*Counsel for Proposed Lead Plaintiff Chan
and the Proposed Class*