**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL CHAN, JASON GORDON, ARIE WEISSMANN, JOHNNY HARRIS, MICHAEL GOLDSTEIN, and NIKIYA BING, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JASON D. ROBINS, DRAFTKINGS INC., GUS III LLC d/b/a DRAFTKINGS PREDICTIONS, and RAILBIRD EXCHANGE, LLC d/b/a DKeX<br><br>Defendants. | Case No. 1:26-cv-13442-DJC-PGL (Lead Case)<br><br>Consolidated with:<br>Case No. 1:26-cv-13525-WGY<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS |

Plaintiffs Michael Chan, Jason Gordon, Arie Weissmann, Johnny Harris, Michael Goldstein, and Nikiya Bing ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Jason D. Robins, DraftKings Inc., GUS III LLC d/b/a DraftKings Predictions, and Railbird Exchange, LLC d/b/a DKeX (DraftKings Inc., GUS III LLC, and DKeX together, "DraftKings," and with Mr. Robins, "Defendants"). Plaintiffs allege the following upon personal knowledge as to their own acts and experiences, and upon information and belief, as to all other matters.

## NATURE OF THE ACTION

1. This case is about DraftKings Predictions ("Predictions"), a prediction-market product that operates as an unlicensed sportsbook. DraftKings also runs a licensed online sportsbook, DraftKings Sportsbook ("Sportsbook"), in states that allow and license it. In states that ban online sports betting, or that have not licensed Sportsbook, DraftKings sells the same sports bets through Predictions, which it calls a "prediction market."

2. The wagers available to consumers in Predictions are the same in substance and risk as Sportsbook. They are sold through the same "super" app (hereinafter, "Super App" or the "App"), to the same customers, using the same infrastructure. DraftKings simply renames them "event contracts" and calls betting "trading."

3. Since *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), each State decides for itself whether to permit sports gambling. Fifteen States prohibit online sports betting. Others, including Florida and Rhode Island, permit it only through a single authorized or tribal operator, not DraftKings. However, beginning on December 19, 2025, DraftKings effectively overrode those choices by delivering sports gambling to residents of those States under the label of a "prediction market."

4. DraftKings knows its customers cannot tell the difference between Sportsbook and Predictions, and it profits from that confusion. Its Chief Executive Officer, Jason Robins, has told investors that "customers don't really even understand the difference" between betting on Sportsbook and betting on Predictions, and that this confusion is "actually a huge advantage."[1]

5. DraftKings deepened that confusion by pricing its "event contracts" in the same "American" odds format its Sportsbook uses, a format that even the CFTC's own staff has called the one "used by casino gambling bookmakers."[2]

6. DraftKings also withholds from Predictions customers the protections that state law requires of licensed sportsbooks. It lets 18-year-olds wager. It omits from the Predictions app

---

[1] DraftKings Inc., *DraftKings Q1 2026 Earnings Presentation*, at 3 (May 7, 2026) ("Q1 2026 Earnings Presentation"), https://shorturl.at/v1TE7; *Earnings Call Transcript: DraftKings Q4 2025 Beats EPS Forecast, Stock Drops*, Investing.com (Feb. 13, 2026) ("Q4 2025 Earnings Call"), https://shorturl.at/zdKKS.

[2] Letter from DJ Hennes, Dir., Mkt. Participants Div., & Acting Dir., Div. of Mkt. Oversight, U.S. Commodity Futures Trading Comm'n, to CFTC-Regulated Entities and Affiliates (Aug. 7, 2026) (the "CFTC Odds Letter"), https://tinyurl.com/mtmy36pv.

addiction hotline information, session time data, and betting-history tools that its licensed Sportsbook provides. It takes positions against its own customers through affiliated market makers, while telling consumers they are trading with one another in a neutral marketplace.

7. The scheme has been enormously profitable. On June 26, 2026, DraftKings reported approximately $3.4 billion in annualized consumer volume and approximately $11.3 billion in annualized total trading volume on Predictions.[3] An estimated 90 percent of its Predictions volume comes from sports, and nearly 70 percent of the sports volume comes from States where online sports betting is illegal.[4] DraftKings projects continued growth driven by the "growing adoption of new event contracts a[nd] features such as combinations, and heightened interest surrounding the World Cup."[5] It has also expanded Predictions' sports offerings to add MLB coverage and broader NBA, NHL, and international selections.[6]

8. By running an unlicensed online sportsbook in States that either ban online sports betting or have not licensed DraftKings to offer it, Defendants violate the federal and Florida RICO statutes, and DraftKings violates state gambling and consumer protection laws. DraftKings has also breached its contracts with its customers and unjustly enriched itself at the expense of hundreds of thousands of consumers. Further, independently of whether any wager was lawful, Defendants deceived consumers about who sat on the other side of their trades, about the margins

---

[3] Press Release, *DraftKings Launches Proprietary Exchange to Bolster Differentiated Predictions Experience*, DraftKings Inc. (June 26, 2026) ("Predictions Press Release"), https://tinyurl.com/yuttbbse; *What Is DKeX? Inside DraftKings' Move to Own Its Prediction Market*, BettingPros (June 29, 2026) ("What Is DKeX").

[4] *DraftKings (DKNG) Q3 2026 Earnings Call Transcript*, The Motley Fool (Nov. 6, 2026) ("Q3 2026 Earnings Call") (Mr. Robins acknowledges that Predictions "is already approaching 10% of our sports volume"), https://tinyurl.com/ah9syauk; Q1 2026 Earnings Presentation, *supra* n.1, at 8 ("[n]early 70% of Predictions Sports Consumer Volume[] Comes from States Without Sportsbook").

[5] Predictions Press Release, *supra* n.3.

[6] *Id*.

embedded in every price, and about the protections that would apply to them. Plaintiffs, on behalf of themselves and the Class, bring this action to recover those consumers' wagers and administrative fees paid, treble damages under RICO, and costs and attorneys' fees.

**PROCEDURAL HISTORY**

9. On July 28, 2026, Plaintiff Chan filed a class action complaint against Defendants in this Court, *Chan v. DraftKings Inc.*, Civil Action No. 1:26-cv-13442 (the "Chan Action").

10. On August 3, 2026, Plaintiffs Gordon, Weissmann, and Harris filed a related class action complaint against the same Defendants, *Gordon v. DraftKings Inc.*, Civil Action No. 1:26-cv-13525 (the "Gordon Action").

11. By Orders dated October 14, 2026, ECF Nos. 50-51, the Court consolidated the *Gordon* Action into the *Chan* Action under Civil Action No. 1:26-cv-13442, designated the *Chan* Action as the lead case, and directed Plaintiffs to file a consolidated complaint. This Consolidated Class Action Complaint supersedes the complaints filed in the *Chan* and the *Gordon* Actions.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Counts I and II arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), and 18 U.S.C. § 1964(c). The Court has supplemental jurisdiction over the state-law claims, including the Florida RICO claim, under 28 U.S.C. § 1367. The Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed Classes contain at least 100 members. At least one Class member is a citizen of a State different from any Defendant. The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Class members' losses total hundreds of millions of dollars.

13. This Court has personal jurisdiction over Defendants. Defendants DraftKings Inc. and GUS III LLC are headquartered in, and operate their businesses primarily from Boston, Massachusetts, and are at home in this District.

14. Defendant DKeX, although headquartered in New York, is a DraftKings subsidiary that is likely directed and controlled from Boston and appears to list and execute the very wagers that Defendants solicit and accept from Boston.

15. Mr. Robins works from DraftKings' Boston headquarters, is domiciled in Massachusetts, and, given his role and location, likely made or approved many of the decisions alleged in this Complaint from Boston.

16. The Court also has personal jurisdiction over each Defendant on the RICO counts under 18 U.S.C. § 1965(b). Because DraftKings' executive leadership, marketing, product, legal, and compliance functions are located in Boston, the conduct at issue was likely conceived, approved, and directed from Boston. Based on these facts, it appears likely that Defendants' personnel in Boston decided to launch Predictions in States where DraftKings could not obtain a sportsbook license; to market to existing Sportsbook customers; to describe wagers as "trading" and "event contracts"; to omit the responsible-gaming safeguards required of licensed operators; to set the fee structure and how fees are disclosed; and to withhold that DraftKings and its affiliates may take the other side of customer positions. The scheme was therefore likely designed in Massachusetts and disseminated nationwide from Massachusetts.

17. Defendants have also consented to jurisdiction and venue here. DraftKings drafted, and required every Predictions customer to accept, the DraftKings Predictions Terms of Use. The Terms of Use designate "the courts of competent jurisdiction sitting within Boston, Massachusetts" as the exclusive forum for "any and all disputes, claims, causes of action, or controversies arising

out of or relating to the Agreements, the breach thereof, your DraftKings Predictions Account, access to, or use of, the DraftKings Predictions App, or access to, or use of, the Services."[7] Customers "irrevocably waive any argument" that the Forum lacks personal jurisdiction or is not "appropriate or convenient."

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside here and a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District. Venue is also proper because Defendants designated this forum in their own Terms of Use.

## PARTIES

### A. Plaintiffs

19. **Plaintiff Michael Chan** is a natural person and a citizen of California. He signed up for Predictions in California through the DraftKings app in April 2026 and wagered on sports through Predictions. Before opening his account, he saw the app-store listing stating that DraftKings is "Live in All 50 States." He then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time he opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Mr. Chan that Predictions was an unlicensed sportsbook. He wagered and lost money on Predictions and paid transaction fees. Relying on these representations, Mr. Chan understood that he was using a lawful, regulated product in which he traded against other users. He did not know that DraftKings or its affiliates could take the other side of his positions. Had those facts been disclosed, he would not have opened an account, wagered on Predictions, or paid any fees.

[7] DraftKings Predictions Terms of Use (Aug. 4, 2026) ("Terms of Use"), https://tinyurl.com/5347wjp8.

20. **Plaintiff Jason Gordon** is a natural person and a citizen of Texas. He signed up for Predictions in Texas through the DraftKings app in or about December 2025 and wagered on sports through Predictions. Before opening his account, he saw the app-store listing stating that DraftKings is "Live in All 50 States." He then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time he opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Mr. Gordon that Predictions was an unlicensed sportsbook. He wagered and lost money on Predictions and paid transaction fees. Relying on these representations, Mr. Gordon understood that he was using a lawful, regulated product in which he traded against other users. He did not know that DraftKings or its affiliates could take the other side of his positions. Had those facts been disclosed, he would not have opened an account, wagered on Predictions, or paid any fees.

21. **Plaintiff Arie Weissmann** is a natural person and a citizen of Texas. He signed up for Predictions in Texas through the DraftKings app in or about January 2026 and wagered on sports through Predictions. Before opening his account, he saw the app-store listing stating that DraftKings is "Live in All 50 States." He then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time he opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Mr. Weissmann that Predictions was an unlicensed sportsbook. He wagered and lost money on Predictions and paid transaction fees. Relying on these representations, Mr. Weissmann understood that he was using a lawful, regulated product in which he traded against other users. He did not know that DraftKings or its affiliates could take the other side of his positions. Had those facts been disclosed, he would not have opened an account, wagered on Predictions, or paid any fees.

22. **Plaintiff Johnny Harris** is a natural person and a citizen of California. He signed up for Predictions in California through the DraftKings app in or about March 2026 and wagered on sports through Predictions. Before opening his account, he saw the app-store listing stating that DraftKings is "Live in All 50 States." He then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time he opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Mr. Harris that Predictions was an unlicensed sportsbook. He wagered and lost money on Predictions, and paid transaction fees. Relying on these representations, Mr. Harris understood that he was using a lawful, regulated product in which he traded against other users. He did not know that DraftKings or its affiliates could take the other side of his positions. Had those facts been disclosed, he would not have opened an account, wagered on Predictions, or paid any fees.

23. **Plaintiff Michael Goldstein** is a natural person and a citizen of California. He signed up for Predictions in California through the DraftKings app and wagered on sports through Predictions. Before opening his account, he saw the app-store listing stating that DraftKings is "Live in All 50 States." He then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time he opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Mr. Goldstein that Predictions was an unlicensed sportsbook. He wagered and lost money on Predictions and paid transaction fees. Relying on these representations, Mr. Goldstein understood that he was using a lawful, regulated product in which he traded against other users. He did not know that DraftKings or its affiliates could take the other side of his positions. Had those facts been disclosed, he would not have opened an account, wagered on Predictions, or paid any fees.

24. **Plaintiff Nikiya Bing** is a natural person and a citizen of Florida. She signed up for Predictions in Florida through the DraftKings app and wagered on sports through Predictions. Before opening her account, she saw the app-store listing stating that DraftKings is "Live in All 50 States." She then completed Defendants' standard sign-up flow, which linked to but did not display the Terms of Use. Each time she opened the app, it displayed the "Live in All 50 States" message. DraftKings did not tell Ms. Bing that Predictions was an unlicensed sportsbook. She wagered and lost money on Predictions, and paid transaction fees. Relying on these representations, Ms. Bing understood that she was using a lawful, regulated product in which she traded against other users. She did not know that DraftKings or its affiliates could take the other side of her positions. Had those facts been disclosed, she would not have opened an account, wagered on Predictions, or paid any fees.

25. To open their accounts, each Plaintiff was required to, and did, assent to the DraftKings Predictions Terms of Use, including their Massachusetts choice-of-law and Boston forum provisions. Each Plaintiff funded their account with their own money and lost that money to Defendants on the outcomes of sporting events.

26. Defendants, meanwhile, knew the legal status of Predictions in each State was contested. Defendants nonetheless told consumers that DraftKings was "Live in All 50 States," conveying that they could lawfully bet on sports wherever they were located, and presented Predictions as lawful "trading." Plaintiffs and Class members did not know the facts that made the transactions unlawful. Defendants made the same representation to the entire Class through uniform advertising, app-store listings, and standardized contracts.

**B. Defendants**

27. **Defendant DraftKings Inc.** is a Nevada corporation with its principal place of business at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116. Founded in 2012 as a daily fantasy sports provider, DraftKings is now a publicly traded company (Nasdaq: DKNG) offering online sports betting, online casino gaming, digital lottery courier services, and prediction markets.[8]

28. DraftKings regularly conducts substantial business in all 50 States, the District of Columbia, and Puerto Rico. DraftKings directs, controls, and profits from the Predictions business from its Boston headquarters, where its executive leadership, marketing, product, legal, and compliance functions are located.[9] DraftKings reported $6.1 billion in total revenue for fiscal year 2025.[10]

29. **Defendant Jason D. Robins** is a natural person and a co-founder, the Chief Executive Officer, and the Chairman of DraftKings Inc. He works from DraftKings' Boston headquarters. Through a dual-class share structure, he controls approximately 88 percent of DraftKings' voting power while holding a far smaller share of its equity. DraftKings' own annual report states that he "will be able to control matters submitted to [DraftKings'] stockholders for approval," including the election of directors and any major corporate transaction.[11] DraftKings also warns investors that Mr. Robins "may have interests that differ from yours."[12] The NFA lists him as a "Listed Principal" and "Indirect Owner" of GUS III LLC with a "10% or More Financial

---

[8] DraftKings Inc., Annual Report (Form 10-K) (Feb. 13, 2026), https://tinyurl.com/43mej5yv.

[9] DraftKings Inc., Proxy Statement (Schedule 14A) (Mar. 26, 2026), https://tinyurl.com/2bt8tpec.

[10] *Id.*

[11] Form 10-K, *supra* n.8, at 41.

[12] *Id.*

Interest."[13] Mr. Robins therefore holds a personal stake in Predictions that may be separate from the interests of DraftKings and its public stockholders.

30. Mr. Robins likely directed and approved much of the conduct at issue. His public statements indicate that he directed the decision to launch Predictions in December 2025 and chose to offer its sports bets only in States where DraftKings holds no sportsbook license. Given his control of DraftKings, he likely approved the October 21, 2025 acquisition of Railbird Technologies Inc. and Railbird Exchange, LLC, which were disclosed in an annual report that he signed.[14] He announced Predictions in a November 2025 investor letter issued in his own name.[15] He likely directed the launch of the Super App in June 2026. He has repeatedly described this strategy in public.[16] *See infra* ¶¶ 57–59.

31. **Defendant GUS III LLC d/b/a DraftKings Predictions** is a Nevada limited liability company and a wholly owned subsidiary of DraftKings Inc. It operates out of DraftKings' Boston headquarters. It is registered with the Commodity Futures Trading Commission ("CFTC") as an Introducing Broker and is a member of the National Futures Association ("NFA"). On July 14, 2026, the NFA approved it as a Futures Commission Merchant.

---

[13] *BASIC Profile for GUS III LLC,* NFA ID 0571907, Nat'l Futures Ass'n, https://tinyurl.com/updc3xcc.

[14] Form 10-K, *supra* n.8, at 61; *see also* Press Release, *DraftKings Acquires Railbird to Advance Future Growth in Prediction Markets*, DraftKings Inc. (Oct. 21, 2025), https://tinyurl.com/5426yt3w.

[15] DraftKings Inc., Q3 2025 Letter to Shareholders (Nov. 6, 2025) ("Q3 2025 Letter"), https://tinyurl.com/4vjxxmw2; Dustin Gouker, *News: DraftKings Says It Is Launching Sports Prediction Markets This Year*, The Closing Line (Nov. 6, 2025), https://perma.cc/738Y-GWEL.

[16] Global Gaming Expo, *Keynote - Inside the C-Suite: Gaming's Future in Focus on Stage*, YouTube (Oct. 9, 2025), at 47:14-:44, https://tinyurl.com/537vsx5d; J. Hyman, *Expect 'Big Things' This Fall: DraftKings CEO on Prediction Markets Growth*, Yahoo! Finance (Aug. 7, 2026), at 1:00-1:47, https://tinyurl.com/r2ppbss8.

32. GUS III LLC designs, prices, markets, and controls the customer-facing Predictions product. It sets the parameters of the markets its users may enter, receives transaction fees on every trade, and receives rebates and other considerations for routing customer orders.

33. GUS III LLC was formerly known as GUS III Inc. It also does business as "DraftKings Sports." The NFA's public record for GUS III LLC (NFA ID 0571907) lists Mr. Robins as a "Listed Principal" and "Indirect Owner" holding a "10% or More Financial Interest."

34. **Defendant Railbird Exchange, LLC d/b/a DKeX ("DKeX")** is a Nevada limited liability company headquartered at 880 3rd Ave, New York, NY 10022 that was acquired by DraftKings on October 21, 2025. This subsidiary operates the exchange on which the sports bets brokered by DraftKings Predictions are executed.

35. DraftKings Inc. also operates a dedicated market-making division that provides liquidity on DKeX and other exchanges, helping to ensure there is a counterparty to its users' bets. DraftKings CEO Jason Robins has called this in-house market making operation "one of our fastest to profitability business lines we've ever launched."[17]

## FACTUAL ALLEGATIONS

### A. States Hold the Power to Regulate Sports Gambling, and Fifteen Have Prohibited Online Sports Betting.

36. Gambling regulation is a core exercise of the States' police power to protect the health, safety, and welfare of their residents. Congress has long reinforced that state authority. *See, e.g.*, 18 U.S.C. § 1084 (wire transmission of sports wagers); 18 U.S.C. § 1952 (interstate facilities used for unlawful activity); 18 U.S.C. § 1953 (interstate transportation of wagering paraphernalia).

[17] DraftKings Inc., Q1 FY2026 Earnings Call Transcript, Yahoo! Finance (May 8, 2026), at 23:04, https://perma.cc/JW7U-7AL6.

37. The one exception was the Professional and Amateur Sports Protection Act ("PASPA"), enacted in 1992, which barred nearly every State from authorizing sports gambling. Testifying in favor of the bill were the commissioners of the National Football League, Major League Baseball, the National Basketball Association, and the National Hockey League.[18]

38. Congress enacted PASPA to protect the integrity of sports and to confront the risk of teenage gambling.[19] Preventing the societal ills that follow sports betting, addiction and financial ruin chief among them, was a central concern then, and it remains one now.[20]

39. In 2018, the Supreme Court struck down PASPA, holding that it violated the Tenth Amendment's anti-commandeering doctrine. *Murphy*, 584 U.S. at 453. Justice Alito, writing for the majority, emphasized: "It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* at 474.

40. The States then made their choices. Today, online sports gambling has been legalized (in some form) in 35 states plus the District of Columbia.[21] Where online sports betting is legal, operators must be licensed and must comply with consumer safeguards to limit the industry's long-documented susceptibility to fraud, addiction, financial ruin, and corruption.[22]

---

[18] J. Goodall, *Bringing Down the House: An Examination of the Law and Policy Underpinning the Professional and Amateur Sports Protection Act of 1992*, 67 Rutgers U. L. Rev. 1097, 1103 n.30 (2015).

[19] S. Rep. No. 102-248, at 5 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 3553, 3556.

[20] Congress believed the establishment of legal gambling would "initiat[e] a process that would inevitably cause a domino effect of moral erosion among the states," necessitating its intervention. Goodall, *supra* n.18, at 1106.

[21] Counting retail as well as online sports betting, sports gambling is allowed in some form in 40 jurisdictions (39 states and Washington D.C.) and prohibited in 11. *See U.S. Sports Betting: Where All 50 States Stand on Online Sports Betting Sites*, CBS Sports, https://tinyurl.com/bdzjfta3 (last visited Nov. 4, 2026). The figures in the text count only online sports betting. *See* Exhibit A.

[22] *Sports Wagering Licenses*, Massachusetts Gaming Commission, https://tinyurl.com/5yjpd8dd (last visited Nov. 4, 2026).

41. Sportsbook is available to consumers in 27 of the 35 legalized online sports gambling states, plus the District of Columbia.[23] In jurisdictions where Sportsbook is available, DraftKings complies with local laws and regulations, including those focused on consumer protection. Meanwhile, 15 states continue to prohibit online sports gambling, having concluded that no regulation is strong enough to contain its societal harms. DraftKings offers Predictions in 14 of those 15 states, plus in 3 states that allow limited online sports betting,[24] for a total of 17 states.[25] Additionally, in 6 states, DraftKings offers customers a "free-to-play" sports contest, as neither Sportsbook nor Predictions is available to customers in these jurisdictions.[26] Thus, between Sportsbook, Predictions, and its free-to-play product, DraftKings markets that it offers sports betting in all 50 states plus the District of Columbia.[27] A chart of DraftKings' product availability by State is attached as **Exhibit A**.

42. California is one of the States that has refused to legalize online sports betting, and its voters made that choice directly. In November 2022, Californians rejected Proposition 26 (in-person sports betting on tribal land) by 67 percent and Proposition 27 (online sports betting) by 82 percent, the largest margin of defeat in California ballot-proposition history. That defeat came after

---

[23] "Legalized" includes limited and not-yet-launched markets, as defined in Exhibit A.

[24] Of the states that have legalized online sportsbooks, 3 states (Delaware, Florida, and Rhode Island) allow online sports gambling but only permit a single operator that is not DraftKings. Another 2 states (Washington and Wisconsin) only allow tribal operators. Montana and Mississippi allow online sports betting only from the premises of state designated locations.

[25] Predictions sports betting was available in a total of 18 states through October 29, 2026, then 17 states following DraftKings sports predictions withdrawal of sports predictions from Utah. *See* Exhibit A.

[26] *See* Exhibit A. DraftKings "free-to-play" contests, also known as Pools, are risk-free games (*i.e.*, customers do not make any monetary wager) where users compete against other players by answering predictive questions or making prop picks without paying an entry fee. Winnings are typically awarded as cash prizes or site credits based on a leaderboard.

[27] *See* Exhibit A (last updated Nov. 4, 2026); *see also Where Is DraftKings Sports Available*?, DraftKings ("DraftKings Availability"), https://tinyurl.com/yc6rmvrt (last visited Nov. 4, 2026).

DraftKings and other online sportsbooks contributed $95 million in support of the measure, and after the industry spent $150 million on political ads.[28]

43. Nebraska voters similarly rejected online sports betting as recently as the November 2026 midterm elections. Nearly 55 percent voted against Initiative Measure 440, which would have amended the Nebraska constitution to allow online sports betting, and 54 percent voted against Initiative 441, which would have legalized it.[29] They did so even though, as the Financial Times reported, DraftKings and FanDuel each gave about $10 million to political groups backing the measures.[30]

44. The States that prohibit online sports betting have thus made a deliberate choice to keep it from their residents. DraftKings set out to reach those residents anyway.

**B. DraftKings Launches Predictions to Reach the States That Ban Its Sportsbook.**

45. DraftKings rose to prominence offering consumers daily fantasy sports. As states legalized online sports betting in the wake of *Murphy*, DraftKings expanded its offerings to include Sportsbook.

---

[28] G. Garcia-Roberts, *Inside the $400 Million Fight to Control California Sports Betting*, Wash. Post (Nov. 3, 2022), https://tinyurl.com/mrrvyccm.

[29] *Nebraska Initiative Measure 440 Election Results: Online Sports Wagering*, The New York Times (last updated Nov. 4, 2026 2:01 PM), https://tinyurl.com/yjxnsmjs; *Nebraska Initiative 441 Election Results: Online Sports Wagering Regulation*, The New York Times (last updated Nov. 4, 2026 2:04 PM), https://tinyurl.com/2r3j8h3j.

[30] Z. Folk, *Nebraska Appears to Reject Legalized Online Sports Betting*, Forbes (Nov. 4, 2026), https://tinyurl.com/7vr2xy6h; M. Taffe & S. Stacey, *Online Betting Companies Wager Big Money on US State Elections*, Financial Times (Nov. 2, 2026), https://tinyurl.com/4me85rjc.

46. Sportsbook has been highly successful. DraftKings controls about 34 percent of the U.S. online sportsbook market.[31] In the fourth quarter of 2025, it reported sports betting revenue of $1.3 billion, a 63 percent year-over-year increase.[32]

47. As a licensed operator, DraftKings has long acknowledged that sports wagering may be offered only where state law authorizes it and only by licensed operators.

48. In recent years, a new category of online sports betting platforms has emerged to circumvent the laws of states that ban sports wagers: "prediction markets." A "prediction market" sells "event contracts." But like a sports bet, sports event contracts pay out based on the outcome of a sporting event or an athlete's performance. And like a sports bet, a sports event contract pays only if the wagered-on result does (or does not) occur; if it does not, the contract expires worthless and the user loses the amount paid.

49. Kalshi pioneered this model, claiming that its sports "contracts" are federally regulated derivatives rather than sports bets. DraftKings copied it.

50. In December 2025, DraftKings launched Predictions. On June 12, 2026, it consolidated its casino, sportsbook, prediction market, and lottery products into a single Super App.[33]

51. On June 26, 2026, it launched DKeX, its own proprietary exchange, which it describes as CFTC-regulated, using technology and a license acquired from Railbird Technologies.[34]

---

[31] *US Sportsbook Market Share 2026*, SportBot AI (Mar. 11, 2026), https://shorturl.at/padQh.

[32] *DraftKings Finishes 2025 on High Note*, Yahoo! Finance (Feb. 12, 2026), https://shorturl.at/oLqHG.

[33] In June 2026, DraftKings consolidated its online casino, sportsbook, prediction markets, and lotteries into a single app, which it calls a "super app." *See DraftKings "Super App" Launches, Combining Casino, Sportsbook, Predictions and Lotteries*, SportsLine (June 12, 2026), https://tinyurl.com/e25pwbbj.

[34] What Is DKeX, *supra* n.3.

52. DraftKings now acts as product designer, market operator, order router, fee collector, and, through its affiliates, as a liquidity provider opposite its own customers.[35] Those are the functions of a sportsbook, which no operator may perform in a State that has not licensed its operation.

53. DraftKings first offered Predictions through an exchange partnership with the Chicago Mercantile Exchange Group ("CME").[36] CME's website lists DraftKings Predictions as a broker partner and urges consumers "to get in on the action."[37] In February 2026, DraftKings partnered with Crypto.com to expand its sports bets, adding player-specific NFL and NBA bets, soccer, and the Olympics.[38] DKeX's first certified "contracts" were all sports bets.[39] Trades are cleared through CME, Crypto.com, and Bitnomial Clearinghouse, LLC.[40]

54. Despite claiming consumers trade against other users, DraftKings trades against its own customers. Jeanine Hightower-Sellitto, Senior Vice President and General Manager of DraftKings Predictions, stated that DraftKings would launch "a dedicated market making

---

[35] *See* DraftKings Inc., *Q2 2026 Earnings Call Transcript* (Aug. 7, 2026) ("Q2 2026 Earnings Call"), https://tinyurl.com/4xkatv9c (CEO Jason Robins: "We own three key layers of the predictions stack in-house: the brokerage, the exchange, and the market maker."); *CFTC Eyes Prediction-Market Conflicts of Interest: Key Points*, Sportico (2026), https://tinyurl.com/mr3se92u (last visited Nov. 4, 2026).

[36] *See* Press Release, *DraftKings Debuts Predictions App*, DraftKings Inc. (Dec. 19, 2025), https://tinyurl.com/bdhhjw42; *DraftKings Predictions: Which Exchange Is Behind These Futures Bets*?, Sportico (Dec. 19, 2025), https://tinyurl.com/34fjyk5x.

[37] *Event Contract Detail – Prediction Markets*, CME Grp., https://tinyurl.com/38e9a4ct (last visited Nov. 4, 2026).

[38] Press Release, *DraftKings Expands Prediction Markets Catalog in Deal with Crypto.com*, DraftKings Inc. (Feb. 6, 2026) ("DraftKings Crypto Deal"), https://tinyurl.com/yx7w896p; *see also* T. Nightingale, *DraftKings Now Offers Player Prop-Style Contracts from Crypto.com*, SBC Ams. (Feb. 9, 2026), https://tinyurl.com/38w2vasx.

[39] D. O'Boyle, *DraftKings Self-Certifies First Contracts for In-House Predictions Exchange — and Reveals Its New Name*, InGame (May 26, 2026), https://tinyurl.com/42ab6c8a.

[40] DraftKings Crypto Deal, *supra* n.38; *see also* ProphetX LLC, Certification Pursuant to CFTC Regulation 40.2(a): "Will DKeX's Event Contract Notional Traded Volume Exceed $4 Billion in November 2026?" Event Contract, at 3 (Oct. 5, 2026), https://tinyurl.com/59fszr6w.

division."[41] Mr. Robins has stated that DraftKings owns "three key layers of the predictions stack in-house: the brokerage, the exchange, and the market maker," making it "the only operator that has all three up and running today."[42] He has called this business "one of [DraftKings'] fastest to profitability business lines we've ever launched."[43] DraftKings' first-quarter 2026 earnings release, filed with the SEC, stated: "With our Super App, market making capabilities, proprietary exchange, and combos coming together, we intend to establish a leadership position in Sports Predictions before year-end."[44] On the second-quarter 2026 earnings call, he reported that DraftKings is "live on three exchanges and consistently making markets on both singles and Combos at a profit," with "double-digit share in the markets where we participate."[45] He added that as DKeX grows, "it will create more opportunities for our market maker."[46]

55. Predictions is a joint operation. Mr. Robins directed its launch, chose the States where it would offer sports bets, and set its strategy. DraftKings runs the product through two subsidiaries. GUS III LLC is the customer-facing broker. It designs, prices, and markets the product, sets market parameters, collects transaction fees, and receives rebates for routing orders. DKeX is the exchange. DKeX self-certified sports-only bets and lists and executes customer wagers. DraftKings' market-making division, purportedly overseen by Ms. Hightower-Sellitto, takes the other side of customer wagers. CME, Crypto.com, and Bitnomial Clearinghouse, LLC list, execute, and clear the bets. Each plays a necessary part in every wager. Together they have

---

[41] D. Gouker, *The Early Line: DraftKings Is Moving to a 'Super App' That Includes Prediction Market*s, The Closing Line (Mar. 2, 2026), https://tinyurl.com/47r8647m.

[42] Q2 2026 Earnings Call, *supra* n.35.

[43] DraftKings Inc., Q1 2026 Earnings Call Transcript (May 8, 2026), The Motley Fool (June 1, 2026) ("Q1 2026 Earnings Call"), https://tinyurl.com/ksfv9smj.

[44] DraftKings Inc., Current Report (Form 8-K), Ex. 99.1 (May 7, 2026), https://tinyurl.com/w4rezya7.

[45] Q2 2026 Earnings Call, *supra* n.35.

[46] *Id*.

run Predictions every day since it launched on December 19, 2025. Defendants collect a fee on every trade. By October 2026, DraftKings reported $10.1 billion in annualized consumer volume, or more than $27 million per day. *See infra* ¶ 62.

56. Every Predictions wager travels over interstate wires. A customer in California, Texas, or Florida places the wager through the App. Defendants route the order from Boston-controlled systems to DKeX in New York or to other exchanges, match it, and settle it through clearinghouses outside the customer's State. Defendants know that each transmission carries a wager on a sporting event. They design and certify the markets as sports bets on game outcomes, spreads, totals, player performance, and combos. Mr. Robins has described these "contracts" as very similar to sportsbook bets.[47] *See infra* ¶ 76. Defendants also know where every customer is. They geolocate each customer before accepting a wager. They route each customer, by location, to Sportsbook or to Predictions. They make sports bets available only in States where DraftKings holds no sportsbook license, and they withhold them in States where it does.

57. DraftKings has been candid with investors about why. "[P]redictions, especially in Sports, is a strategic priority for DraftKings."[48] Mr. Robins explained that DraftKings sees little "financial opportunity in places where we already have online sports betting. So why go there when it's just going to upset regulators that we have great relationships with?"[49] DraftKings views Predictions as "a massive, incremental opportunity" to acquire "millions of customers."[50]

---

[47] *DraftKings CEO on Prediction Markets: Some Companies Are Spinning Narratives That Just Aren't True*, CNBC: Squawk Box (Aug. 7, 2026, 8:29 AM EDT), at 02:43-03:45, https://tinyurl.com/y72c5tan.

[48] DraftKings Inc., *Q1 2026 Letter to Shareholders* (May 7, 2026) ("Q1 2026 Letter"), https://tinyurl.com/3bmkxjw4 (last visited Nov. 4, 2026).

[49] *Jason Robins: Prediction Markets Are a Gamble, iCasino on Upswing, and More*, InGame (Nov. 7, 2025) ("Prediction Markets Are a Gamble"), https://tinyurl.com/5n6ej6w8.

[50] K. Hamilton, *DraftKings Shares Lofty Prediction Markets Goals in 2026 Outlook*, Wall St. J. (Feb. 13, 2026), https://tinyurl.com/2j7bsbju.

58. Mr. Robins has repeated this strategy many times. In September 2025, he said the prediction-market opportunity "is likely to be very significant in states that do not have legal online sports betting" and "fairly small in states that do."[51] In October 2025, he said prediction markets let companies "access . . . customers in the roughly half of the U.S. that does not have a legal sports betting product . . . ."[52] In a November 2025 investor letter, he wrote that Predictions might "motivate more states to legalize online sports betting," adding: "We will pursue this opportunity, we will compete, and we will win."[53]

59. The strategy has largely worked. On DraftKings' second-quarter 2026 earnings call, Mr. Robins reported "massive new customer acquisition in states without regulated Sportsbook."[54] In August 2026, he predicted "millions of new predictions customers . . . because we're offering our sports predictions product only in the states that we don't have legal sports betting."[55] In September 2026, he named Florida as one of the States "where we are seeing our Predictions growth."[56] And in November 2026, Mr. Robins confirmed the Company's strong growth, noting it is now the third largest prediction market by consumer volume, with annualized total volume of $56.8 billion.[57]

[51] D. Gouker, *Everything DraftKings' CEO Just Said About Prediction Markets*, The Event Horizon (Sept. 8, 2025), https://perma.cc/T3ER-DUAD.

[52] Global Gaming Expo, *supra* n.16, at 47:14-:44.

[53] D. Gouker, *News: DraftKings Says It Is Launching Sports Prediction Markets This Year*, *supra* n.15.

[54] Q2 2026 Earnings Call, *supra* n.35.

[55] Hyman, *supra* n.16, at 1:00-1:47.

[56] DraftKings Inc. Presents at Wells Fargo 9th Annual Consumer Conference Transcript, Seeking Alpha (Sept. 22, 2026), https://tinyurl.com/ynbxf3ez.

[57] Q3 2026 Earnings Call, *supra* n.4.

60. DraftKings expects 95 percent of the U.S. population to have access to its offerings by the end of 2026.[58] On the third-quarter 2026 earnings call, Mr. Robins explained that "the spend that we incrementally did in predictions was local spend" in the States where it offers sports predictions, aimed at "an audience that is very much our brand and our core audience."[59] He said that when DraftKings launched Predictions, "I was thinking we have to defend our turf and win this market on sports."[60]

61. Part of the reason DraftKings did not have to defend its turf was because DraftKings designed Predictions as an extension of Sportsbook, inside the same Super App. It brings to Predictions an "intuitive customer experience, content packaging, and promotional mechanics," and runs "exactly the same playbook that we executed in the other verticals."[61] It moves customers automatically between bets and "contracts" according to their location and the purported legality of each offering, through what it calls a "cross-sell engine."[62]




62. More than 1.6 million customers have engaged with Predictions as of November 2026.[63] By October 2026, annualized consumer volume had reached $10.1 billion, and annualized

[58] Q1 2026 Earnings Presentation, *supra* n.1.

[59] Q3 2026 Earnings Call, *supra* n.4.

[60] *Id.*

[61] Q2 2026 Earnings Call, *supra* n.35.

[62] *Id.*

[63] DraftKings Inc., *DraftKings Reports Third Quarter Revenue Growth of 16%*, Press Release (Nov. 5, 2026) (figure includes both sports and non-sports customers), https://tinyurl.com/yj7drzbf. Non-sports markets, however, account for only about 10 percent of Predictions' volume. Q3 2026 Earnings Call, *supra* n.4.

total volume traded had reached $56.8 billion.[64] DraftKings now projects $650 million to $750 million in Predictions revenue for fiscal year 2027.[65] For 2026, it expects "new customer promotions" to "offset the lion's share" of Predictions gross revenue.[66]

**C. Predictions Is an Unlicensed Sportsbook.**

63. By DraftKings' own account, Predictions and Sportsbook are the same business. "[T]hey serve the same customers in the same live moments and leverage shared underlying infrastructure."[67] DraftKings now reports a single combined "Sports" revenue figure covering both products.[68] It likewise reports a single "Sports Consumer Volume" metric, defined as "the total amount of settled customer wagers or trades on our Sportsbook and Prediction Markets offerings."[69] DraftKings reports that retention and engagement of new Predictions customers are "in line with that of Sportsbook customers," and that Predictions' growth "has followed the same playbook that made our Sportsbook offering number one in the industry."[70]

64. Mr. Robins has said the products are "so similar" that DraftKings sees little cannibalization between them, and that prediction customers "look a lot like our existing customers," except that they "tend to be Californians and Texans."[71] "If you look at kind of who these customers are demographically, what their spend patterns are, what sports, it's actually quite

---

[64] DraftKings Inc., *Third Quarter 2026 Business Update* (Nov. 5, 2026) ("Q3 2026 Business Update"), https://tinyurl.com/3jdyj447.

[65] *Id.*

[66] Q3 2026 Business Update, *supra* n.64 ("Fiscal Year 2026 and 2027 Guidance" section).

[67] Q1 2026 Letter, *supra* n.48.

[68] *Id.*

[69] DraftKings Inc., *DraftKings Reports Second Quarter Results*, Current Report (Form 8-K), Exhibit 99.1 (Aug. 6, 2026) ("August Form 8-K"), https://tinyurl.com/58jczf46.

[70] Q3 2026 Business Update, *supra* n.64.

[71] Q4 2025 Earnings Call, *supra* n.1.

similar."[72] On the second-quarter 2026 earnings call, he reiterated this point, stating that in States without legal sportsbooks, "like California and Texas, we are seeing a very similar customer profile to who we get on [online sportsbook]," and that early "volume per customer and month-over-month retention is similar to a sportsbook customer, which is what we expected."[73] He said the same in DraftKings' SEC-filed earnings release: "The similarity of Predictions customer metrics to Sportsbook customer metrics, our advantaged LTV position, and our playbook to innovate on a leading Predictions offering all underpin our confidence that we can win the category this NFL season and beyond."[74]

65. The user experience is the same. Predictions presents matchups with the same layout, terminology, and mechanics as a sportsbook: spreads, totals, underdogs, trade slips, and payout odds.




[72] Q1 2026 Earnings Call, *supra* n.43.

[73] Q2 2026 Earnings Call, *supra* n.35.

[74] August Form 8-K, *supra* n.69.

66. For example, one market presents a Dallas Mavericks–Toronto Raptors game with the option "Mavericks Win by 8.5 points or more," alongside payout odds and binary "Yes" or "No" selections.




67. DraftKings built the Super App to remove any visible difference between Predictions and Sportsbook. Mr. Robins explained that Predictions as a standalone app was "confusing for customers," because the Sportsbook & Casino app came up first in app-store searches.[75] DraftKings told the Wall Street Journal that the Super App's purpose is to "make the look and feel of the platform a mirror of its sports-betting operations."[76] The Sports tab in an unlicensed State is nearly identical to DraftKings' licensed sportsbook in New Jersey, for example. DraftKings uses the same AI and machine-learning systems that set Sportsbook probabilities to

[75] *DraftKings CEO on Launch of New Super App, Prediction Markets and More* (Mar. 2, 2026), https://tinyurl.com/mu5s9xdh; *DraftKings' Robins Says New 'Super App' Needed to Cut Customer Confusion*, Sports Bus. J. (Mar. 3, 2026), https://tinyurl.com/57z67p6c.

[76] K. Hamilton, *DraftKings Is Using Its Sports-Betting Playbook to Win Prediction Markets Race*, Wall St. J. (Mar. 3, 2026), https://tinyurl.com/3fnz4mfz.

power Predictions.[77] From launch until the present, Predictions displayed prices by default in American odds, the format used by licensed sportsbooks.[78] DraftKings' own Help Center tells customers that American, decimal, and fractional odds "are the same," just "different odds formats."[79]

68. The bets are the same. On both products, consumers can wager on game outcomes, margins of victory, aggregate scoring, individual player propositions, futures, and in-game outcomes as they unfold. Predictions offers "combo" bets, which are parlays under another name. More than 30 percent of Predictions bets are combos,[80] which likely win only about 3.1 percent of the time.[81] By DraftKings' own account, more than half of Predictions customers have placed combos, and combos approach 20 percent of Predictions consumer volume.[82]

69. The economics are the same. In a sportsbook, the House sets the line, takes the other side, and charges a fee, or "vig," on each wager. On Predictions, DraftKings prices each bet with a margin built into both sides. When there are not enough users on one side, DraftKings or its affiliated market makers take the other side. DraftKings charges a tiered flat-rate transaction fee on every bet bought or sold, the functional equivalent of the vig.

---

[77] M. Breen, *DraftKings Unveils 'Super App' Plans to Capture $10B Prediction Market Opportunity*, DeFi Rate (Mar. 2026), https://tinyurl.com/4nv3a2ue (last visited Nov. 4, 2026).

[78] *CFTC Makes a Notable Move on Prediction Markets*, Sports Bus. J. (Aug. 21, 2026), https://tinyurl.com/ym46w399; *see also* B. King, *DraftKings' Fall Theme? A Season of Customer Acquisition*, Sports Bus. J. (Sept. 11, 2026), https://tinyurl.com/mr46v64s.

[79] *Understanding Odds*, DraftKings Help Ctr., https://tinyurl.com/msk53fzc (last visited Nov. 4, 2026).

[80] Predictions Press Release, *supra* n.3.

[81] E. Giambalvo et al., *Americans Can't Stop Betting Parlays. Sportsbooks Are Cashing In*, Wash. Post (Oct. 9, 2025), https://tinyurl.com/5t2p5zeb; *see also* J. Lee & C. Silverman, *Parlay Bets Are Burning Gamblers as Market Booms on Kalshi*, Bloomberg (July 28, 2026), https://shorturl.at/OTseu.

[82] Q2 2026 Earnings Call, *supra* n.35.

70. The "Yes" and "No" prices on a bet are set independently and need not sum to $1.00. Each contract pays $1.00 if it wins and nothing if it loses. In a fair market, the two prices would add up to exactly $1.00. On Predictions, they typically add up to more. For example, if "Yes" costs 55 cents and "No" costs 50 cents, the two sides together cost $1.05, but only one side can win, and the winner collects only $1.00. The extra 5 cents is a margin built into the prices, just like the vig a sportsbook builds into its odds. Moreover, a customer who takes "Yes" and a customer who takes "No" are usually not betting against each other. Each is typically betting against a market maker, which profits from the spread between the two prices whatever the outcome. Fees are charged at each layer: the broker, the exchange, and the clearinghouse each take a fee, and the fees rise with the size of the bet. These "maker and taker fees" are a "substantial and growing portion of [DraftKings'] Predictions gross revenue . . . [a] high-gross margin revenue stream."[83]

71. Mr. Robins has explained that owning the broker, the exchange, and the market maker lets DraftKings "capture economics across the entire value chain" and "capture LTV from those exchange fees ourselves."[84] On DraftKings' own screen, a $5 order on a bet priced at 45 cents buys only 10 bets, at a cost of $4.50, plus "$0.20 in fees." Because fees are charged on every bet bought or sold, and because the margin is built into both sides of every price, a customer whose predictions are exactly as accurate as the prices he pays imply will steadily lose money.

72. DraftKings has told investors that Predictions will carry "structurally higher margins" than its traditional sportsbook, 10 to 30 percentage points higher, because "prediction

[83] Q3 2026 Business Update, *supra* n.64.

[84] *Id.*

markets aren't subject to state taxes."[85] Mr. Robins has said that tax avoidance is the "main thing" behind those margins.[86] That statement indicates that DraftKings collects about the same vig on both products, it just keeps more on Predictions because it pays no state tax. DraftKings' own figures are consistent with that inference. In the third quarter of 2026, its "Sportsbook hold rate eclipsed 11%," while it reported a take rate of "approximately 11.1%" on DKeX trades in September and October.[87]

73. For combo bets, DraftKings and its market makers control the odds. When a consumer requests a combo, market makers (including DraftKings) quote a line within milliseconds through an anonymous back-end bidding system that only DraftKings can access.[88] An ordinary user cannot take the other side. Doing so requires approved access to that back-end system, working knowledge of DraftKings' API, and software that can quote prices in a split second.

74. Predictions also exploits information asymmetry. Market makers, including DraftKings, use dedicated research teams, proprietary models, and can draw data from

---

[85] *DraftKings CEO on Launch of New Super App, Prediction Markets and More*, *supra* n.75.

[86] Hamilton, *supra* n.76; *DraftKings CEO on Launch of New Super App, Prediction Markets and More*, *supra* n.75; *see also* DraftKings Inc., Investor Day 2026 Presentation, at 24 (Mar. 2, 2026) ("Investor Day Presentation"), https://tinyurl.com/2uvf6bs2.

[87] Q3 2026 Business Update, *supra* n.64.

[88] Q2 2026 Earnings Call, *supra* n.35; *see also What are Predictions Combos? US*, DraftKings Help Center (last visited Nov. 4, 2026), https://tinyurl.com/3fpn3ae3.

Sportsbook.[89] They also receive reduced or zero fees, different position limits, and operational benefits through their integration with the exchange.[90]

75. DraftKings expects to be "the best [market maker], given [its] modeling capabilities."[91] It says its market maker leverages its "industry-leading sportsbook modeling and risk management capabilities."[92] Mr. Robins has acknowledged that consumers fare worse on prediction markets because "experts" and professional market makers sit on the other side of retail trades.[93] DraftKings estimates that 80 to 90 percent of prediction-market volume in sportsbook States comes from "professional betting syndicates and institutional traders."[94] He has also called it "irresponsibly" misleading for prediction-market operators to claim their product differs from an online sportsbook, because "most of the money is being put up, most liquidity is being put up by professional market makers, institutions, things like that."[95]

76. In an August 7, 2026 CNBC interview, Mr. Robins said "it's completely a myth" that prediction markets are "different from a sportsbook": "There's . . . market makers, Wall Street traders and institutional people that are making these bets that the customers are playing against.

---

[89] *See* Investor Day Presentation, *supra* n.86, at 20; *see also* C. Vasilev, *Citizens: Railbird, Market Making Key to DraftKings Growth*, Gambling Insider (June 23, 2026), https://tinyurl.com/4by6fm8e (reporting Citizens analysts' view that "sports betting operators . . . already possess pricing expertise, trading infrastructure, and proprietary models developed through years of sportsbook operations").

[90] *See* Railbird Exch., LLC d/b/a DKeX, Rulebook r. 4.3 (Sept. 2, 2026) (Market Maker benefits), https://tinyurl.com/3eubxmcc; *see also id*. r. 4.5 (Market Maker position accountability levels).

[91] B. Horney, *DraftKings, FanDuel Push Further Into Prediction Markets*, Yahoo! Finance (May 8, 2026), https://tinyurl.com/4yxm494r.

[92] Q2 2026 Earnings Call, *supra* n.35.

[93] Q1 2026 Earnings Call, *supra* n.43.

[94] Q2 2026 Earnings Call, *supra* n.35.

[95] Q1 2026 Earnings Call, *supra* n.43; D. O'Boyle, *DraftKings CEO: Some Operators 'Irresponsibly' Overstating Difference Between Predictions and Sportsbook*, InGame (May 8, 2026), https://perma.cc/W278-TPDD.

It's really no different in that regard from a sportsbook."[96] He called sports prediction markets "an entertainment thing."[97] Gross profit margins for market making approach 95 percent, while the takers who bet on sports rarely profit.[98] Exchanges reward market makers with rebates and incentives. Indeed, DKeX runs its own market-maker incentive program, allowing market makers to hold positions up to ten times larger than ordinary users.[99]

77. DraftKings tells consumers the opposite. In a Covers Q&A published on December 19, 2025, Jeanine Hightower-Sellitto, Senior Vice President and General Manager of DraftKings Predictions, said that "there's not a house for these products" and that their "market mechanics . . . wholly differ from a sportsbook."[100] At launch, she told CBS News that users originate the trades while DraftKings acts as a broker: "We're handling that order and it's getting sent to an exchange for it to be executed."[101]

78. DraftKings' sponsored promotions carry the same message to consumers. A FOX Sports promotion for DraftKings Predictions, updated August 10, 2026 and running DraftKings' offer terms marked "Sponsored by DK," tells consumers that "[p]articipants trade with one another

---

[96] *DraftKings CEO on Prediction Markets, supra* n.47, at 02:43-03:45.

[97] *Id.* at 03:27.

[98] M. Rybaltowski, *DraftKings Is Bullish on New Exchange, but Questions Remain on Fee Generation*, iGaming Bus. (June 30, 2026), https://tinyurl.com/44az62bu (reporting Citizens analyst Jordan Bender's view that market-making has "gross margins approaching 95%").

[99] *See* Railbird Exch., LLC d/b/a DKeX, Rulebook, *supra* n.90, r. 4.5 (noting market makers are permitted to have accountability levels of 10 times the position of non-market makers).

[100] R. Butler, *Q&A: DraftKings Predictions SVP Talks Launch, Future Plans*, Covers (Dec. 19, 2025), https://tinyurl.com/3442v53e.

[101] M. Cunningham, *DraftKings Hopes to Score Big with New Prediction Market App*, CBS News (Dec. 19, 2025), https://tinyurl.com/4m4sxy55.

on the exchange, not against the operator," and that "DraftKings earns a per-contract fee that is built into trade pricing and charged on each side."[102]

79. That statement appears to be inaccurate. As a market maker, DraftKings holds positions and has a preferred outcome. It also earns more when consumers buy the popular side of a bet. Mr. Robins has said DraftKings plans "to shift the volume that we have, in sports at least, to our platform."[103]

80. Defendants' own Terms of Use confirm the point. In a "Market-Makers" section buried more than a dozen pages into a thirty-five-page document, they disclose that market makers may "enter Commodity Transactions against or on the other side of your Commodity Transactions," may "hold long or short positions in the same Commodity Transactions you engage in," may "have economic interests that are adverse to yours," and that "affiliates of DraftKings Predictions may act as a Market Maker."[104] DraftKings further discloses that Predictions "may be in possession of information that, in the event known to you, might cause you to seek to dispose of or retain or increase your position," and that it "will be under no duty to make any such information available to you."[105]

81. Defendants therefore profit from every transaction regardless of outcome. In addition to transaction fees, they receive "discounts, rebates, payments, or other consideration" in connection with customer transactions, which they may retain "without disclosing the amount

[102] *DraftKings Predictions Promo Code: New DraftKings Customers Trade $5, Get $150 in Predictions Dollars*, FOX Sports (updated Aug. 10, 2026), https://tinyurl.com/3m3usz4z.

[103] N. Omoigui, *DraftKings CEO: In-House Predictions Push the "Same Story" as OSB Playbook*, EGR (Oct. 8, 2026), https://tinyurl.com/3ekc92xr; *DraftKings Maintains 2026 Guidance of $6.5B–$6.9B Revenue and $700M–$900M Adjusted EBITDA*, Seeking Alpha (Aug. 7, 2026), https://tinyurl.com/297px569.

[104] Terms of Use, *supra* n.7.

[105] *Id.*

received."[106] They acknowledge that providing customers access to the relevant exchanges "may constitute the principal means for DraftKings Predictions to generate revenue."[107] DraftKings' annual report confirms that, as an introducing broker, some of its Predictions "revenue is generated from introducing fees" paid by futures commission merchants.[108] They acknowledge "financial and other inducements to persuade you to trade."[109]

82. DraftKings recently quantified the take, characterizing it to investors as "[a] substantial and growing portion of our Predictions gross revenue."[110] Specifically, trades on DKeX carry an "11.1% take rate" on consumer volume across all participants, and DraftKings captures 65.6 percent of that gross revenue, or 7.3 percent of consumer volume. That share encompasses exchange taker and maker fees, broker taker fees, and its own market maker's "[t]rading spreads and returns."[111]

83. Defendants also conceal the true cost of each wager. They display headline odds and payouts in sportsbook format, while the transaction fees that reduce a consumer's return are disclosed only "in the DraftKings Predictions App at the point of placement and with the Commodity Transaction confirmation."[112]

84. Defendants' pricing display compounded the deception. Defendants do not display the price of a sports bet as what it is: a dollar amount between $0.01 and $0.99 for a bet that settles at $1.00 or $0.00. Instead, they convert each price into "American" or "moneyline" odds, the plus-

---

[106] *Id.*

[107] *Id.*

[108] Form 10-K, *supra* n.8, at 4.

[109] Terms of Use, *supra* n.7.

[110] Q3 2026 Business Update, *supra* n.64.

[111] *Id.*

[112] Terms of Use, *supra* n.7.

and-minus format (for example, "+150" or "−200") that DraftKings' licensed Sportsbook and other casino bookmakers use.

85. The difference is material. In a genuine market, the price of a binary contract is the market's implied probability of the outcome. A "Yes" contract trading at 40 cents implies a 40 percent probability, and a contract trading at 62 cents implies a 62 percent probability. American odds invert that information. They state only the hypothetical profit on a $100 stake, or the stake required to win $100, so the same 40-cent contract appears as "+150" and the same 62-cent contract appears as "−163." A consumer viewing "+150" is shown a potential payout, not the market's probability of the outcome, the per-contract price, or the margin built into "Yes" and "No" prices that, as alleged above, need not sum to $1.00. *See supra* ¶¶ 69-70.

86. The American odds format thus shows what Predictions is: a bookmaker's line. It also conceals the price, probability, and spread that Defendants claim set their product apart from a sportsbook wager.

87. Even the CFTC's own staff has recognized that Defendants' pricing display is the format of casino gambling bookmakers. On August 7, 2026, the CFTC's Division of Market Oversight and Market Participants Division released a joint staff letter addressed to "CFTC-Regulated Entities and Affiliates" on the subject of "Misleading or Deceptive Practices."[113] Commission staff stated that it was "concerned by reports of potential violations" by entities involved in event contracts, "including that some CFTC-regulated products are being marketed not in nominal or percentage terms that reflect market pricing, but in the 'American odds' format used by casino gambling bookmakers, in contravention of these rules."[114]

[113] CFTC Odds Letter, *supra* n.2.

[114] *Id*. at 1.

88. The CFTC Odds Letter drew the same line Plaintiffs draw. It explained that the price of a genuine exchange-traded contract is "determined through a process of competitive bidding amongst market participants," and that "in most cases, order books show real-time customer bid and ask prices."[115] Staff concluded that bookmaker-style odds are "likely to mislead market participants about the nature of the transaction into which they are entering."[116] Staff further warned that "market participant confusion between the two products could be exploited to drive participants into higher-margin, non-market-priced bookmaking products."[117] CFTC staff asked every recipient to review "their pricing displays, marketing material, and other information, as well as information displayed or used by their partners and affiliates," and to confirm receipt by August 31, 2026.[118]

89. Predictions is precisely the product the CFTC was concerned about when sending this letter. It is priced and presented as a bookmaker's line, with a margin built into both sides. Defendants hold GUS III LLC out as a CFTC-registered Introducing Broker and NFA-approved Futures Commission Merchant, and DKeX as a designated contract market.[119] Defendants therefore had express notice that their displays were likely deceptive because they mirrored a casino bookmaker's.

90. The concerns raised by the CFTC Odds Letter were grounded in empirical research. It cited a randomized controlled trial by the Behavioural Insights Team, conducted with the Ohio

[115] *Id*. at 2.

[116] *Id*.

[117] *Id*.

[118] CFTC Odds Letter, *supra* n.2, at 2.

[119] In citing this Odds Letter, Plaintiffs do not concede that Defendants' sports bets are swaps subject to CFTC's exclusive jurisdiction, that they may lawfully be listed on any designated contract market, or that federal law displaces state gambling law. Instead, the discussion of the CFTC letter herein demonstrates that Predictions is not a swap, but a sports bet. *See infra* ¶¶ 141-142.

Casino Control Commission, in which more than 4,000 U.S. participants evaluated identical real-world sportsbook wagers presented in one of five formats.[120] The study tested sportsbook wagers. Its findings apply to Predictions because Predictions offers the same wagers. Participants shown American odds alone chose the riskier bet significantly more often than participants shown other formats. They were also significantly more overconfident.[121] Shown a same-game parlay with an implied probability of winning of 4 percent, participants viewing American odds estimated, on average, a 53 percent chance of winning.[122] Adding the implied probability of winning alongside the odds reduced the number of risky bets participants chose.[123] The CFTC Odds Letter itself observed that the opaque pricing of casino-style bookmaking "can lead to increased risk-taking behavior by participants."[124]

91. That distortion falls hardest on the wagers DraftKings most prominently promotes. More than 30 percent of Predictions bets are combos, which likely win only about 3.1 percent of the time. *See supra* ¶ 68. The research on which the CFTC relied found that American odds inflated consumers' confidence in exactly this kind of low-probability, multi-leg wager. By displaying combos and other bets in American odds while withholding the implied probability that would have corrected that overconfidence, Defendants induced consumers to place riskier wagers, and to wager more, than they would have had prices been shown in cents or percentages.

92. Defendants knew the American odds format misled consumers and kept using it. DraftKings chose the format to make Predictions mirror its Sportsbook. *See supra* ¶ 67. When the

---

[120] CFTC Odds Letter, *supra* n.2, at 2; *see also* Behavioural Insights Team, *American Odds Lead to Riskier Sports Betting* (Aug. 4, 2025), https://tinyurl.com/4e7j5mbd.

[121] Behavioural Insights Team, *supra* n.120.

[122] *Id.*

[123] *Id.*; CFTC Odds Letter, *supra* n.2, at 2.

[124] CFTC Odds Letter, *supra* n.2, at 2 n.7.

CFTC released the CFTC Odds Letter on August 7, 2026, DraftKings Predictions was still displaying run lines, moneylines, and totals for that day's Major League Baseball games in plus-and-minus odds rather than share prices.[125]

93. Defendants continued to display American odds after receiving the CFTC Odds Letter, and they continue to display American odds even through the present. The American odds display was uniform. Every Class member who purchased a sports bet saw prices in the same format on the same App.

94. The American odds display appears to have served no legitimate purpose that accurate pricing could not, and it benefited Defendants by obscuring the nature and cost of each transaction. Defendants have not notified affected consumers or offered any remedy for wagers placed while the display was in use.

95. No Defendant holds a license to offer sports wagering through Predictions in any State where Predictions operates, and no Defendant holds a license from the Massachusetts Gaming Commission to offer sports wagering through Predictions. Predictions is an unlicensed sportsbook operating under the label of a "prediction market."

**D. DraftKings Markets Predictions as Lawful Sports Betting Nationwide.**

96. While DraftKings markets Predictions as lawful sports betting in all 50 states, it has acknowledged the legal risk of this approach to its investors. Mr. Robins has stated that "there are some regulatory questions that make the future and exactly what that's going to look like not

[125] *See CFTC Warns Prediction Markets: Stop Displaying Swap Prices Like Sports Betting Odds*, Casino.org (Aug. 7, 2026), https://tinyurl.com/3a3ah5vj; C. Lynch, *American Odds Pricing on Prediction Markets Proves a Bridge Too Far for CFTC*, Gaming America (Aug. 14, 2026), https://tinyurl.com/pbmys9xr.

entirely certain."[126] In the same answer, he described DraftKings' effort to teach consumers that "if you are in California, you can use DraftKings now. If you are in Texas, you can use DraftKings now."[127] He said DraftKings began to "refine our message" to that effect in the second quarter of 2026.[128] And in November 2026, he told shareholders that DraftKings had estimated its returns "[e]ven if sports contracts were to end in July 2028," and that it was "in a win-win position no matter how any future court ruling plays out."[129]

97. Mr. Robins described the target States by name:

> . . . [S]ome of the biggest states in the country like California, Texas, Florida, we were not present in with [online sports betting], and we have Predictions there now. So those are huge opportunities for us. It was about half the country, population-wise, that we were able to launch Predictions. … It would be like if you told me we opened up the rest of the U.S. overnight to some lesser version, but still very strong version of [] sports product that could really monetize the customers and engage the customers in ways that we never were able to with fantasy sports.[130]

98. Asked about the World Cup, Mr. Robins said: "I think it'll be absolutely tremendous for customer acquisition, starting with these prediction states . . . we have never had a World Cup . . . in those states. So we're going to really go for it."[131]

99. DraftKings markets Predictions directly to its existing Sportsbook customers, including through in-app promotions and pop-up banners inside the Sportsbook interface. It also offers new-user promotions on Predictions that mirror those on Sportsbook.

---

[126] Q2 2026 Earnings Call, *supra* n.35; *see also* C. Vasilev, *DraftKings Q2 Profitability Falls but Predictions Growth Outpaces Expectations*, Gambling Insider (Aug. 10, 2026), https://tinyurl.com/apuurpr2.

[127] Q2 2026 Earnings Call, *supra* n.35.

[128] *Id.*

[129] Q3 2026 Business Update, *supra* n.64.

[130] Q4 2025 Earnings Call, *supra* n.1.

[131] Q1 2026 Earnings Call, *supra* n.43.




100. Its national advertising, including during the NBA playoffs and the World Cup, draws no distinction between the two products. Following the December 2025 launch, DraftKings proclaimed that users could now legally place sports bets in all 50 States.




101. DraftKings' advertising reinforces the message. The DraftKings Sports & Casino app-store listing promises "Live in All 50 States" and urges users to "[g]et in on the action." The Predictions website defaults to a "Sports" tab, and the first 11 of its 17 market categories are sports. At launch, DraftKings offered a special trading bonus only to users in States where sports

predictions were available, with no comparable promotion for financial trades.[132] Widely disseminated video advertisements emphasize this point, including one with celebrities Nick Jonas and Kevin Hart where Mr. Jonas says, "Now that DraftKings is available in all 50 states, we can finally go on that road trip we've always talked about."[133] The ad, which began airing in August 2026, then depicts their "road trip" through North Dakota, Texas, and Florida, stating "even the New Yorkers that live in Miami can make picks."[134] Barstool Sports promoted that DraftKings is available in all 50 States and that it "doesn't matter where you reside."[135] Other ads urge consumers to "trade sports like it's Wall Street."[136]

102. DraftKings made these same representations to every Class member through the same channels. Every Class member downloaded the same app from the same app-store listing, which promises "Live in All 50 States." Every Class member completed the same sign-up flow and accepted the same Terms of Use. And every time any Class member opened the app, it displayed the same message: "Live in All 50 States." That message was not a one-time advertisement. It was a repeated, affirmative representation, made to every user at every session, that the product could lawfully be used wherever the user was located. More than 1.6 million customers received it. *See supra* ¶ 62.

---

[132] Press Release, DraftKings Debuts Predictions App, *supra* n.36.

[133] *DraftKings Speed Of Sports 2026 Road Trip HERO 30 Social 16x9 1*, YouTube (Aug. 28, 2026), https://tinyurl.com/46pwvpk2; *see also* B. King, *DraftKings' Latest Ad Campaign Takes Aim at the Next Frontier*, Sports Bus. J. (Aug. 31, 2026), https://tinyurl.com/ydr5dcey.

[134] *Id*.

[135] Barstool Sports, *DraftKings Is Now Available in All 50 States*, Facebook (June 1, 2026), https://tinyurl.com/y6p9fnuu.

[136] *See DraftKings Predictions TV Spot 'Trade Sports Like It's Wall Street'*, iSpot (Jan. 28, 2026), https://tinyurl.com/4z4snyeu.

103. Given his control of DraftKings and his public role in the Predictions strategy, it seems likely that Mr. Robins approved each of these campaigns, including the "Live in All 50 States" app-store listing and in-app display, the Nick Jonas and Kevin Hart advertisement, the Barstool Sports and FOX Sports promotions, the "trade sports like it's Wall Street" advertisement, and the Broward County billboards. He controls DraftKings' decisions through approximately 88 percent of its voting power, and he personally announced the strategy those campaigns carried out. Each campaign was likely also approved by the other officers identified in this complaint, including Ms. Hightower-Sellitto, Senior Vice President and General Manager of DraftKings Predictions, who promoted Predictions to the public in her own interviews. *See supra* ¶¶ 54, 77.

104. DraftKings' promotions are designed to create repeat betting. Offers include "spend $5 to get $150"; $200 for a $5 trade, paid $50 at a time over several weeks; a "20% trade match up to $50"; and $25 in "Predictions Dollars" for each referred friend. These credits can be redeemed only by placing more bets. The same advertisements carry the warning "GAMBLING PROBLEM? CALL 1-800-GAMBLER," the warning DraftKings attaches to its licensed sportsbook ads. No financial product is sold with a compulsive-gambling helpline. The fine print offers Sportsbook to persons "21+" but Predictions to persons "18+," while the headline sells "DRAFTKINGS SPORTS" and the fine print calls the same product "[e]vent [c]ontract [t]rading."

105. Defendants charge per-bet transaction fees to administer, process, match, and settle each trade; and ancillary fees in connection with Predictions accounts (together, "Administrative and Ancillary Fees"). These fees are themselves a product of the scheme. They are money consumers paid for an unlawful service: the brokerage, matching, and execution of sports wagers that Defendants had no right to offer. Consumers paid them only because Defendants represented that the service was lawful. Absent that representation, consumers would not have bought the

service and would not have paid any fee. The fees are owed and recoverable whether a consumer won or lost any wager. Defendants charge them on every trade, keep them regardless of outcome, and record each one in their own transaction records. DraftKings discloses them on its own order screen. *See supra* ¶ 71.

**E. DraftKings Deceives Consumers and Profits from Their Confusion.**

106. DraftKings markets Predictions as "trading" and "predicting," not betting. It avoids the words "gambling" and "gaming," and instructs its partners to do the same. Its November 2025 shareholder letter referred to "responsible engagement" rather than responsible gaming.[137] It offers some of its responsible gaming protections but brands them as "responsible trading."[138]

107. These labels are misleading. As Shane Kraus, director of the Behavioral Addictions Lab at the University of Nevada, Las Vegas, has explained: "If consumers hear 'trading' rather than 'betting,' some may perceive the activity as more legitimate or financially sophisticated, even though they are really still risking their money on uncertain outcomes."[139]

108. DraftKings also trades on the trust it built as a licensed operator. Consumers encounter Predictions through the same App, brand, and account they associate with a regulated sportsbook. DraftKings moves consumers between "bets" and "contracts" based on their location.

109. DraftKings intends this confusion. Asked how it would market Predictions nationally when Sportsbook is legal in only half the country, Mr. Robins said:

---

[137] Q3 2025 Letter, *supra* n.15.

[138] Press Release, *DraftKings Debuts Predictions App, Entering Prediction Markets*, DraftKings Inc. (Dec. 19, 2025), https://tinyurl.com/2y2ptaz4.

[139] *DraftKings Is Turning Sports Betting Into Wall Street Trading—and Regulators Just Cleared the Path*, Inc. (July 16, 2026), https://tinyurl.com/yc2bb9e7.

> Most customers don't really even understand the difference. So I think the national marketing footprint is a big advantage because we can . . . drive people towards our product and we can use it in ways that we can rotate messages and have slightly different things, but in essence, it's the same general message to the customer. And I think that provides us a ton of leverage and synergy.[140]

110. Consumers who believe they are using a licensed DraftKings product do not know to ask whether it is lawful where they live, whether any state regulator oversees it, or whether the protections they associate with the DraftKings brand apply.[141]

111. Defendants knew their conduct was unlawful, or at least knew its legality was contested, and proceeded anyway. *See supra* ¶ 96. In the Event Contracts Risk Disclosure incorporated into the Terms of Use, Defendants acknowledge "[t]he regulatory and litigation landscape applicable to event contracts is actively evolving, including, but not limited to, if and in what circumstances event contracts may be listed or cleared pursuant to federal and state laws and regulations, the types of event contracts that may be listed or cleared, and whether event contracts or certain types of event contracts are permissible irrespective of state gaming laws and regulations."[142] DraftKings also warns of possible "prohibitions or geographic limitations," "obligations to satisfy state-level licensing," and "modifications to event contract validity," such that contracts could also be "voided or settled without your consent at a non-market price."[143]

---

[140] Q4 2025 Earnings Call, *supra* n.1.

[141] *See* D. O'Boyle, *DraftKings CEO: Users Don't Understand Difference Between Predictions and Sportsbook — That Helps Us*, InGame (Feb. 13, 2026), https://tinyurl.com/4hsr4vnx; *DraftKings' Robins Says New 'Super App' Needed to Cut Customer Confusion*, *supra* n.75 (quoting Robins: "if you're in a state that does not have online sports betting, you'll see predictions, and if you're a state that has online sports but you'll see the sports book product, and we're going to sort it out for them on the back end"); *see also* Cong. Rsch. Serv., R49266, *Prediction Markets Legislation in the 119th Congress* (2026), https://tinyurl.com/dak3npfe (noting that state-regulated sports betting platforms "may have certain consumer protections not required on prediction market platforms").

[142] DraftKings Inc., Event Contracts Risk Disclosure, https://tinyurl.com/2vt6f7yd (last visited Oct. 19, 2026).

[143] *Id.*

112. Mr. Robins confirmed this knowledge on the third-quarter 2026 earnings call. He told investors that DraftKings' "[b]ase case forecast is a midyear 2028 Supreme Court ruling," and that DraftKings had modeled the scenario in which "there is a ruling that shuts down sports predictions in July 2028."[144] He described "all sports contract[s] go[ing] away" as "the most draconian likely scenario."[145] Mr. Robins further added that DraftKings has "managed to stay completely out of the litigation everywhere," and that he believes "most states are waiting to see what the courts decide before taking more severe action."[146] DraftKings thus priced the risk that its sports bets are unlawful into its business plan while telling consumers that Predictions is legal and "Live in All 50 States."

113. Defendants then shift the risk of illegality to their customers. In capital letters, the Terms of Use state that Defendants "DO NOT WARRANT THAT YOUR CREATION OF YOUR DRAFTKINGS PREDICTIONS ACCOUNT, YOUR USE OF THE SERVICES, OR ANY COMMODITY TRANSACTION IS LAWFUL IN ANY PARTICULAR JURISDICTION," and require each customer to "REPRESENT AND WARRANT THAT YOUR ACTIVITIES ARE LAWFUL IN EVERY JURISDICTION."

114. The Terms of Use go further. They require customers to "RELEASE AND HOLD HARMLESS THE DRAFTKINGS RELEASED PARTIES FROM ANY AND ALL LIABILITY RELATED TO, AND . . . WAIVE ALL DISPUTES, CAUSES OF ACTION, CONTROVERSIES, AND CLAIMS AGAINST THE DRAFTKINGS RELEASED PARTIES ARISING OUT OF, YOUR CREATION OF YOUR DRAFTKINGS PREDICTIONS

[144] Q3 2026 Earnings Call, *supra* n.4.

[145] *Id.*

[146] *Id.*

ACCOUNT, YOUR USE OF THE SERVICES, OR ANY COMMODITY TRANSACTION VIOLATING APPLICABLE LAW." A "WAIVER OF DAMAGES" provision repeats that DraftKings is not "RESPONSIBLE FOR YOUR COMPLIANCE WITH APPLICABLE LAW."

115. Defendants drafted the Terms of Use and presented them in legalese on a take-it-or-leave-it basis as a condition of opening an account. A consumer could not open an account, deposit funds, or place a wager without accepting them. Worse, the sign-up flow did not display the Terms of Use; it provided only a link to them. Defendants offered no version of Predictions without these provisions and no option to pay more to avoid them. Defendants also reserved the right to amend the Agreements "at any time, and without notice to you." No Plaintiff was represented by counsel when accepting them, and neither was any other Class member.

116. Moreover, the Terms of Use run more than thirty-five pages and contain at least nineteen headed sections. The warranty disclaimer, the customer's warranty of lawfulness, and the release of claims for "ANY COMMODITY TRANSACTION VIOLATING APPLICABLE LAW" appear together in a single paragraph near the end of the eighteenth section, titled "DISCLAIMER OF WARRANTIES." That paragraph follows several paragraphs about third-party exchanges, intellectual property, and software defects. The statement that Defendants are not "RESPONSIBLE FOR YOUR COMPLIANCE WITH APPLICABLE LAW" appears in the nineteenth section, titled "WAIVER OF DAMAGES AND CONSEQUENTIAL DAMAGES." The opening notice of the Terms of Use warns consumers that the Agreements are "SUBJECT TO A WAIVER OF TRIAL BY JURY." It says nothing about lawfulness, the release, or the waiver of damages. Nothing in Defendants' advertising, app-store listing, or sign-up flow mentions the Terms. Instead, those consumers were told, before opening an account and at every session afterward, that DraftKings was "Live in All 50 States." *See supra* ¶¶ 101-102. No reasonable

consumer reading that marketing would expect the Terms of Use to disclaim the lawfulness of the very product being sold.

117. The provisions also run in one direction only. Defendants disclaim any warranty that Predictions is lawful anywhere but require the customer to warrant that the customer's use is lawful everywhere. Defendants knew the facts bearing on lawfulness, including where they held licenses and why they launched Predictions only in States where they held none. Consumers did not. Defendants also reserved the right to refuse any transaction that "might contravene Applicable Law," confirming that they, not consumers, were positioned to assess and control legal risk. The release and waiver cover precisely the claims that would arise if Defendants' representations of lawfulness were false.

118. These provisions are separate from the rest of the Agreements. They sit in the warranty and damages-waiver sections described above. *See supra* ¶ 116. Neither section defines the parties' core exchange. The Terms of Use state that they "solely govern your creation of a DraftKings Predictions Account and your use of the Services." That core bargain is distinct: Defendants provide access to the App and the Services, and customers fund accounts and pay transaction fees, which are "disclosed to you in the DraftKings Predictions App at the point of placement." That exchange operates the same way with or without the risk-shifting provisions. The Terms of Use also contain a severability clause in the "MISCELLANEOUS" section: "In the event any term of the Agreements is to any extent illegal, otherwise invalid, or incapable of being enforced, such term shall be enforced to the maximum extent permissible, and all other terms of the Agreements shall remain in full force and effect."

## F. Predictions Exposes Consumers to the Harms the States Sought to Prevent.

119. Gambling is addictive. More than 2.5 million U.S. adults meet the criteria for a severe gambling problem each year, and another five to eight million experience mild or moderate problems. Gambling advertising drives more frequent gambling. About half of those seeking help for gambling disorder report suicidal ideation, and about 17 percent have attempted suicide, compared with 0.6 percent of the general population each year.[147] Gambling addiction has one of the highest suicide attempt rates of any addiction, and an estimated 5 percent of all suicides are gambling-related.[148] The financial harm is also substantial. In the United States, consumer gambling losses now exceed $100 billion annually.[149]

120. Research on online sports wagering, the activity Predictions offers under another label, shows serious harm. Online gambling is the single strongest predictor of gambling-related harm among 57 risk factors studied.[150] Roughly 58 percent of 18 to 22-year-olds bet on sports each year; of those, nearly 10 percent bet weekly and 4 percent daily.[151] When online sports betting arrives in a State, household savings, credit scores, and investment fall, while debt and bankruptcy

---

[147] D. Boland, *The Relationship Between Problem Gambling and Suicide,* Birches Health (Apr. 30, 2024), https://tinyurl.com/wk4h2z74.

[148] B. Pempus, *Gambling and Suicide: The Latest Research on Risks*, Gambling Harm.Org (Jan. 30, 2026), https://tinyurl.com/yc3mprju; Press Release, The Massachusetts Council on Gambling and Health (June 20, 2014), https://tinyurl.com/srmfjrk6.

[149] A. McCann, *Most Gambling-Addicted States (2026)*, WalletHub (Apr. 21, 2026), https://tinyurl.com/3ec3ptjm.

[150] P. Newall, *Sludge, Dark Patterns and Dark Nudges: A Taxonomy of Online Gambling Platforms' Deceptive Design Features*, 120 Addiction 1916, 1917 (2025), https://doi.org/10.1111/add.70085.

[151] NCAA, *Sports Betting Activities Survey* (April 2023) at 2-3, https://tinyurl.com/43nsaerd.

rise.[152] Intimate partner violence after an upset loss by the home team is nearly 10 percent more prevalent in States with sports betting.[153]

121. These harms apply with at least equal force to Predictions, which reaches consumers in States that have refused to authorize online sports betting.[154] Gambling addicts who block themselves from sportsbooks are relapsing on prediction markets.[155] As one doctor who runs gambling treatment programs put it, they are "like different doors into the same room."[156]

122. Young adults are especially vulnerable, and DraftKings users skew young and male.[157] Research indicates that prediction markets may be more harmful than sportsbooks. In July 2025, the median return for a prediction-market user was −8 percent, compared with −5 percent for sportsbook users, while for those wagering less than $100 the losses slid to −26.8 percent.[158] The losses also displace savings. A study of more than 180,000 households found that risky bets crowd out positive-value investments, like buying a house or saving for retirement.[159] Another

---

[152] S. Baker et al., *Gambling Away Stability: Sports Betting's Impact on Vulnerable Households*, Nat'l Bureau of Econ. Rsch., Working Paper No. 33108, (2024), https://www.nber.org/papers/w33108.

[153] H. Hackney, *New Study Links Sports Gambling to Violence, Senator Weighs In, Expert Opines*, Sports Law Expert (Nov. 29, 2024), https://tinyurl.com/4presajk.

[154] *See* Exhibit A.

[155] R. Anemone, *Polymarket and Gambling Disorder: Clinical Considerations for Mental Health Professionals*, Behavioral Health News (June 30, 2026), https://tinyurl.com/yzjzttv7.

[156] J. Cohen & C. Lewis, *Prediction Markets Say They're Different from Sportsbooks. Gambling Addicts Say It's All the Same*, Associated Press (updated May 1, 2026, 6:02 AM), https://tinyurl.com/5ccbm2vp.

[157] *See US Prediction Market Trades Are Predominantly Sports-Based*, S&P Global Mkt. Intel. (Oct. 2026), https://tinyurl.com/bpw9ptmp; *see also Research Reveals Retail Traders Suffer Deeper Losses on Prediction Markets Than Sportsbooks*, Coin Alert News (Mar. 25, 2026) (DraftKings users have a median age of around 35), https://tinyurl.com/3pxcswar.

[158] S. Reynolds, *Retail traders fare worse on prediction markets than sportsbooks*, CoinDesk (May 24, 2026), https://tinyurl.com/2s3jj8jk.

[159] J. Angelo, *Sports Betting Takes a Financial Toll*, Semafor (July 23, 2026), https://tinyurl.com/37dedzbr.

study found that each dollar wagered on sports reduced net investment in stocks and other financial instruments by just over two dollars.[160]

123. By calling Predictions "trading," DraftKings compounds the harm and invites consumers to treat sports bets as investments. But unlike stocks or bonds, sports wagers are zero-sum and carry no positive expected return. Yet a 2026 Betterment survey found that 52 percent of Generation Z ("Gen Z") respondents, those born between 1997 and 2012, moved money originally meant for investment into sports betting, and 25 percent viewed wagering as part of their long-term financial strategy.[161] Bank of America Institute found that Gen Z made up almost 50 percent of online betting activity in July 2026, and that respondents viewed prediction markets as a form of investing, despite recovering less than 75 cents for every dollar.[162] DraftKings encourages that confusion with ads urging consumers to "trade sports like it's Wall Street."[163]

124. DraftKings has acknowledged the harm. In its first-quarter 2026 business update, DraftKings told investors that Predictions customers "are experiencing losses more quickly" than Sportsbook customers.[164]

125. DraftKings once called responsible gaming a corporate commitment. In December 2019, announcing its platinum membership in the National Council on Problem Gambling ("NCPG"), DraftKings' then-chief compliance officer, Tim Dent, said: "From the moment someone registers a DraftKings account, our top priority is ensuring every user has an engaging,

[160] *Id.*

[161] K. McNair, *52% of Gen Z investors have redirected investing money to sports bets*, CNBC (Aug. 28, 2026), https://tinyurl.com/mv3bmbbc.

[162] Bank of America Institute, *Online Betting Platforms: What's the Money Line*?, at 2 (Sept. 1, 2026), https://tinyurl.com/mpcb3f3f.

[163] *See DraftKings Predictions TV Spot 'Trade Sports Like It's Wall Street'*, *supra* n.136.

[164] Q1 2026 Letter, *supra* n.48, at 3.

fun and, most importantly, a safe experience."[165] In or about November 2025, shortly before launching Predictions, DraftKings withdrew from the American Gaming Association, the trade association of licensed gaming operators.[166]

126. The NCPG has explained that buying and selling sports bets is functionally gambling and has urged prediction-market operators to adopt the same safeguards required of licensed sportsbooks.[167] NCPG's former executive director has stated that there are no meaningful psychological distinctions between sportsbooks and prediction markets where addiction risk is concerned. DraftKings has not adopted those safeguards.[168]

127. When Predictions launched, DraftKings carried over only some of Sportsbook's tools: deposit limits, cool-off periods, and self-exclusion.[169] It omitted gambling addiction hotline information, session time data, and did not offer the same betting-history visualizations. The Terms of Use state only that Defendants "may permit" customers to set limits and expressly disclaim any obligation: "DraftKings Predictions is not required by law or regulation to provide these Responsible Trading tools and does not assume any obligation by offering them."[170]

128. DraftKings has also declined to use its data to protect at-risk customers. Instead, DraftKings uses customer data to decide who receives its promotions. *See supra* ¶ 104. In 2023, DraftKings built a machine-learning model from online casino customer betting records that

---

[165] News Release, *NCPG Welcomes DraftKings as a Platinum Member*, DraftKings (Dec. 6, 2019), https://tinyurl.com/axnt7yyt.

[166] C. Brewer, *FanDuel, DraftKings Abandon AGA Trade Group as Rift over Sports Prediction Markets Grows*, CNBC (Nov. 18, 2025), https://tinyurl.com/yc4ja9rw.

[167] National Council on Problem Gambling, *Consumer Protections for Prediction Market Event Contracts*, https://tinyurl.com/mprenffx (last visited Oct. 20, 2026).

[168] *See id.*; *see also* Terms of Use, *supra* n.7.

[169] D. O'Connor, *Sportico: Sportsbook Prediction Markets Launched with Few Responsible Gaming Safeguards*, Casino.org (Jan. 12, 2026), https://tinyurl.com/p8st7j6r.

[170] Terms of Use, *supra* n.7.

scored each customer by how much the customer was likely to lose for each promotion offered. The score, known internally as "elasticity," was recalculated weekly.[171] Employees were told the goal was not to cut promotional spending but to "redeploy" it, which they understood to mean directing more promotions to the biggest losers. One analyst who tested the model concluded that, by the model's logic, "the best investment would be a problem gambler."[172] Another said: "It is as predatory as it sounds. If you lose more, we give you more, so you keep playing more."[173] DraftKings built the first model for its online casino and began building similar models for its sports wagering promotions around the same time. A DraftKings executive told investors that data science improved its margins on promotion-driven sports bets by 13 percent in 2025 and that DraftKings used artificial intelligence to personalize hundreds of millions of promotional dollars.[174]

129. DraftKings applies the same customer scoring and promotion-targeting systems to Predictions. DraftKings told investors in March 2026 that it was merging Predictions and Sportsbook into "a single seamless customer experience"; that the merged app would allow "cross-pollination of all DraftKings gaming content and promotions"; that it would rely on "customer-level personalization" and a "global marketing & promotions platform"; and that its "strategy to win in Predictions will follow our Sportsbook playbook." Predictions customers use the same account, app, and data infrastructure as Sportsbook customers. The scope of DraftKings' use of these models on Predictions customers is within Defendants' exclusive knowledge.

---

[171] *How DraftKings Uses A.I. to Target the Gamblers Likeliest to Lose*, N.Y. Times (Sept. 19, 2026), https://tinyurl.com/yrcv4sj5.

[172] *Id.*

[173] *Id.*

[174] *Id.*

130. In 2024 and early 2025, DraftKings data scientists built another machine-learning model, using the same betting records used for promotional targeting, to assign customers "risk scores" and predict gambling problems before they escalated.[175] The team found it could predict which customers would need intervention better than chance.[176] In early 2025, the day the team was to present the model to DraftKings' chief responsible gaming officer, the meeting was canceled and the project was shut down.[177] Two other internal efforts were also shelved.[178] DraftKings' Chief Responsible Gaming Officer, Lori Kalini, has confirmed that company leaders made a "collective decision" not to use predictive technology for problem gambling.[179] DraftKings' largest competitors, FanDuel and Fanatics, use third-party risk-scoring tools.[180] DraftKings uses none. Its responsible gaming group numbers about 50 of its 5,000 employees.[181] The same decision governs Predictions, which is not subject to the state-required safeguards that apply to Sportsbook.

131. These omissions appear to be deliberate. Under the Commodity Exchange Act, the CFTC may not permit event contracts based on "gaming." An operator that implemented a full suite of gambling-addiction tools would risk conceding that its product is gaming. DraftKings' legal position thus appears to depend on withholding protection from consumers.

132. By contrast, an operator licensed under the Massachusetts Sports Wagering Law must implement responsible-gaming features, report suspected illegal activity, bar wagering by

---

[175] *Id.*

[176] *See id.*

[177] *How DraftKings Uses A.I. to Target the Gamblers Likeliest to Lose*, *supra* n.171.

[178] *See id.*

[179] *See id.*

[180] *See id.*

[181] *See id.*

persons connected to the events, verify age and identity, offer wagering limits, and honor the Commonwealth's voluntary self-exclusion program. *See* Mass. Gen. Laws ch. 23N, §§ 4(d)(2), 11, 13(d); 205 Code Mass. Regs. §§ 248.16, 256.07.

133. Predictions also permits wagering at age eighteen. Licensed sports wagering in Massachusetts and many other jurisdictions requires a minimum age of twenty-one. DraftKings' Predictions accepts customers as young as eighteen to place wagers, creating a "back-door into sports betting."[182] Prediction markets have faced widespread criticism from the gaming industry, sports leagues and state officials for allowing those under 21 years old to place millions of dollars in bets.[183] DraftKings has also faced reports of substantial underage use of its products.[184]

134. Prediction markets are also vulnerable to insider trading and manipulation. Documented incidents include markets predicting which words Coinbase CEO Brian Armstrong would use during an October 2025 earnings call, on which he then recited those words;[185] a CFTC investigation of a presidential teleprompter operator who netted more than $90,000 on Kalshi;[186] the arrest of a U.S. Special Forces soldier who earned over $400,000 trading on classified

---

[182] W. Blasi, *People Under 21 Can't Use Most Sportsbooks—So They've Wagered Over $5 Billion on Kalshi Instead*, MarketWatch (Sept. 3, 2026), https://www.marketwatch.com/story/people-under-21-cant-use-most-sportsbooks-so-theyve-wagered-over-5-billion-on-kalshi-instead-03730919.

[183] *See* S. Khimm, *NBA, PGA and NCAA Want Higher Age Limits for Prediction Markets*, NBC News (May 1, 2026), https://tinyurl.com/3phnzuxw; Off. of Governor Ned Lamont, *Fact Sheet: 2026 Legislative Proposal*, H.B. 5038 (2026).

[184] *Underage Sports Betting: Legal Apps Under Investigation*, Cent. Or. Daily News, https://tinyurl.com/2rw36jb7 (last visited Oct. 26, 2026) ("DraftKings, by far, had the most reports with 620, accounting for $2.78 million in wagers by suspected underage users since 2023.").

[185] *See* E. Nicolle & J. Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), https://tinyurl.com/3326bzk7.

[186] D. Mangan et al., *Trump Suspends Teleprompter Operator over Kalshi Bets Allegations, White House Says*, CNBC (July 16, 2026), https://tinyurl.com/2rcrdpy3.

information;[187] an investigation of former Representative George Santos for wagering against his own attendance at a State of the Union address;[188] traders who manipulated Spotify streaming to move song-chart contracts;[189] and roughly $200 million in Polymarket transactions flagged as possible insider activity.[190] Sports bets are especially exposed, because many people learn of injuries, lineups, and coaching decisions before the public. While Mr. Robins has said operators must "protect the ecosystem as best as you can,"[191] DraftKings has not disclosed safeguards it has implemented that are reasonably adequate to keep insiders out of its sports markets.

### G. Courts, Regulators, and the Sports Industry Treat Sports Event Contracts as Sports Betting.

135. Courts have rejected the premise that sports event contracts escape state gambling law, even in States where sports betting is legal. The leading example comes from Massachusetts, DraftKings' home state. In *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026), the Attorney General alleged that Kalshi's "uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior."[192] The court denied Kalshi's motion to dismiss on preemption grounds and allowed the Attorney General's motion for a preliminary injunction. The court rejected as "overly broad" the argument that the Commodity Exchange Act displaces "traditional

---

[187] M. De Witte, *Prediction Markets Are Surging – Here's What You Need to Know*, Stanford Report (Apr. 28, 2026), https://tinyurl.com/mry93dah.

[188] *See* D. Yaffe-Bellany & S. LaFraniere, *U.S. Is Said to Be Investigating George Santos Over Kalshi Betting*, N.Y. Times (June 2, 2026), https://tinyurl.com/2xukmdfh.

[189] B. Lipton & T. Odusola, *How Prediction Markets Are Shaping Real-World Events and Eroding Public Trust*, Roosevelt Institute (July 22, 2026), https://tinyurl.com/py269wka.

[190] Denis O., *Polymarket Sees $200M in Trades Flagged as Possible Insider Activity: Bloomberg*, Bitcoin Foundation (July 21, 2026), https://tinyurl.com/5cs768br.

[191] Q1 2026 Earnings Call, *supra* n.43.

[192] Complaint ¶ 72, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct. Suffolk Cnty. filed Sept. 12, 2025).

state police powers, such as gambling regulation." *Id.*, slip op. at 10. On February 6, 2026, the court entered a preliminary injunction barring Kalshi from "[o]ffering, listing, matching, executing, settling, or otherwise facilitating any contract" on "sporting events" for "any person located in Massachusetts." Prelim. Inj. Order, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct. Suffolk Cnty. Feb. 6, 2026), *stayed pending appeal*, No. 2026-P-244 (Mass. App. Ct. Feb. 17, 2026), *appeal pending*, No. SJC-13906 (Mass. argued May 4, 2026).

136. Other courts have done the same. *See State v. KalshiEX LLC*, No. 26-2-11368-8 SEA (Wash. Super. Ct. King Cnty. July 21, 2026) (granting preliminary injunction); *State ex rel. Nev. Gaming Control Bd. v. Coinbase Fin. Mkts., Inc.*, No. 26 OC 00030 1B (Nev. Dist. Ct. Carson City Mar. 26, 2026) (same); *Nessel v. KalshiEX LLC*, No. 26-1087-CZ (Mich. Cir. Ct. Ingham Cnty. Sept. 1, 2026) (granting preliminary injunction); *State ex rel. Nev. Gaming Control Bd. v. KalshiEX, LLC*, No. 26 OC 00050 1B (Nev. Dist. Ct. Carson City Mar. 20, 2026) (granting temporary restraining order); *State ex rel. Nev. Gaming Control Bd. v. Blockratize, Inc.*, No. 26 OC 00012 1B (Nev. Dist. Ct. Carson City Jan. 29, 2026) (same); *see also KalshiEX LLC v. Cafferelli*, --- F. Supp. 3d ----, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) (denying prediction market's motion to enjoin state enforcement); *KalshiEX LLC v. Williams*, No. 25-cv-8846 (AT), 2026 WL 2017466 (S.D.N.Y. July 13, 2026) (same); *QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) (same); *KalshiEX, LLC v. Cox*, No. 26-cv-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026) (same); *KalshiEX, LLC v. Bird*, No. 4:26-cv-00109, 2026 WL 2691009 (S.D. Iowa Sept. 8, 2026) (same).

137. On November 13, 2025, the Massachusetts Gaming Commission wrote to all Massachusetts sports wagering licensees, including DraftKings, stating that licensees are

"prohibited from offering sports-related event contracts in Massachusetts, directly or via an affiliate, related business entity, or other association, or directing patrons to such event contracts being offered in Massachusetts," warning that it "may take steps up to and including revocation of your license," and requiring a written response within ten business days.[193]

138. Numerous state officials have reached the same conclusion. Attorneys General of States where Predictions operates, including Alabama, California, Minnesota, New Mexico, and South Carolina, have rejected any distinction between sportsbook bets and prediction-market bets as "illusory," explaining: "On so-called 'prediction markets,' users can make all the same wagers they can make at a traditional sportsbook."[194] They have also warned that sports gambling poses serious risks to public health and financial security, that millions of Americans qualify as problem or pathological gamblers, and that the States are best equipped to protect their residents from those harms.[195]

139. Utah Governor Spencer Cox put it plainly: "These prediction markets . . . are gambling – pure and simple . . . [t]hey are destroying the lives of families and countless Americans, especially young men."[196]

140. State regulators across the country have issued cease-and-desist letters and brought enforcement actions against prediction markets offering sports contracts, including in Arizona, Connecticut, Illinois, Kentucky, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey,

---

[193] Letter from Dean Serpa, Exec. Dir., Mass. Gaming Comm'n, to All Sports Wagering Operators (Nov. 13, 2025), https://tinyurl.com/46aha8vs.

[194] Letter from Dave Yost, Att'y Gen. of Ohio, et al., to Commodity Futures Trading Comm'n, at 2 (Apr. 30, 2026), https://tinyurl.com/yc4fha3t.

[195] *Id.*

[196] Spencer J. Cox (@GovCox), X (Feb. 17, 2026, 4:21 PM), https://tinyurl.com/yrds6hhm.

New York, Ohio, Rhode Island, Tennessee, Utah, Washington, and Wisconsin.[197] On March 4, 2025, the Nevada Gaming Control Board ordered Kalshi to cease offering event contracts including those tied to sporting events and elections, stating that the conduct "is unlawful in Nevada, unless and until approved as licensed gaming," and warning that it may result in criminal liability.[198] Prediction markets have also faced consumer lawsuits in Alabama, California, Illinois, New York, and Oregon.

141. Two federal courts of appeals have held that sports-event contracts are not swaps within the CFTC's exclusive jurisdiction. *KalshiEX LLC v. Schuler*, --- F.4th ----, 2026 WL 2884087, at *1, *15 (6th Cir. Sept. 25, 2026) (holding, in the alternative, that state gambling laws are not preempted even if the contracts were swaps); *KalshiEX, LLC v. Assad*, --- F.4th ----, 2026 WL 2543846, at *17 (9th Cir. Aug. 28, 2026); *see also Blue Lake Rancheria v. Kalshi, Inc.*, --- F.4th ----, 2026 WL 2728466, at *13–14 (9th Cir. Sept. 16, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 686 (D. Md. 2025); *N. Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1185 (D. Nev. 2025) ("Congress . . . did not want gambling to take place on CFTC-designated exchanges.").

142. The Third Circuit, in a divided preliminary-injunction ruling, has reached a contrary conclusion, and New Jersey's petition for *certiorari* is pending. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), *petition for cert. filed sub nom. Flaherty v. KalshiEX LLC*, No. 26-299 (U.S. Sept. 2, 2026). *Flaherty* applied a preliminary-injunction standard to a state regulator's

---

[197] Press Release, *CFTC Sues Wisconsin to Reaffirm Its Exclusive Jurisdiction over Prediction Markets*, Commodity Futures Trading Comm'n (Apr. 28, 2026), https://tinyurl.com/4e3k47s3 (describing Wisconsin's suits against five platforms and the CFTC's suits against Arizona, Connecticut, Illinois, and New York); *see generally* Letter from Dave Yost, *supra* n.194.

[198] Letter from Kirk D. Hendrick, Chairman, Nev. Gaming Control Bd., to Tarek Mansour, CEO, and Eliezer Mishory, Chief Regul. Officer & Gen. Counsel, KalshiEX LLC, at 1 (Mar. 4, 2025), https://tinyurl.com/mv6usxku.

enforcement action against a designated contract market. It expressly declined to decide whether the Commodity Exchange Act preempts all state gambling regulation, and Judge Roth dissented, explaining that the presumption against preemption applies with special force to gambling and that CFTC Rule 40.11(a)(1) itself forbids designated contract markets from listing gaming contracts. *Flaherty* did not address private claims that a platform deceived consumers about its fees, its role as a counterparty, or its legality, and it did not address the conduct of an introducing broker or market maker. Defendants' sports contracts turn only on the outcome of games. They have no potential financial, economic, or commercial consequence to the parties, 7 U.S.C. § 1a(47)(A)(ii), and serve no hedging purpose. Congress authorized the CFTC to bar contracts involving "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). CFTC rules bar designated contract markets from listing contracts that "involve[], relate[] to, or reference[] . . . gaming." 17 C.F.R. § 40.11(a). Kalshi itself previously told the D.C. Circuit that contracts on games "are unlikely to serve any 'commercial or hedging interest.'" Br. for Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

143. Federal oversight does not fill the gap. The CFTC has approximately 543 employees nationwide covering all derivatives markets,[199] while Nevada and Pennsylvania, for example, each employ close to 400 gaming regulators.[200] Exchanges may self-certify a new event contract and begin trading it the next business day. The CFTC has also declined to adopt the 21-year minimum age that States impose on sports wagering. *See supra* ¶ 133. Young adults under 21

---

[199] U.S. Commodity Futures Trading Comm'n, *Plan for Operations During a Lapse in Appropriations* (Sept. 29, 2025), https://tinyurl.com/3yt8h2dw.

[200] Nevada Gaming Control Board, Informational Report at 6 (Oct. 14, 2025), https://tinyurl.com/52phpzkj; Pennsylvania Gaming Control Board, Annual Report 2024–2025 at 4 (Sept. 2025), https://tinyurl.com/mrywxd5c.

traded $5 billion on Kalshi alone in 2026, and sports account for about 90 percent of Kalshi's volume.[201]

144. Prediction markets also do not serve the informational purpose their operators claim. Only about 3 percent of takers profit, and roughly two-thirds of accounts bear aggregate losses.[202] The other 97 percent of takers "suppl[y] most of the volume but little information."[203] The few who profit do so mainly by acting as institutional market makers.[204]

145. The sports industry agrees. The leagues treat prediction markets as sports betting even though they have long permitted players to trade in ordinary financial futures markets. Major League Baseball has prohibited its players from engaging with baseball event contracts under its sports betting policies.[205] The National Football League views prediction markets the same way it views sports betting, bars players and personnel from using them, and has warned that they are potentially more dangerous to league integrity because they lack the oversight that applies to legal sports betting.[206] The National Basketball Association prohibits its players from wagering on prediction markets and told the CFTC that "[prediction] markets raise integrity concerns that are

[201] *People Under 21 Can't Use Most Sportsbooks-So They've Wagered Over $5 Billion on Kalshi Instead*, *supra* n.182.

[202] R. Gómez-Cram et al., *Prediction Market Accuracy: Crowd Wisdom or Informed Minority*? (Working Paper, rev. Apr. 25, 2026) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6617059; A. L. Sussman, *Wisdom of the Few? Prediction Markets Are Driven by a Small Number of Skilled Traders*, Yale Insights (June 10, 2026), https://tinyurl.com/5azss6ze; S. Reynolds, *Only 3% of Traders Drive Prediction Markets' Accuracy, Not the Crowd, Study Finds*, CoinDesk (Apr. 26, 2026), https://tinyurl.com/y27p5nr9.

[203] *See* Gómez-Cram et al., *supra* n.202, at 16.

[204] *Id.*; *see also* Sussman, *supra* n.202.

[205] *See* B. Davis, *MLB Sent Memo Warning Players About Prediction Markets*, Front Office Sports (Dec. 5, 2025), https://tinyurl.com/3w896c84.

[206] *See* B. Horney, *NFL Warns Prediction Markets Are Sports Betting With Less Oversight*, Front Office Sports (Aug. 25, 2025), https://tinyurl.com/2s79mjt6.

similar to those associated with sports betting."[207] It has warned that prediction markets are not required to report suspicious trades or cooperate with league investigations.[208] It has also urged that prediction markets bar bets on player transactions, injuries, and officiating and disciplinary decisions; consult leagues before listing new sports contracts; share trading information with league investigators; and block athletes and other insiders.[209] NCAA President Charlie Baker has stated that the NCAA "vehemently opposes college sports prediction markets," warning that "student-athletes face harassment and abuse for lost bets on game performance" and that "[t]heir decisions and future should not be gambled with, especially in an unregulated marketplace that does not follow any rules of legitimate sports betting operators."[210] The integrity safeguards these leagues demand are the same protections DraftKings denies its customers.

146. Florida illustrates the point. Florida authorizes sports betting only through its 2021 Gaming Compact with the Seminole Tribe, which requires bettors to be twenty-one and mandates age verification, geofencing, anti-money-laundering controls, suspicious-activity reporting, and problem-gambling programs. Bookmaking outside that framework is a felony, *see* Fla. Stat. § 849.25(2); betting on sporting contests is separately prohibited, *id.* § 849.14; and gambling contracts are void, *id.* § 849.26. DraftKings knows this. It spent $22.7 million on a failed 2021 ballot initiative to open Florida to other operators, and it secretly funded litigation challenging the

---

[207] Letter from Nat'l Basketball Ass'n to Commodity Futures Trading Comm'n, at 1 (Apr. 30, 2026), https://tinyurl.com/r4nvrxp4.

[208] *Id.*; *see also* D. Bernstein, *NBA Sends CFTC 'Integrity Risks' Letter With Scandals Still Fresh*, Sportico (May 2, 2025), https://tinyurl.com/yc7c87pm.

[209] Letter from Nat'l Basketball Ass'n, *supra* n.207; *see* R. Maese, *The Hottest Market on Kalshi Is One the NBA Doesn't Think Should Exist*, Wash. Post (July 23, 2026), https://tinyurl.com/5es6etat.

[210] *See* D. Purdum, *Prediction Market Kalshi Self-Certifies Transfer Portal Trading*, ESPN (Dec. 17, 2025), https://tinyurl.com/5fpwf2d2.

Compact.[211] When it launched Predictions, DraftKings named Florida a key market.[212] It has since advertised on billboards in Florida to "take your game anywhere" and "now live in the 305,"[213] and promoted that Predictions is "Available in CA, FL, TX." *See also supra* ¶ 101 (ad claiming "even the New Yorkers that live in Miami can make picks").

147. DraftKings has disregarded this consensus. By operating an illegal sportsbook disguised as "sports predictions," DraftKings has defied the public policy of various states while simultaneously engaging in unfair business acts and practices that mislead consumers into believing: the operation of its gambling website is lawful, when it is not; and that they are not gambling against the House, when they are. The damage resulting from Defendants' conduct to the Classes amounts to hundreds of millions of dollars.

**H. Plaintiffs' Pre-Suit Demands.**

148. On April 29, 2026, Plaintiffs Gordon, Weissmann, and Harris, through counsel, mailed and delivered to Defendants at DraftKings' Boston headquarters, the principal place of business of DraftKings Inc. and GUS III LLC and the place where Defendants maintain assets, a written demand for relief under Mass. Gen. Laws ch. 93A, § 9(3) (the "*Gordon* 93A Demand").

149. The *Gordon* 93A Demand was made on behalf of Gordon, Weissmann, and Harris individually and on behalf of all similarly situated customers. The *Gordon* 93A Demand identified each claimant by name and reasonably described the unfair and deceptive acts and practices relied upon. It stated that DraftKings was "operating an unlawful sports betting operation in

[211] *See* D. Kam, *No Sports Betting on Florida 2022 Ballot as Petition-Gathering Fails*, Miami Herald (Apr. 26, 2022), https://perma.cc/W4JU-V6NQ; *see also Protect the Constitution LLC v. State of Fla.*, No. 2025CA00718, Seq. No. 28 (Fla. 2d Cir. Ct. Oct. 31, 2025).

[212] Butler, *supra* n.100; Q4 2025 Earnings Call, *supra* n.1.

[213] P. Santoro, *DraftKings Pushes Prediction Market Ads into California, Texas, Georgia Ahead of NFL Kickoff*, SNJ Today (Aug. 27, 2026), https://tinyurl.com/mr9z6t2j.

Massachusetts under the guise of a lawful 'prediction market'"; that DraftKings "falsely represent[s] that users are merely 'trading' or 'predicting' outcomes of future events rather than placing wagers"; that DraftKings offered sports-related bets without the license Massachusetts law requires; and that DraftKings displayed "headline odds pricing" that excluded transaction fees disclosed only at checkout. It described the injuries suffered, including monetary losses from wagering on an unlicensed platform, transaction fees not reflected in the advertised odds, and the loss of the consumer protections licensed operators must provide. It demanded an accounting and refunds. A true and correct copy of the *Gordon* 93A Demand is attached as **Exhibit B**.

150. Defendants responded in writing to the *Gordon* 93A Demand on May 29, 2026, denying liability, disputing that Chapter 93A applies, and declining to tender any settlement. Defendants' written response addressed each of Plaintiffs' theories on the merits and made no written tender of settlement within thirty days of receipt of the *Gordon* 93A Demand. To date, Defendants have not changed their conduct. A true and correct copy of Defendants' response is attached as **Exhibit C**.

151. On August 3, 2026, Plaintiff Chan, through counsel, served on Defendants a separate written demand for relief under Mass. Gen. Laws ch. 93A, § 9(3), on behalf of himself and all similarly situated persons (the "*Chan* 93A Demand"). A process server delivered the *Chan* 93A Demand by hand to Defendants, to the attention of DraftKings' Legal Department at Defendants' Boston headquarters on August 4, 2026.

152. The *Chan* 93A Demand identified the claimant and reasonably described the unfair and deceptive acts and practices relied upon. It stated that Defendants willfully and knowingly (1) offered, through Predictions, sports gambling that is functionally identical to online sportsbook wagers that are illegal in those States; (2) marketed sports gambling on Predictions as lawful and

safe when they knew it was not; and (3) deceived consumers into thinking they were not gambling against the House, when they were. It enclosed and incorporated the complaint in the *Chan* Action. It demanded payment of all amounts wagered on Predictions by residents of those States, and that Defendants stop marketing Predictions as a legal way to bet on sports in those States and stop accepting funds from their residents for sports betting on Predictions. A true and correct copy of the *Chan* 93A Demand is attached as **Exhibit D**. More than thirty days have passed since Defendants received the *Chan* 93A Demand. Defendants did not respond to the *Chan* 93A Demand or change their conduct.

153. By letter dated August 3, 2026, Plaintiff Chan, through counsel, notified Defendants of their violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*. ("CLRA"), on behalf of himself and all Predictions customers in California who wagered on sports (the "*Chan* CLRA Notice"). A process server delivered the *Chan* CLRA Notice by hand to Defendants, to the attention of DraftKings' Legal Department at DraftKings' Boston headquarters, on August 4, 2026.

154. The *Chan* CLRA Notice identified violations of Cal. Civ. Code § 1770, including §§ 1770(a)(5), (a)(7), and (a)(14). It explained that Defendants sell Californians sports bets that are functionally identical to illegal online sportsbook wagers, marketed Predictions as legal and safe in California when it is not, and deceived consumers into thinking they were not gambling against DraftKings. Under Cal. Civ. Code §§ 1781 and 1782(a)(2), it demanded that Defendants (1) cease the misrepresentations and omissions; (2) notify each Class member; (3) on request, refund the amounts wagered on sports bets; and (4) pay attorneys' fees and costs. It warned that Plaintiff would seek damages if Defendants did not act within thirty days. A true and correct copy

of the *Chan* CLRA Notice is attached as **Exhibit E**. The venue declarations required by Cal. Civ. Code § 1780(d) for Plaintiffs Chan, Goldstein, and Harris are attached as **Exhibit F**.

155. By letter dated November 3, 2026, Plaintiffs Gordon and Weissmann, both citizens of Texas, through counsel, gave Defendants written notice of their claims under the Texas Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq.* ("DTPA"), on behalf of themselves and all persons in Texas who spent money buying sports-related event contracts on Predictions (the "*Gordon* DTPA Notice"). Counsel served the *Gordon* DTPA Notice by email on Defendants' counsel under Tex. Bus. & Com. Code § 17.505(a).

156. The notice supplemented the *Gordon* 93A Demand and preserved Plaintiffs' Texas claims in the alternative. It identified each Plaintiff, stated that each saw the "Live in All 50 States" app-store listing before opening an account, and stated that each wagered and lost money and paid transaction fees on Predictions. It specified violations of § 17.46(b)(5), (7), (12), and (24) and an unconscionable course of action under §§ 17.45(5) and 17.50(a)(3). It explained that Defendants represented Predictions as lawful in Texas when it is gambling under Texas Penal Code Chapter 47; represented that users trade with one another when DraftKings and its affiliated market makers take the other side; displayed odds that omit transaction fees disclosed only at checkout; and concealed that Predictions is unlicensed, that its legality was contested, that its affiliates take adverse positions, and that it receives rebates on customer trades. It demanded that Defendants (1) refund all amounts deposited and lost on Predictions, with all fees, to Plaintiffs and all Texas consumers; (2) stop offering sports-related event contracts in Texas and stop marketing Predictions as lawful there; (3) provide an accounting of all amounts collected from Texas consumers, including fees and rebates; and (4) pay attorneys' fees and expenses. A true and correct copy of the *Gordon* DTPA Notice is attached as **Exhibit G**.

157. On November 6, 2026, Plaintiffs Gordon and Weissmann, through counsel, sent a copy of the *Gordon* DTPA Notice to the Consumer Protection Division of the Office of the Attorney General of Texas by certified mail, as required by Tex. Bus. & Com. Code § 17.501(a). Plaintiffs will also send a copy of this Consolidated Class Action Complaint to the Consumer Protection Division within 30 days. *Id.*

## CLASS ALLEGATIONS

158. Under Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves and the following class:

> **The Class:** All persons who spent money purchasing sports-related "contracts" (i.e., bet on sports) on the DraftKings Predictions mobile or web platforms.

159. In addition, or in the alternative, Plaintiffs propose the following subclasses:

> **California Subclass:** All persons in California who spent money purchasing sports-related "contracts" (i.e., bet on sports) on the DraftKings Predictions mobile or web platforms.
>
> **Florida Subclass:** All persons in Florida who spent money purchasing sports-related "contracts" (i.e., bet on sports) on the DraftKings Predictions mobile or web platforms.
>
> **Texas Subclass:** All persons in Texas who spent money purchasing sports-related "contracts" (i.e., bet on sports) on the DraftKings Predictions mobile or web platforms.

160. Excluded from the Classes are: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally

adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any excluded person.

161. Plaintiffs reserve the right to amend or modify the class definitions as discovery proceeds.

162. The Classes contain hundreds of thousands of members. Joinder is impracticable.

163. Class members are identifiable from Defendants' records. Defendants collect each customer's legal name, date of birth, tax identification number and address, verify identity and eligibility, and record geolocation. They therefore know each Class member's State, deposits, wagers, fees paid, and losses.

164. Common questions of law and fact predominate over individual questions. They include:

a. whether Predictions' sports markets are unlawful gambling;

b. whether the Terms of Use require the application of Massachusetts substantive law;

c. whether Plaintiffs and Class members lost money or other things of value on Predictions;

d. whether Defendants, directly or through affiliates, take positions adverse to customers and profit regardless of outcome, and whether they disclosed those facts;

e. whether Defendants' display of bet prices in American odds was likely to mislead reasonable consumers;

f. whether Defendants are liable for conduct that was unlawful, unfair, deceptive, or misleading under applicable law, including Mass. Gen. Laws ch. 93A, §§ 2, 9;

g. whether DraftKings Inc., GUS III LLC, or the Predictions Enterprise is an enterprise under 18 U.S.C. § 1961(4), and whether Mr. Robins conducted or participated in its affairs;

h. whether Defendants' operation of Predictions constitutes a pattern of racketeering activity, including violations of 18 U.S.C. §§ 1084, 1952, 1955, 1341, and 1343, or the collection of unlawful debt under 18 U.S.C. § 1961(6);

i. whether Defendants conspired to violate 18 U.S.C. § 1962(c);

j. whether Defendants violated Fla. Stat. §§ 772.103 and 895.03;

k. whether Defendants were unjustly enriched; and

l. the proper measure of damages, including treble damages under 18 U.S.C. § 1964(c) and Fla. Stat. § 772.104(1), restitution, and disgorgement.

165. Each Class member assented to the same Terms of Use, which select Massachusetts substantive law for the Agreements. Massachusetts also has the most significant relationship with the claims, because Defendants likely designed, approved, and directed the challenged conduct from Massachusetts, where they are headquartered. A single body of law therefore governs the Class's claims, and common questions predominate. Moreover, the federal RICO claims arise under a single federal statute that applies uniformly to every Class member, wherever located. The Subclass claims are pleaded in the alternative under the laws of California, Florida, and Texas, each of which applies uniformly within its Subclass.

166. Plaintiffs' claims are typical. Each Plaintiff wagered and lost money on Predictions because of the same course of conduct.

167. Plaintiffs will fairly and adequately protect the interests of the Classes. They have retained counsel experienced in complex class litigation. Neither Plaintiffs nor their counsel has interests adverse to the Classes.

168. A class action is superior to other methods. Individual losses are small relative to the cost of individual litigation. Class treatment avoids duplicative proceedings and inconsistent rulings.

169. Defendants have acted on grounds generally applicable to the Classes, making final injunctive and declaratory relief appropriate for the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of RICO, 18 U.S.C. § 1962(c)
### (On Behalf of All Plaintiffs and the Class Against Defendant Robins)

170. Plaintiffs incorporate all preceding paragraphs as if fully set forth here.

171. DraftKings Inc. is an "enterprise" under § 1961(4). DraftKings Inc. has an existence apart from the racketeering. It is a publicly traded corporation with its own board, thousands of employees, public stockholders, $6.1 billion in fiscal year 2025 revenue, and licensed sportsbook operations in approximately 27 States and the District of Columbia.

172. In the alternative, GUS III LLC is the enterprise. It has its own legal existence, NFA registration, place of business, and trade names.

173. In the further alternative, Mr. Robins, DraftKings Inc., GUS III LLC, DKeX, DraftKings' dedicated market-making division, and the exchange and clearing partners that list, execute, and clear Predictions bets, including CME Group, Crypto.com, and Bitnomial Clearinghouse, LLC, are a group of individuals and entities associated in fact that constitute an "enterprise" under 18 U.S.C. § 1961(4) (the "Predictions Enterprise"). The Predictions Enterprise

has a common purpose: to offer and profit from sports wagers placed by customers located in States where DraftKings holds no sportsbook license and where sports betting is illegal. Its members are bound by contracts, routing arrangements, market-maker incentive programs, and fee-and-rebate sharing. It is an ongoing organization whose members function as a continuing unit to achieve that purpose. It has operated continuously since at least December 2025, long enough to pursue its purpose, and it continues to operate today. The Predictions Enterprise is distinct from Mr. Robins and from each of its other members, and it includes CME Group, Crypto.com, and Bitnomial Clearinghouse, LLC, which are outside the DraftKings corporate family.

174. Mr. Robins is a "person" under 18 U.S.C. § 1961(3). A natural person who directs a corporation is distinct from it, even when he is its chief executive and acts within the scope of his employment. Mr. Robins does not own DraftKings; he directs it. He holds approximately 88 percent of its voting power but a far smaller share of its equity. DraftKings tells investors that his interests "may differ" from theirs and may be "adverse." The NFA lists him separately as an "Indirect Owner" of GUS III LLC with a "10% or More Financial Interest." He thus has a personal stake in Predictions that is his own, not DraftKings'.

175. Furthermore, Mr. Robins conducted and participated in the conduct of the enterprise's affairs through his own acts, not merely through his title. He personally announced Predictions in a November 2025 investor letter issued in his own name. He publicly explained the decision to offer sports bets only in States where DraftKings holds no sportsbook license, stating that DraftKings sees little "financial opportunity in places where we already have online sports betting," which indicates that he likely made that choice. He likely approved the October 21, 2025 Railbird acquisition, which he disclosed in an annual report he signed. He likely directed the June 2026 Super App launch. He personally promoted Predictions to investors and the public, stating

that DraftKings is "offering our sports predictions product only in the states that we don't have legal sports betting." It seems likely that he also approved the "Live in All 50 States" campaign. Lower-level personnel, including the dedicated market-making division, likely carried out these decisions under his direction.

176. Mr. Robins conducted the enterprise's affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5). The predicate acts fall into five categories:

(a) **Illegal gambling business (18 U.S.C. § 1955).** Mr. Robins conducted, financed, managed, supervised, directed, and owned an illegal gambling business in violation of the gambling laws of Massachusetts (Mass. Gen. Laws ch. 23N, § 5(a)), California (Cal. Penal Code §§ 330, 337a), Texas (Tex. Penal Code § 47.03(a)(2)), Florida (Fla. Stat. §§ 849.14, 849.25), and other States where Predictions operates. *See supra* ¶ 146; *infra* ¶¶ 200, 239-241, 315-316. Five or more persons participated in the illegal gambling business during a continuous period and DraftKings generated more than $2,000 in single-day revenue.

(b) **Transmission of wagers and wagering information (18 U.S.C. § 1084).** Mr. Robins, through DraftKings, knowingly used wire communication facilities to transmit, in interstate commerce, bets and wagers on sporting events, and information assisting in placing them, while engaged in the business of betting or wagering. When a customer located in California, Texas, Florida, or another State where DraftKings holds no sportsbook license places a wager through the App, DraftKings geolocates the customer and accepts the wager. DraftKings then appears to route the order through systems controlled from Boston to DKeX in New York or to other exchanges, match it, and settle it through clearinghouses outside the customer's State. Every such transmission appears to originate in a State where the wager is illegal. Mr. Robins likely

knows where each wager originates because DraftKings geolocates every customer before accepting it and offers state-specific products.

**(c) Use of interstate facilities in aid of unlawful activity (18 U.S.C. § 1952).** Mr. Robins, through DraftKings, used facilities in interstate commerce, including the internet, the App, interstate wires, and the mails, with intent to promote, manage, and carry on an unlawful activity. Namely, a business enterprise involving gambling in violation of the laws of the States in which it operates. From Boston, DraftKings likely delivered the App and its sports betting markets to consumers in California, Texas, Florida, and other States where DraftKings holds no sportsbook license, and marketed illegal markets to them through nationwide ad campaigns. DraftKings appears to have routed each wager to DKeX in New York or to other exchanges and settled it through out-of-state clearinghouses. *See supra* ¶ 56. After each such use, Mr. Robins, through DraftKings, performed further acts to carry on the business. DraftKings likely accepted and matched wagers, collected Administrative and Ancillary Fees, took the other side of customer positions through its market makers, and paid out and collected on settled bets.

**(d) Mail and wire fraud (18 U.S.C. §§ 1341, 1343).** Mr. Robins, through DraftKings, used interstate wires and mail to further a scheme to obtain money through two false representations: that Predictions is lawful in all 50 States; and that users trade with one another rather than against DraftKings. These predicates are pleaded with particularity. DraftKings transmitted the "Live in All 50 States" representation by interstate wire, through the app-store listing and in the App, to each Plaintiff before account opening and at each session. *See supra* ¶¶ 19–24, 101–102. DraftKings transmitted the representation that users "trade with one another on the exchange, not against the operator" through sponsored promotions. *See supra* ¶ 78. Each resulting wager and fee was transmitted by interstate wire. *See supra* ¶ 56.

(e) **State-law gambling felonies (18 U.S.C. § 1961(1)(A)).** Mr. Robins, through DraftKings, committed acts involving gambling that are chargeable under State law and punishable by imprisonment for more than one year, including: receiving, recording, and forwarding bets in violation of Tex. Penal Code § 47.03(a)(2); and bookmaking in violation of Fla. Stat. § 849.25(2). Each is a felony of the third degree.

177. Independently of any pattern, Mr. Robins conducted the enterprise's affairs through the collection of unlawful debt under 18 U.S.C. §§ 1961(6) and 1962(c). The Administrative and Ancillary Fees and losing stakes DraftKings collects on each wager are debts incurred in gambling activity that violates State law, in connection with the business of gambling.

178. At least five persons have conducted, financed, managed, supervised, directed, or owned Predictions since its launch on December 19, 2025. They are: (1) Mr. Robins, who appears to have directed the launch, state selection, and strategy; (2) GUS III LLC, the customer-facing broker that appears to have designed, priced, and marketed the product and collected transaction fees; (3) DKeX, the exchange that lists and executes the sports bets; (4) DraftKings' dedicated market-making division, which takes the other side of customer wagers, and its personnel, including Jeanine Hightower-Sellitto, Senior Vice President and General Manager of DraftKings Predictions; and (5) the exchange and clearing partners that list, execute, and clear the bets, including the Chicago Mercantile Exchange Group, Crypto.com, and Bitnomial Clearinghouse, LLC. The business has operated continuously for more than 30 days. It has also earned more than $2,000 in gross revenue in a single day. By October 2026, DraftKings reported $10.1 billion in annualized consumer volume on Predictions, or more than $27 million per day. *See supra* ¶ 62. DraftKings collects a fee on every trade.

179. The predicate acts are related. Each shares the same purpose, participants, methods, and victims: selling sports wagers through Predictions, DKeX, and affiliated market makers in States where DraftKings holds no license.

180. The predicate acts are continuous. They are not a single scheme with a finite goal. They occur each time a wager is solicited, accepted, transmitted, or settled, and they number in the millions. This is DraftKings' regular way of operating Predictions, an ongoing business line that DraftKings reports together with its distinct Sportsbook revenue.

181. The predicate acts threaten to continue. Predictions was operating when this action was filed and continues to operate today. Mr. Robins expects "millions of new predictions customers." DraftKings has added new sports markets, combos, and its own exchange, DKeX. DraftKings has continued to accept wagers after this action was filed.[214]

182. Plaintiffs and the Class were injured in their property by reason of the violation in two independent ways. 18 U.S.C. § 1964(c). First, Plaintiffs were injured by the stakes they lost to DraftKings and its affiliated market makers, which took the other side of their wagers. Second, Plaintiffs and the Class were injured through the fees they paid on every unlawful wager. These fees are paid regardless of the wager's outcome and include: the Administrative and Ancillary Fees, exchange and clearing fees, rebates, and rake-like charges paid directly to DraftKings and its partners. *See supra* ¶¶ 70-71, 82.

183. Each Plaintiff and Class member would not have opened an account or paid any fee but for the representation, made at Mr. Robins' direction, that Predictions was lawful. Thus,

[214] In the alternative, the predicate acts span more than ten months, involve around 1.6 million customers in many States, and constitute closed-ended continuity. *See supra* ¶ 62.

Plaintiffs were induced to part with money they would otherwise not have spent at all. No third party's injury stands between the racketeering and this loss.

184. Plaintiffs and the Class are entitled to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT II**
**Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of All Plaintiffs and the Class Against All Defendants)**

185. Plaintiffs incorporate paragraphs 1 through 169 and Count I as if fully set forth here.

186. Mr. Robins appears to have agreed with each of DraftKings Inc., GUS III LLC, and DKeX that he would conduct the affairs of DraftKings Inc., or alternatively GUS III LLC or the Predictions Enterprise, through the pattern of racketeering activity alleged in Count I.

187. This Count rests on the substantive violation pleaded in Count I, in which a natural person, Mr. Robins, conducts a distinct corporate enterprise. Each agreement alleged here was between Mr. Robins, a natural person with a personal stake in the scheme, and a legally distinct entity. Plaintiffs do not allege that the DraftKings entities conspired only among themselves. Each Defendant knew of and agreed to the general objective: offering sports wagers through Predictions in States where DraftKings holds no license and collecting fees and trading profits on those wagers. Each Defendant agreed that at least two of the predicate acts alleged in Count I would be committed in furtherance of that objective. *See supra* ¶ 176(a)–(e).

188. The object of each agreement was criminal. Defendants agreed to commit federal crimes under 18 U.S.C. §§ 1955, 1084, and 1952 and state felonies under Mass. Gen. Laws ch. 23N, § 5(a), Cal. Penal Code §§ 330, 337a, Tex. Penal Code § 47.03(a)(2), and Fla. Stat. §§ 849.14, 849.25.

189. Mr. Robins also has a personal stake in the scheme independent of his role as an officer. His pay is almost entirely equity. For 2025, he took a base salary of $1 and received about $19.2 million in stock awards.[215] Part of that equity is performance stock units whose payout, from 25 percent to 200 percent of target, turns on DraftKings' fiscal year 2026 net revenue and Adjusted EBITDA.[216] DraftKings counts Predictions revenue in its reported revenue. *See supra* ¶ 63. Every dollar of Predictions revenue therefore moves Mr. Robins' own payout. The NFA also lists him separately as an "Indirect Owner" of GUS III LLC with a "10% or More Financial Interest." *See supra* ¶ 33.

190. In addition, the exchange and clearing partners that list, execute, and clear Predictions sports bets, including CME Group, Crypto.com, and Bitnomial Clearinghouse, LLC, appear to have knowingly agreed to facilitate sports wagers by customers located in States where those wagers are illegal. These co-conspirators are outside the DraftKings corporate family.

191. Each Defendant objectively manifested that agreement through its own acts:

**(a)** **Mr. Robins** appears to have directed the launch, state selection, Railbird acquisition, and Super App, and announced the strategy to investors.

**(b)** **DraftKings Inc.** funded Predictions, acquired Railbird, and operated the dedicated market-making division that trades against customers.

**(c)** **GUS III LLC** designed, priced, and marketed the customer-facing product, set market parameters, collected transaction fees, and received rebates for routing orders.

---

[215] Proxy Statement, *supra* n.9.

[216] *Id.*

**(d)** **DKeX,** a pre-existing exchange DraftKings acquired on October 21, 2025, self-certified sports-only bets, listed and executed customer wagers, and ran a market-maker incentive program allowing positions ten times larger than ordinary users.

192. Each Defendant appears to have acted knowingly. Mr. Robins has said it is "completely a myth" that sports prediction markets differ from a sportsbook, that customers "don't really even understand the difference," and that DraftKings avoids States where it holds licenses because going there would "upset regulators." Defendants' Terms of Use disclaim any warranty that Predictions is lawful in any jurisdiction while Defendants market it as available in all 50 States.

193. Plaintiffs and the Class were injured in their property by reason of the conspiracy, as alleged in Count I. That injury flowed directly from overt acts of racketeering committed in furtherance of the conspiracy: GUS III LLC solicited, accepted, and charged fees on each wager, and DKeX listed, matched, and executed each wager, in violation of 18 U.S.C. §§ 1084, 1955, and 1952, and Defendants collected the Administrative and Ancillary Fees on every one of those transactions. Plaintiffs and the Class are entitled to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT III**
**Violation of the Massachusetts Consumer Protection Act**
**Mass. Gen. Laws ch. 93A, §§ 2, 9**
**(On Behalf of All Plaintiffs and the Class Against All Defendants)**

194. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

195. All Plaintiffs bring this Count individually and on behalf of the Class under Mass. Gen. Laws ch. 93A, § 9(1)–(2) and Fed. R. Civ. P. 23.

196. The Terms of Use provide that the Agreements "shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles or any other law or regulation that would permit or require the application of the

substantive laws of any jurisdiction other than the Commonwealth of Massachusetts." That clause appears in a separate section titled "CONSENT TO JURISDICTION IN MASSACHUSETTS, CHOICE OF LAW, ATTORNEYS' FEES," apart from the warranty disclaimer, release, and waiver of damages. It applies equally to both parties. Defendants chose it, selecting the law of their own home State, where they are headquartered. Defendants also chose Boston as the exclusive forum. The Agreements govern every Predictions account, every use of the App and the Services, and every Commodity Transaction. Each Plaintiff and each Class member accepted them on the same terms by opening an account. Chapter 93A therefore applies uniformly to the claim of every Class member, wherever they reside.

197. Massachusetts law also applies if the Agreements are void as gambling bets because the choice-of-law clause is severable. The Terms of Use provide that if any term is invalid, "all other terms of the Agreements shall remain in full force and effect." *See supra* ¶ 118. Defendants drafted the clause and the severability provision, and they should not be allowed to escape their own choice of law by invoking the illegality of their own product.[217]

198. Massachusetts also has the most significant relationship to the challenged conduct. Because DraftKings' executive leadership, marketing, product, legal, and compliance functions are in Boston, Defendants likely designed, priced, marketed, and operated Predictions from Boston, wrote and disseminated the challenged representations, and set and collected its fees there. Defendants are also licensed by the Massachusetts Gaming Commission to offer sports wagering in Massachusetts, market their gambling products to Massachusetts consumers, and employ personnel in Massachusetts. Based on these facts, it seems likely that the decisions to launch

[217] Even if the clause did not survive, Massachusetts law would still govern because Massachusetts has the most significant relationship to the challenged conduct, as alleged below.

Predictions in unlicensed States, to market it as legal in all 50 States, and to withhold the omitted facts were made by executives in Boston. The conduct occurred primarily and substantially within the Commonwealth.

199. Plaintiffs and Class members are "persons" under Mass. Gen. Laws ch. 93A, § 1(a).

200. Defendants engaged in unlawful conduct. The Massachusetts Sports Wagering Law provides that "[n]o person shall engage in sports wagering in the commonwealth except as provided in this chapter." Mass. Gen. Laws ch. 23N, § 5(a). Predictions accepts "wager[s]," meaning sums "risked on an uncertain occurrence," on sporting events without a license. *Id.* § 3. The Massachusetts Superior Court has preliminarily enjoined a prediction market from offering sports event bets without that license. *See KalshiEX*, No. 2584CV02525; *supra* ¶ 135. The same reasoning applies to Predictions. That statute protects public health, safety, and welfare, and Defendants' knowing violation of it is unfair and deceptive under § 2 and 940 Code Mass. Regs. § 3.16(3).

201. Independent of any statutory violation, Defendants' conduct is unfair. It falls within the penumbra of the Commonwealth's gaming statutes because it is immoral, unethical, oppressive, and unscrupulous; and because it caused substantial injury that consumers could not reasonably avoid and that no countervailing benefit outweighs. Defendants deliberately marketed an addictive gambling product in States that outlaw it, stripped of the safeguards the licensed product carries, and called consumer confusion "actually a huge advantage." Defendants also used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers likeliest to lose; shut down the model their own data scientists built to identify at-risk customers; and used Sportsbook data and modeling to trade against their own customers through affiliated market makers. *See supra* ¶¶ 54, 74-75, 128-130.

202. Defendants' affirmative representations and omissions also had the capacity to mislead reasonable consumers. Defendants represented that DraftKings is "Live in All 50 States" and that Predictions could lawfully be used in every State; represented that users were "trading" rather than wagering; presented a betting board indistinguishable from Sportsbook; conveyed that users traded with one another in a neutral marketplace; and advertised headline odds that omitted transaction fees. Defendants failed to disclose that Predictions is unlicensed, that its legality was contested, that their affiliates take adverse positions, that they receive undisclosed rebates, and that licensed-operator protections do not apply. *See* 940 Code Mass. Regs. § 3.16(2).

203. This deception concerns legality itself, not the rules or odds of a regulator-approved game. Unlike patrons of a licensed casino who understood the rules and the stakes, Class members were told that an unlicensed product was lawful. No Massachusetts regulator has approved Predictions or interpreted the law to permit it. No regulatory proceeding is pending that would resolve these claims, so no stay under § 9(7) is warranted. The Massachusetts Gaming Commission has instead told its licensees, including DraftKings, that offering sports event bets in Massachusetts is prohibited.

204. Defendants' display of bet prices in bookmaker-style American odds was itself an unfair and deceptive act. It presented each wager as a bookmaker's line while concealing the price, probability, and margin of the transaction. Even the CFTC's staff described the format as the one "used by casino gambling bookmakers" and warned that it is "likely to mislead market participants about the nature of the transaction." *See supra* ¶¶ 87-88. The nature of the transaction is a sports

wager, and the display concealed the cost of that wager. The display therefore had the capacity to mislead reasonable consumers under § 2(a).[218]

205. Plaintiffs and the Class suffered separate, identifiable harm, including: (a) money deposited and lost on an illegal product they would not have used had the truth been disclosed; (b) Administrative and Ancillary Fees, which Defendants kept whatever the outcome and which the advertised odds did not reflect; (c) inflated effective prices from the margin built into both sides of each transaction; and (d) the loss of protections state law requires of licensed operators, including responsible-gaming tools, deposit and time limits, statutory self-exclusion, integrity monitoring, age verification at twenty-one, segregation of customer funds, and reserve requirements. Each category is an independent injury. Each category is measured objectively.

206. Defendants implicitly represented that Predictions met a legally required standard, licensure under Mass. Gen. Laws ch. 23N and the comparable laws of each Class member's State, and it did not. An unlicensed product without the safeguards required by Mass. Gen. Laws ch. 23N, § 4(d)(2) was worth less, as used, than the lawful product Defendants advertised. The fees and margin are fixed, out-of-pocket amounts shown on Defendants' own screens. *See supra* ¶ 71. In addition to, and independent of, the harm flowing from Predictions' illegality, Plaintiffs and the Class were harmed by Defendants' misrepresentations and omissions about who sat on the other side of their trades, about the margins embedded in each price, and about the protections that would apply. That deception caused the harm in categories (a), (b), and (c) even if Predictions were found lawful. Had Defendants disclosed that DraftKings and its affiliates took the other side of customer wagers with superior information and models, reasonable consumers would not have wagered on

---

[218] Plaintiffs do not assert a claim under the Commodity Exchange Act and do not concede that Defendants' sports bets are swaps or that any federal regime governs them. Plaintiffs rely on the CFTC staff's observations only as evidence that the display was deceptive under Massachusetts law.

Predictions at all. Under this theory, amounts deposited and lost are measured net of any winnings withdrawn.

207. Defendants' unfair and deceptive acts caused these injuries. Every Class member wagered on the same unlicensed product, through the same App, under the same Terms of Use, and after exposure to the same uniform labels, betting-board presentation, and headline odds. Every wager placed with an unlicensed operator lost the protections state law requires, and every transaction carried a margin built into its price. Had Defendants disclosed the omitted facts, reasonable consumers would not have wagered on Predictions. Separately, and in addition to causation through illegality, Defendants' counterparty, pricing, and protection misrepresentations and omissions each had the capacity to mislead, caused Class members to pay more than they otherwise would have paid, and caused them to wager money they otherwise would not have wagered, whether or not any wager was lawful.

208. Plaintiffs satisfied the demand requirements of Mass. Gen. Laws ch. 93A, § 9(3). As alleged in paragraphs 148 through 152, the *Gordon* 93A Demand was served April 29, 2026, more than thirty days before suit, and the *Chan* 93A Demand was delivered on August 4, 2026, more than thirty days before this Consolidated Class Action Complaint. Defendants made no written tender of settlement in response to either demand.

209. Defendants' violations were willful and knowing. Defendants are sophisticated, licensed operators who know that sports wagering may be offered only with a license, and their own Terms of Use anticipate that States would demand they stop. Defendants also continued to display bet prices in American odds after the CFTC Odds Letter gave them notice that the format was the one used by casino gambling bookmakers and was likely to mislead consumers. Their

refusal to grant relief was made in bad faith with knowledge or reason to know that their conduct violated § 2.

210. Chapter 93A permits a class action where the unfair or deceptive act "has caused similar injury to numerous other persons similarly situated" and the plaintiff "adequately and fairly represents such other persons." Mass. Gen. Laws ch. 93A, § 9(2). Both conditions are met. Thousands of Class members opened accounts under the same Terms of Use, received the same representations and omissions, wagered on the same unlicensed product, and suffered the same types of injury. Defendants' records identify each member, their State, and the amounts deposited, wagered, paid in fees, and lost. Because Massachusetts law governs every member's claim, no variation in state consumer-protection law defeats predominance. For the reasons stated in the Class Allegations, the requirements of Rule 23(a) and (b)(3) are also satisfied.

211. Plaintiffs and the Class are entitled to actual damages or statutory damages of $25 per Class member, whichever is greater; not less than two and up to three times actual damages; reasonable attorneys' fees and costs under Mass. Gen. Laws ch. 93A, § 9(4); and injunctive and other equitable relief.

## COUNT IV
**Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of All Plaintiffs and the Class Against All Defendants)**

212. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here. This Count is pleaded in the alternative to Count V.

213. All Plaintiffs bring this Count individually and on behalf of the Class.

214. Massachusetts law governs for the reasons stated in paragraphs 196 through 198.

215. The Agreements form a contract between Defendants and each Class member. Defendants drafted the Agreements. Each Class member assented to them by opening an account.

In exchange for access to the App and the Services, Class members deposited funds and paid the transaction fees Defendants charged.

216. Plaintiffs and the Class performed their portion of the contract when they funded their accounts, paid every fee Defendants charged, and complied with the Agreements.

217. Defendants breached the implied covenant of good faith and fair dealing, and the express terms of the Agreements, by (a) providing unlicensed sports wagers that are unlawful under the law of the State where that wager occurred; (b) charging fees and building margins into contract prices that were illegal under the law of the State where that wager occurred; and (c) failing to offer services in compliance with the law of the State where that wager occurred.

218. The Agreements gave Defendants broad discretion over the promotions they offered, the routing and execution of customer orders, the counterparties to customer trades, and the Responsible Trading tools they made available. The fruit of the Agreements for Class members was access to a marketplace in which Defendants acted as broker and administered the Services fairly.

219. Defendants exercised that discretion in bad faith to gain an unbargained-for advantage over their own customers. Specifically, Defendants: (a) used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers likeliest to lose, the logic under which "the best investment would be a problem gambler"; (b) shut down the model their own data scientists built to identify at-risk customers, and decided not to use predictive technology for problem gambling, while offering certain Responsible Trading tools they disclaimed any obligation to provide; (c) routed customer orders to DKeX, where their own market maker trades; and (d) used Sportsbook data and modeling to trade against their customers through

affiliated market makers while representing that DraftKings earns only a broker's fee. *See supra* ¶¶ 54, 74-75, 128-130.

220. Defendants' disclaimer of any warranty of legality does not bar the implied covenant claim, which is part of every contract governed by Massachusetts law, and which cannot be waived. The release, disclaimer, and limitation-of-liability provisions of the Terms of Use do not permit Defendants to exercise their contractual discretion in bad faith against the customers they serve.

221. As a direct and proximate result, Plaintiffs and the Class suffered damages, including Administrative and Ancillary Fees, inflated effective prices from the margins built into each transaction, and amounts lost on wagers induced by targeted promotions and placed against Defendants' affiliated market makers. They are entitled to damages, with interest under Mass. Gen. Laws ch. 231, § 6C, and costs.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of All Plaintiffs and the Class Against All Defendants)**

222. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here. This Count is pleaded in the alternative to Count IV.

223. All Plaintiffs bring this Count individually and on behalf of the Class.

224. This Count arises under Massachusetts law for the reasons stated in paragraphs 196 through 198. This is the case even though this Count alleges that the Agreements are void because the choice-of-law clause is separable and survives, and because Massachusetts has the most significant relationship to the challenged conduct. Massachusetts unjust enrichment law therefore applies uniformly to the claim of every Class member.

225. Plaintiffs and the Class conferred measurable benefits directly on Defendants, at their own expense, including (a) money deposited and lost; (b) Administrative and Ancillary Fees; (c) rebates and other consideration Defendants received in connection with Class members' wagers; (d) trading profits Defendants' affiliates realized by taking adverse positions; and (e) licensing, compliance, tax, and responsible-gaming costs Defendants avoided by operating outside state regulatory frameworks. Plaintiffs seek restitution of each category separately. Administrative and Ancillary Fees are recoverable whether or not amounts wagered and lost are recoverable.

226. Defendants knew of and appreciated these benefits. They track every deposit, wager, fee, and position, and report the resulting volumes to investors. Defendants voluntarily accepted and retained these benefits.

227. Plaintiffs and the Class reasonably understood that Defendants offered lawful consumer-to-consumer markets. They conferred these benefits on that understanding, which Defendants induced, and did not intend to fund an unlicensed gambling enterprise or Defendants' adverse trading. The parties are not in equal fault. Defendants knew Predictions was unlicensed and its legality contested, and took advantage of consumers by telling them it was lawful. Class members did not know, and had no means to learn, the facts that made the product unlawful.

228. Under principles of equity and good conscience, Defendants should not retain these benefits without paying their value. Defendants obtained them through conduct state law prohibits, through the misrepresentations and omissions alleged above, and by concealing from the consumers who paid them that Defendants and their affiliates traded against those consumers.

229. This Count is also pleaded in the alternative. To the extent the Agreements are void as gambling contracts, Plaintiffs lack an adequate remedy at law.

230. Defendants should be compelled to disgorge into a common fund, for the benefit of Plaintiffs and the Class, all proceeds they unjustly received.

**COUNT VI**
**Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**
**(In the Alternative, On Behalf of the California Subclass Against All Defendants)**

231. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

232. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

233. The Agreements form a contract between Defendants and each California Subclass member. Defendants drafted them, and each Subclass member assented by opening an account. Plaintiffs Chan, Harris, and Goldstein and the California Subclass performed by funding their accounts, paying the transaction fees Defendants charged, and complying with the Agreements.

234. Defendants breached the Agreements by: (a) providing unlicensed sports wagers that are unlawful under California law; (b) charging fees and building margins into contract prices that were illegal under California law; and (c) failing to offer services in compliance with Applicable Law.

235. The Agreements give Defendants broad discretion to set market parameters, price contracts, select and act as market makers, decide what information to share, and decide what promotions and Responsible Trading tools to offer. Defendants exercised that discretion in bad faith to deprive Subclass members of the benefit of their bargain. Their affiliates took positions against Subclass members, using Sportsbook data and modeling. They withheld information that "might cause you to seek to dispose of or retain or increase your position." They retained undisclosed rebates on Subclass members' transactions. And they used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers

likeliest to lose, while shutting down the model their own data scientists built to identify at-risk customers. *See supra* ¶¶ 54, 74-75, 128-130.

236. As a direct result, Plaintiffs Chan, Harris, and Goldstein and the California Subclass suffered damages in the amount of the Administrative and Ancillary Fees they paid, which Defendants charged and retained regardless of the outcome of any trade. They do not seek amounts wagered or lost.

**COUNT VII**
**Violations of California Gambling Laws,**
**Cal. Bus. & Prof. Code § 19800 *et seq.*; Cal. Penal Code §§ 330, 337a, 337j**
**(In the Alternative, On Behalf of the California Subclass Against All Defendants)**

237. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

238. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

239. California's Gambling Control Act requires that all gambling operations be licensed, and that every person who deals, operates, carries on, conducts, maintains, or exposes for play any gambling game obtain a state gambling license. Cal. Bus. & Prof. Code §§ 19801, 19850. It provides that "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." *Id.* § 19801(d). Defendants have not applied for or obtained any license under the Act. Plaintiffs plead these violations, and the Penal Code violations alleged below, both as an independent basis for restitution and as predicate "unlawful" acts under the UCL in Count VIII.

240. Defendants also violate Cal. Penal Code § 330 by conducting banking games, when they trade as the House through market makers, and percentage games, when they collect fees on consumers' bets.

241. Defendants violate Cal. Penal Code § 337a by bookmaking and by receiving, holding, and recording money wagered on the results of contests, and § 337j(a)(2) by receiving compensation or a share of revenue for carrying on a controlled game.

242. As a direct result, Plaintiffs Chan, Harris, and Goldstein and the California Subclass paid Administrative and Ancillary Fees to Defendants for operating a gambling enterprise that Defendants had no right to conduct. They are entitled to restitution of those fees, which Defendants collected regardless of the outcome of any wager, together with public injunctive relief and any other remedy available under California law. Plaintiffs do not seek restitution of amounts wagered or lost.

**COUNT VIII**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(In the Alternative, On Behalf of the California Subclass Against All Defendants)**

243. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

244. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

245. Plaintiffs Chan, Harris, and Goldstein, Defendants, and California Subclass members are "persons" under California's Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

246. Defendants violated the Gambling Control Act, Cal. Bus. & Prof. Code §§ 19801(d), 19850; Cal. Penal Code §§ 330, 337a, and 337j(a)(2), as alleged in Count VII; the False Advertising Law, as alleged in Count IX; and the CLRA, as alleged in Count X.

247. Defendants' conduct is immoral, unethical, oppressive, and unscrupulous, and its gravity outweighs any benefit. Among other things, Defendants used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers

likeliest to lose; shut down the model their own data scientists built to identify at-risk customers; and used Sportsbook data and modeling to trade against their own customers through affiliated market makers. *See supra* ¶¶ 54, 74-75, 128-130. It also offends the public policy California voters expressed in rejecting Propositions 26 and 27.

248. Defendants' representations and omissions, that users are "trading" rather than wagering, that the product is lawful, that users trade with one another in a neutral marketplace, and that advertised odds reflect the cost of a transaction, are likely to deceive reasonable consumers. So too is Defendants' display of bet prices in bookmaker-style American odds, the format even the CFTC's staff has described as the one "used by casino gambling bookmakers." Plaintiffs Chan, Harris, and Goldstein relied on them and would not have wagered had the truth been disclosed.

249. Plaintiffs Chan, Harris, and Goldstein and the California Subclass suffered injury in fact and lost money or property under § 17204, namely the Administrative and Ancillary Fees they paid. Those fees were charged for services Defendants could not lawfully provide, so Subclass members paid more than they would have paid had the truth been disclosed. In addition, and independently of whether any wager was lawful, Subclass members paid more than they would have paid because Defendants misrepresented who sat on the other side of their trades, concealed the margins embedded in each price, and misrepresented the protections that would apply. Defendants charged and kept these fees as the operator of Predictions, for their own services, not as a payment processor for third-party games. Plaintiffs do not ask the Court to enforce or adjudicate any wager. They remain at risk of continuing injury absent an injunction.

250. Plaintiffs seek restitution and disgorgement of Administrative and Ancillary Fees, public injunctive relief, and attorneys' fees under Cal. Code Civ. Proc. § 1021.5.

251. Plaintiffs plead this equitable claim in the alternative and lack an adequate remedy at law to the extent legal remedies would not reach fees obtained indirectly through rebates or would not stop Defendants' continuing conduct.

**COUNT IX**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 *et seq.***
**(In the Alternative, On Behalf of the California Subclass Against All Defendants)**

252. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

253. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

254. California's False Advertising Law ("FAL") makes it unlawful to disseminate, in connection with the sale of services, any statement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

255. Defendants disseminated advertising to California consumers, including through the app-store listing, video advertisements, social media, and the DraftKings app, that was untrue or misleading. Defendants advertised that DraftKings was "Live in All 50 States" and that users could legally place sports bets in every State. They described sports wagers as "trading" and "event contracts" and urged consumers to "trade sports like it's Wall Street." They presented Predictions as a legitimate prediction market in which users trade with one another and represented that DraftKings earns only a broker's fee. They also displayed bet prices in bookmaker-style American odds, the format even the CFTC's staff has described as the one "used by casino gambling bookmakers."

256. Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue or misleading. Defendants knew that Predictions holds no California

gambling license, acknowledged in their Terms of Use that its legality was contested, and knew that their affiliates take positions against customers using Sportsbook data and modeling. *See supra* ¶¶ 54, 74-75, 128-130.

257. These statements were likely to deceive reasonable consumers. Plaintiffs Chan, Harris, and Goldstein saw and relied on them in opening accounts and placing wagers and would not have done so had the truth been disclosed. As a result, Plaintiffs Chan, Harris, and Goldstein and the California Subclass lost money or property under § 17535, namely the Administrative and Ancillary Fees they paid. Those fees were charged for services Defendants could not lawfully provide. In addition, and independently of whether any wager was lawful, the statements that users trade with one another rather than against the operator were themselves untrue or misleading and caused Subclass members to pay fees they otherwise would not have paid.

258. Plaintiffs Chan, Harris, and Goldstein and the California Subclass seek restitution of Administrative and Ancillary Fees under Cal. Bus. & Prof. Code § 17535, public injunctive relief, and attorneys' fees under Cal. Code Civ. Proc. § 1021.5. Plaintiffs do not seek restitution of amounts wagered or lost. Plaintiffs plead this equitable claim in the alternative and lack an adequate remedy at law to the extent legal remedies would not reach fees obtained indirectly through rebates or would not stop Defendants' continuing advertising.

## COUNT X
## Violation of the California Consumers Legal Remedies Act
## Cal. Civ. Code § 1750 *et seq.*
## (In the Alternative, On Behalf of the California Subclass Against All Defendants)

259. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

260. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

261. The California Consumers Legal Remedies Act ("CLRA") prohibits the practices listed in Cal. Civ. Code § 1770(a) in any transaction intended to result, or that results, in the sale of goods or services to a consumer and gives any consumer who suffers damage a right of action. *Id.* § 1780(a).

262. Plaintiffs Chan, Harris, and Goldstein and California Subclass members are "consumers," Cal. Civ. Code § 1761(d), who purchased "services," *id.* § 1761(b), for personal, family, or household purposes in "transactions," *id.* § 1761(e). The services are Defendants' own account, brokerage, order-routing, matching, and execution services, for which Defendants charged Administrative and Ancillary Fees.

263. Defendants are also "persons." *Id.* § 1761(c).

264. Defendants violated the CLRA by: (a) representing that Predictions has characteristics and benefits it does not have, including that it is a lawful, neutral, peer-to-peer market, and by displaying bet prices in bookmaker-style American odds that misrepresent the nature of the transaction, § 1770(a)(5); (b) representing that Predictions is of a particular standard or quality when it is of another, including that it is a lawful, regulated product equivalent to a licensed sportsbook, when it is an unlicensed gambling product stripped of the age-verification, responsible-gaming, and integrity safeguards California law requires, § 1770(a)(7); (c) representing that the transactions confer rights and remedies they do not, including that users acquire enforceable positions in a lawful market protected by federal regulation, when the wagers are void and unenforceable under California law and carry none of the protections afforded customers of a licensed operator, § 1770(a)(14); and (d) inserting unconscionable provisions in the Terms of Use, including the disclaimer of lawfulness, which contradicts Defendants' advertising

that DraftKings is "Live in All 50 States," the shifting of legal risk to consumers, and the disclaimer of any obligation to provide the Responsible Trading tools Defendants advertise, § 1770(a)(19).

265. Defendants also had a duty to disclose the facts that made those representations misleading: that Predictions is unlicensed, that its legality was contested, that it lacks the safeguards California law requires of licensed operators, that the wagers confer none of the rights and protections afforded customers of a licensed operator, and that their affiliates take adverse positions using Sportsbook data and modeling. That duty arose because those facts were material, known exclusively to Defendants, and contrary to Defendants' partial representations, including the "Live in All 50 States" advertising that the Terms of Use disclaim.

266. Plaintiffs Chan, Harris, and Goldstein and the California Subclass relied on these misrepresentations and omissions and suffered damage as a result, including the Administrative and Ancillary Fees they paid. In addition, and independently of whether any wager was lawful, the misrepresentations that Predictions is a neutral, peer-to-peer market, and the omission of the margins embedded in each price and of Defendants' adverse positions, each violated § 1770(a)(5) and (a)(7) and caused that damage.

267. Because more than thirty days have passed since the *Chan* CLRA Notice without an appropriate correction, repair, replacement, or other remedy, Plaintiffs seek injunctive relief under § 1780(a)(2); actual damages and restitution limited to Administrative and Ancillary Fees; punitive damages; and attorneys' fees and costs under § 1780(a), (d), and (e).

## COUNT XI
## Unjust Enrichment and Restitution Under California Law
## (In the Alternative, On Behalf of the California Subclass Against All Defendants)

268. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth herein.

269. Plaintiffs Chan, Harris, and Goldstein bring this Count on behalf of the California Subclass.

270. California treats unjust enrichment as a quasi-contract claim for restitution.

271. Defendants received a benefit from every California Subclass member: the Administrative and Ancillary Fees charged to administer, process, match, and settle each trade. Defendants collected those fees on every transaction, whatever its outcome. The fees are fixed and identifiable, not gambling losses, and are paid to administer the games. Defendants charged them as the operator, for their own services, not as a payment processor for games run by others.

272. Defendants' retention of those fees is unjust. Defendants charged them to operate a gambling enterprise that California law forbids them to conduct. Cal. Bus. & Prof. Code §§ 19801(d), 19850. They obtained them through the uniform misrepresentations alleged above, including that Predictions is lawful and that users trade with one another. They concealed that their affiliates traded against the same customers who paid the fees, using Sportsbook data and modeling. And they directed promotions to the customers their models predicted were likeliest to lose, while shutting down the model built to identify at-risk customers. *See supra* ¶¶ 54, 74-75, 128-130.

273. Plaintiffs Chan, Harris, and Goldstein and the California Subclass seek restitution of the Administrative and Ancillary Fees they paid. They do not seek amounts wagered or lost. To the extent the Agreements are void, they lack an adequate remedy at law.

**COUNT XII**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201 *et seq.***
**(In the Alternative, On Behalf of the Florida Subclass Against All Defendants)**

274. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

275. Plaintiff Bing brings this Count on behalf of the Florida Subclass.

276. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") declares unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

277. Plaintiff Bing and the Florida Subclass members are "consumers." Fla. Stat. § 501.203(7). Defendants' advertising, offering, and sale of Predictions to persons in Florida is "trade or commerce." *Id.* § 501.203(8).

278. Defendants' conduct is unfair because it offends Florida's established public policy against unlicensed sports wagering and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Defendants marketed an addictive gambling product stripped of the safeguards their licensed product carries, permitted wagering at age eighteen, and called consumer confusion "actually a huge advantage." Defendants also used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers likeliest to lose; shut down the model their own data scientists built to identify at-risk customers; and used Sportsbook data and modeling to trade against their own customers through affiliated market makers. *See supra* ¶¶ 54, 74-75, 128-130.

279. Defendants represented that users were "trading" rather than wagering; presented a betting board indistinguishable from Sportsbook; displayed bet prices in bookmaker-style American odds, the format even the CFTC's staff has described as the one "used by casino gambling bookmakers"; and conveyed that users traded with one another in a neutral marketplace. Defendants failed to disclose that Predictions is unlicensed, that its legality was contested and known to be contested, that their affiliates take adverse positions, that they receive undisclosed rebates, and that licensed-operator protections do not apply. These representations and omissions were likely to mislead consumers acting reasonably.

280. Plaintiff Bing saw these representations, including the statement that DraftKings is "Live in All 50 States," before placing wagers while located in Florida. Defendants displayed the legality claim prominently and repeatedly. Any contrary disclaimer appears only in the Terms of Use, more than a dozen pages into a long document that consumers need not open to trade and is not displayed on the betting screens. A reasonable consumer would not see it. CFTC registration does not specifically permit this conduct. CFTC Regulation 40.11 prohibits registered entities from listing contracts that involve gaming. 17 C.F.R. § 40.11(a).

281. Defendants' practices caused Plaintiff Bing and the Florida Subclass actual damages, including (a) Administrative and Ancillary Fees, which Defendants kept for their own matching and execution services whatever the outcome and which are not money won or lost in any gambling transaction; (b) inflated effective prices from the margin built into each transaction; and (c) amounts deposited and lost on a product they would not have used had the truth been disclosed. Each category is a separate measure of actual damages. In addition, and independently of whether any wager was lawful, the misrepresentations and omissions about who sat on the other side of each trade, about the margins embedded in each price, and about the protections that would apply each caused the damages in categories (a), (b), and (c). Had Defendants disclosed that DraftKings and its affiliates took the other side of customer wagers, consumers acting reasonably would not have wagered on Predictions at all. Under this theory, amounts deposited and lost are measured net of any winnings withdrawn.

282. Plaintiff Bing and the Florida Subclass seek a declaratory judgment and injunctive relief under Fla. Stat. § 501.211(1); actual damages under § 501.211(2); and reasonable attorneys' fees and costs under §§ 501.211(2) and 501.2105.

**COUNT XIII**
**Violation of Florida's Civil Remedies for Criminal Practices Act and Florida RICO Act**
**Fla. Stat. §§ 772.103, 772.104, 895.03, 895.05(6)**
**(In the Alternative, On Behalf of the Florida Subclass Against Defendant Robins)**

283. Plaintiffs incorporate paragraphs 1 through 169, and the person, enterprise, and conduct allegations of Count I, *see supra* ¶¶ 171-177, as if fully set forth here.

284. Plaintiff Bing brings this Count on behalf of the Florida Subclass. This Count rests only on wagers placed by Subclass members while located in Florida and on injury suffered in Florida. Each predicate act alleged below is an offense under Florida law.

285. Florida's Civil Remedies for Criminal Practices Act makes it unlawful for any person employed by or associated with an enterprise to conduct or participate in the enterprise through a pattern of criminal activity or the collection of an unlawful debt. Fla. Stat. § 772.103(3). A person injured by such a violation may recover "threefold the actual damages sustained," with minimum damages of $200, and reasonable attorneys' fees and costs. *Id.* § 772.104(1). The Florida RICO Act prohibits the same conduct, *id.* § 895.03(3), and authorizes any aggrieved person to obtain injunctive relief without showing special or irreparable damage, *id.* § 895.05(6). Florida courts look to federal RICO decisions in construing these statutes.

286. DraftKings Inc. is an "enterprise" under Fla. Stat. §§ 772.102(3) and 895.02(5), which include corporations and other legal entities, whether licit or illicit. DraftKings Inc. exists wholly apart from the pattern alleged here. It is a publicly traded corporation with its own board of directors, thousands of employees, public stockholders, $6.1 billion in fiscal year 2025 revenue, and licensed sportsbook operations in approximately 27 States and the District of Columbia.

287. Mr. Robins is a "person" who is associated with the enterprise. A natural person who directs a corporation is distinct from it, even when he is its chief executive and acts within the scope of his employment. Mr. Robins does not own DraftKings; he directs it. He holds

approximately 88 percent of its voting power but a far smaller share of its equity. DraftKings tells investors that his interests "may differ" from theirs and may be "adverse." The NFA lists him separately as an "Indirect Owner" of GUS III LLC with a "10% or More Financial Interest." He thus has a personal stake in Predictions that is his own, not DraftKings'. The person and the enterprise are therefore distinct.[219]

288. Mr. Robins conducted and participated in the enterprise's affairs in Florida. He appears to have directed the December 2025 launch of Predictions and its sports bets in States, including Florida, where DraftKings holds no sportsbook license. Florida permits online sports betting only through the Seminole Tribe under its 2021 Gaming Compact, and DraftKings has long known it cannot operate there. It spent $22.7 million on a failed 2021 ballot initiative to open Florida to other operators and funded litigation challenging the Compact. *See supra* ¶ 146. When Predictions launched, DraftKings named Florida among its "key markets." *Id.* Mr. Robins himself singled out Florida, with California and Texas, as one of "the biggest states in the country" where DraftKings had no online sportsbook but now has Predictions. *See supra* ¶ 97. He also appears to have approved the October 21, 2025 acquisition of Railbird Exchange, LLC, the exchange that lists the sports bets offered in Florida. He likely directed the June 2026 launch of the Super App, whose Sports tab is powered by Predictions, in Florida. DraftKings then blanketed Broward County with billboards announcing "DraftKings Sports NOW IN FLORIDA" and "Let's Ride, Florida." It also advertised in Florida that consumers could "take your game anywhere," that DraftKings was "now live in the 305," and that Predictions was "Available in CA, FL, TX." *See supra* ¶ 146. Its national advertising targeted Floridians too: the Nick Jonas and Kevin Hart "All

[219] In the alternative, GUS III LLC is the enterprise. It is a separately organized limited liability company with its own NFA identification number (0571907), its own place of business at 222 Berkeley Street, Boston, and its own trade names, "DraftKings Predictions" and "DraftKings Sports."

50 states" road-trip ad runs through Florida and tells viewers that "even the New Yorkers that live in Miami can make picks." *See supra* ¶ 101. In September 2026, Mr. Robins named Florida a State "where we are seeing our Predictions growth." *See supra* ¶ 59.

289. Mr. Robins conducted the enterprise's affairs through a pattern of "criminal activity" under Fla. Stat. § 772.102(1)(a), and of "racketeering activity" under § 895.02(8)(a)48, which reaches any offense under chapter 849. Plaintiffs do not rely on fraud predicates in this Count. The predicate offenses are:

**(a) Receiving sports wagers (Fla. Stat. § 849.14).** Section 849.14 reaches anyone who "receives in any manner whatsoever any money or other thing of value staked, bet, or wagered" on the result of a contest of skill, speed, power, or endurance, and anyone who "aids, or assists, or abets, or influences in any manner" those acts. Through the enterprise, Mr. Robins receives money wagered by Florida consumers on sporting events and aids and abets those wagers.

**(b) Bookmaking (Fla. Stat. § 849.25).** Section 849.25 makes it a felony to engage in bookmaking, defined as taking or receiving, while engaged in the business of gambling, any bet or wager on the result of any trial or contest. Mr. Robins engages in bookmaking. He acts in a common scheme with two or more persons, including DraftKings Inc., GUS III LLC, DKeX, and their employees, to take and receive wagers, and he takes advantage of betting odds to produce a profit. Both are factors under § 849.25(1)(b).

290. Each wager accepted from a Subclass member in Florida is a separate incident of criminal activity. Mr. Robins has committed far more than two such incidents. They include, without limitation, the multiple wagers Plaintiff Bing placed on sporting events through Predictions while located in Florida since December 19, 2025. They also include the thousands of wagers other Subclass members placed through Predictions while located in Florida. Each of these

wagers occurred after Predictions launched on December 19, 2025. Each is identified in Defendants' records by date, amount, event, and the Subclass member who placed it. These records are in Defendants' exclusive possession, custody, and control.

291. These incidents form a pattern. They share the same intent, results, accomplices, victims, and methods: accepting sports wagers from Florida consumers through Predictions, DKeX, and affiliated market makers, without a Florida license, and collecting fees and trading profits on each one.

292. The incidents are not isolated. The last incident occurred within five years of a prior incident, and the incidents continue today. Fla. Stat. §§ 772.102(4), 895.02(7). The exclusion in § 772.102(4) for "fraudulent conduct arising out of a single contract or transaction" does not apply. The predicates here are gambling offenses, not fraud, and each arises from a separate wager.

293. The pattern has open-ended continuity. Accepting sports wagers in Florida is DraftKings' regular way of doing business there. It has likely been done thousands of times since December 2025 and likely been done every day. DraftKings reports Predictions revenue together with its licensed sportsbook revenue as a single business line. Mr. Robins expects "millions of new predictions customers" and has named Florida as a growth State. This is criminal conduct of an ongoing nature. In the alternative, the pattern has closed-ended continuity. It is a series of related predicates extending over a substantial period, more than ten months.

294. Independently of any pattern, Mr. Robins conducted the enterprise's affairs through the collection of unlawful debt. Debts arising from violations of Fla. Stat. §§ 849.14 and 849.25 are unlawful debts. *Id.* § 772.102(2). The Administrative and Ancillary Fees that DraftKings charges and collects on every Florida wager arise from those violations. Each collection of those fees is a separate violation of § 772.103(3).

295. Subclass members are not *in pari delicto* with Mr. Robins. He knew Predictions was unlicensed in Florida and told consumers it was "Live in All 50 States." He buried the risk of illegality in Terms of Use that consumers did not see. Subclass members had no means to learn the facts that made the product unlawful. Their fault, if any, is far less than his.

296. Plaintiff Bing and the Florida Subclass were directly injured by reason of the violation in two independent ways. First, Subclass members were injured by the stakes they lost to DraftKings and its affiliated market makers, which took the other side of their wagers. Second, Subclass members were injured through the Administrative and Ancillary Fees they paid to DraftKings on every Florida wager. These fees are paid regardless of the wager's outcome. DraftKings charged those fees for an unlawful service, and Subclass members paid them directly to DraftKings. Each Subclass member would not have opened an account or paid any fee but for the representation, made at Mr. Robins' direction, that Predictions was lawful. Thus, Subclass members were induced to part with money they would otherwise not have spent at all. No third party's injury stands between the violation and this loss.

297. Plaintiff Bing and the Florida Subclass are entitled to threefold their actual damages, with minimum damages of $200 per Subclass member, and reasonable attorneys' fees and costs under Fla. Stat. § 772.104(1). They are also entitled to an injunction under Fla. Stat. § 895.05(6) barring Mr. Robins, and those acting in concert with him at his direction, from continuing to conduct the enterprise's affairs in Florida through the pattern alleged above.

## COUNT XIV
## Rescission and Restitution
## (In the Alternative, On Behalf of the Texas Subclass Against All Defendants)

298. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

299. Plaintiffs Gordon and Weissmann bring this Count on behalf of the Texas Subclass.

300. The Agreements form a contract between Defendants and each Texas Subclass member. Defendants drafted the Agreements. Each Subclass member assented to them on the same terms by opening an account. Subclass members deposited funds and paid transaction fees in exchange for access to the Services.

301. Plaintiffs Gordon and Weissmann and the Texas Subclass funded their accounts, paid the transaction fees Defendants charged, and complied with the Agreements.

302. Defendants breached the Agreements by: (a) providing unlicensed sports wagers that are unlawful under Texas law; (b) charging fees and building margins into contract prices that are illegal under Texas law; and (c) failing to offer the Services in compliance with Applicable Law. Because the Agreements are founded on illegal gambling, Texas law will not enforce them, and Plaintiffs elect to rescind them.

303. Defendants knew Predictions was unlicensed in Texas, knew its legality was contested, and represented it as lawful. Subclass members did not know otherwise. The facts that made the transactions unlawful were known to Defendants and concealed from consumers.

304. Common evidence shows the deception. Every Subclass member accepted the same standardized Agreements. Every Subclass member received the same core message through the same channels: that Predictions was live and lawful in all 50 States, that wagers were "trading," and that users traded with one another in a neutral marketplace. Defendants delivered that message through uniform advertising, app-store listings, the App's betting-board presentation, and the Terms of Use. None of these materials disclosed that Predictions is unlicensed in Texas or that Defendants' affiliates trade against customers.

305. Defendants' misrepresentations induced each Subclass member's decision to open an account and wager and caused each member's losses. Legality was the precondition of every

transaction. No reasonable consumer knowingly enters an illegal contract. Each Subclass member paid money to Defendants only after receiving the representation of legality, and each lost money as a direct result.

306. Subclass members were similarly situated as to knowledge. Defendants controlled the facts about licensing and adverse trading. Subclass members had no access to them. No Subclass member knew before wagering that Predictions was unlicensed in Texas. Any mistake by Subclass members was a mistake of fact about this platform's specific licensing and regulatory status, not a mistake about Texas law. Defendants used their superior knowledge of those facts to gain an advantage over consumers who could not discover them.

307. Plaintiffs Gordon and Weissmann and the Texas Subclass elect to rescind the Agreements and every Predictions transaction. They tender any counter-restitution the Court deems equitable. They seek restitution of the consideration paid, including amounts deposited and lost, less any winnings withdrawn. Separately and independently, they seek restitution of the Administrative and Ancillary Fees, which were consideration for Defendants' own matching and execution services and are recoverable without proof of any wager.

**COUNT XV**
**Unjust Enrichment**
**(In the Alternative, On Behalf of the Texas Subclass Against All Defendants)**

308. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

309. Plaintiffs Gordon and Weissmann bring this Count on behalf of the Texas Subclass.

310. Defendants wrongfully secured benefits from every Texas Subclass member, including Administrative and Ancillary Fees, amounts deposited and lost, rebates on Subclass members' trades, and trading profits their affiliates realized against Subclass members.

311. Defendants secured those benefits by fraud and undue advantage. They sold a gambling product unlawful in Texas as lawful "trading." They concealed that their affiliates took adverse positions, using Sportsbook data and modeling. They withheld information they said they had "no duty" to share. They directed promotions to the customers their models predicted were likeliest to lose, while shutting down the model built to identify at-risk customers. *See supra* ¶¶ 54, 74-75, 128-130. Defendants were unjustly enriched because they profited from unlawful conduct.

312. Defendants' uniform misrepresentations induced every Subclass member's payments. It would be unconscionable for Defendants to retain these benefits. Plaintiffs Gordon and Weissmann and the Texas Subclass seek restitution and disgorgement of all benefits Defendants wrongfully secured, less any winnings withdrawn. Separately and independently, they seek restitution of the Administrative and Ancillary Fees.

**COUNT XVI**
**Restitution of Gambling Losses and Fees Paid in an Illegal Transaction**
**Tex. Penal Code ch. 47; Texas Common Law**
**(In the Alternative, On Behalf of the Texas Subclass Against All Defendants)**

313. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

314. Plaintiffs Gordon and Weissmann bring this Count on behalf of the Texas Subclass.

315. Texas Penal Code Chapter 47 prohibits gambling, gambling promotion, keeping a gambling place, and possessing a gambling device, absent a statutory exemption. "Gambling" includes making a bet on the partial or final result of a game or contest or on the performance of a participant. Tex. Penal Code § 47.01(4). Intentionally or knowingly receiving, recording, or forwarding a bet or offer to bet is gambling promotion, a felony of the third degree. *Id.* § 47.03(a)(2).

316. Predictions accepts wagers on sporting events from Texas consumers without any license or exemption, in violation of Chapter 47. Defendants did so knowingly and for profit.

317. Plaintiffs Gordon and Weissmann and the Texas Subclass lost money at gambling to Defendants, who received and retained those amounts together with Administrative and Ancillary Fees. Defendants and their affiliated market makers took the opposite side of Subclass members' wagers with their own capital and kept the stakes when Subclass members lost.

318. Under Texas law, a party to an illegal transaction may recover when the parties are not *in pari delicto*, including when the illegality depends on facts known to the defendant but unknown to the plaintiff. Defendants knew that each sports bet they sold to Texas residents was a bet on the outcome of a sporting event. Defendants designed the markets, set the prices, geolocated each customer, and offered sports bets in Texas precisely because Texas does not license online sports betting. Defendants told consumers the opposite. Subclass members did not know, and could not discover, the facts that made this platform unlawful.

319. Plaintiffs Gordon and Weissmann and the Texas Subclass are entitled to restitution of the amounts they paid, wagered, or lost, together with costs and other relief available under Texas law. Separately and independently, they are entitled to restitution of the Administrative and Ancillary Fees, which Defendants charged for their own services and which are recoverable without proof of any wager.

**COUNT XVII**
**Violation of the Texas Deceptive Trade Practices–Consumer Protection Act**
**Tex. Bus. & Com. Code §§ 17.41–.63**
**(In the Alternative, On Behalf of the Texas Subclass Against All Defendants)**

320. Plaintiffs incorporate paragraphs 1 through 169 as if fully set forth here.

321. Plaintiffs Gordon and Weissmann bring this Count on behalf of the Texas Subclass.

322. Plaintiffs Gordon and Weissmann and the Texas Subclass are "consumers" under Tex. Bus. & Com. Code § 17.45(4), and Defendants are "persons" under § 17.45(3).

323. On November 3, 2026, Plaintiffs Gordon and Weissmann gave Defendants written notice describing the acts complained of and the injuries suffered. Defendants have not agreed to tender settlement. To the extent notice under § 17.505(a) was not fully satisfied as to any theory, notice was impracticable under § 17.505(b) because Defendants' conduct is ongoing and limitations continue to run, and abatement under § 17.505(c), not dismissal, is the appropriate remedy.

324. Defendants' marketing of an illegal gambling product to Texas consumers, stripped of the safeguards lawful operators must provide, is an unconscionable action or course of action under §§ 17.45(5) and 17.50(a)(3). Defendants took advantage of consumers' lack of knowledge to a grossly unfair degree. They used machine-learning models that score customers by how much they are likely to lose to direct promotions to the customers likeliest to lose; shut down the model their own data scientists built to identify at-risk customers; and used Sportsbook data and modeling to trade against their own customers through affiliated market makers. *See supra* ¶¶ 54, 74-75, 128-130.

325. Defendants' representations that DraftKings is "Live in All 50 States," that Predictions is a lawful "prediction market," and that users trade with one another rather than against Defendants and their affiliates are false, misleading, or deceptive acts under § 17.46(b), including § 17.46(b)(5), (7), (12), and (24). So is Defendants' display of bet prices in bookmaker-style American odds, the format even the CFTC's staff has described as the one "used by casino gambling bookmakers."

326. Plaintiffs Gordon and Weissmann and the Texas Subclass relied on these representations and omissions to their detriment. Plaintiffs Gordon and Weissmann each saw the "Live in All 50 States" claim before opening an account. Neither had any independent way to evaluate whether CFTC registration made Predictions lawful in Texas. Every Subclass member received the same uniform "trading" labels, betting-board presentation, and headline odds before placing any wager, and none received the omitted facts. Defendants' conduct was a producing cause of their economic damages, including amounts deposited and lost, Administrative and Ancillary Fees, and inflated effective prices. Administrative and Ancillary Fees are a separate measure of economic damages, paid in reliance on Defendants' false representation of legality.

327. In addition, and independently of whether any wager was lawful, Defendants' representations that users trade with one another rather than against Defendants, and their omission of the margins embedded in each price, were false, misleading, or deceptive acts under § 17.46(b) and a producing cause of the amounts deposited and lost, the Administrative and Ancillary Fees, and the inflated effective prices Subclass members paid. Had those facts been disclosed, Subclass members would not have wagered on Predictions at all. Under this theory, amounts deposited and lost are measured net of any winnings withdrawn. Independently, the unconscionability claim under § 17.50(a)(3) does not require reliance.

328. No disclaimer defeats this claim. The Terms of Use do not disclaim Defendants' advertising representations of legality, and their disclaimers are not a waiver in conspicuous bold-face type of at least 10 points that satisfies Tex. Bus. & Com. Code § 17.42. Any purported waiver of DTPA rights is void.

329. Under § 17.50, Plaintiffs Gordon and Weissmann and the Texas Subclass are entitled to economic damages, up to three times economic damages for Defendants' knowing conduct, and reasonable and necessary attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully request that the Court enter judgment against Defendants and:

a. certify the Classes under Fed. R. Civ. P. 23, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

b. declare that Defendants' conduct violates the laws referenced herein;

c. award Plaintiffs and the Class treble damages under 18 U.S.C. § 1964(c) on Counts I and II, against Defendant Robins on Count I and jointly and severally against all Defendants named in Count II, measured by the amounts they lost, and/or by the Administrative and Ancillary Fees and other fees and charges they paid, together with costs and reasonable attorneys' fees;

d. award actual or statutory damages under Mass. Gen. Laws ch. 93A, § 9, and not less than double and up to treble damages for Defendants' willful and knowing violations and bad-faith refusal to grant relief;

e. in the alternative, award Plaintiffs and the Class damages for breach of contract and the implied covenant of good faith and fair dealing, with interest under Mass. Gen. Laws ch. 231, § 6C;

f. in the alternative, award restitution and disgorgement of all benefits Defendants unjustly received, including into a common fund;

g. in the alternative, award the California Subclass damages for breach of contract and the implied covenant of good faith and fair dealing, limited to Administrative and Ancillary Fees;

h. in the alternative, award the California Subclass restitution of Administrative and Ancillary Fees under California gambling law and Cal. Bus. & Prof. Code §§ 17203 and 17535;

i. in the alternative, award the California Subclass actual damages measured by Administrative and Ancillary Fees, restitution, and punitive damages under Cal. Civ. Code § 1780;

j. in the alternative, award the California Subclass restitution of Administrative and Ancillary Fees under California unjust enrichment law;

k. in the alternative, award the Florida Subclass actual damages, and declaratory and injunctive relief, under Fla. Stat. § 501.211;

l. in the alternative, award the Florida Subclass threefold actual damages, minimum damages of $200 per Subclass member, and attorneys' fees and costs under Fla. Stat. § 772.104(1), and injunctive relief against Defendant Robins under Fla. Stat. § 895.05(6);

m. in the alternative, order rescission of the Agreements and restitution to the Texas Subclass of all amounts paid to Defendants, including amounts deposited and lost and Administrative and Ancillary Fees, less any winnings withdrawn, and restitution and disgorgement under Texas unjust enrichment law;

n. in the alternative, award the Texas Subclass restitution of gambling losses and Administrative and Ancillary Fees under Texas common law, and economic damages and up to treble economic damages under Tex. Bus. & Com. Code § 17.50(b)(1);

o. in addition or in the alternative to any award of amounts wagered or lost, award Plaintiffs, the Class, and each Subclass restitution or damages measured by the Administrative and Ancillary Fees they paid, under each Count that seeks those fees;

p. order an accounting of all amounts Class members deposited, wagered, and lost on Predictions, and of all fees, rebates, payments, and trading profits Defendants and their affiliates received, provided that the California Subclass seeks an accounting only to identify Administrative and Ancillary Fees;

q. declare, under 28 U.S.C. § 2201, the release, disclaimer, limitation-of-liability, contractual limitations-period, and remedy-waiver provisions of the Terms of Use void and unenforceable as applied to Plaintiffs' statutory claims;

r. enjoin Defendants from continuing the challenged conduct, including through public injunctive relief;

s. award reasonable attorneys' fees, costs, and expenses;

t. award pre- and post-judgment interest as allowed by law; and

u. grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 9, 2026

Respectfully submitted,

By: /s/ *Aaron Schwartz*
Aaron Schwartz

**KAPLAN FOX & KILSHEIMER LLP**
Aaron Schwartz (*pro hac vice*)
Clara P. Owens (*pro hac vice forthcoming*)
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: 212-687-1980
*aschwartz@kaplanfox.com*
*cowens@kaplanfox.com*

Laurence D. King (*pro hac vice*)
Sophia V. Pintar (*pro hac vice*)
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Tel: 415-772-4700
*lking@kaplanfox.com*
*spintar@kaplanfox.com*

By: /s/ *Scott C. Harris*
Scott C. Harris

**BRYSON HARRIS SUCIU DEMAY, PLLC**
Scott C. Harris (BBO# 714774)
James R. DeMay (*pro hac vice*)
900 W. Morgan St.
Raleigh, NC 27603
Tel: (704) 941-4648
*sharris@brysonpllc.com*
*jdemay@brysonpllc.com*

J. Hunter Bryson (*pro hac vice*)
11 Park Place, 3rd Floor
New York, NY 10007
Tel: (919) 539-2708
*hbryson@brysonpllc.com*

*Counsel for Plaintiffs and the Proposed Classes*

**BERMAN TABACCO**
Kathleen M. Donovan-Maher (BBO# 558947)
Steven J. Buttacavoli (BBO# 651440)
One Liberty Square
Boston, MA 02109
Tel: 617-542-8300
*kdonovanmaher@bermantabacco.com*
*sbuttacavoli@bermantabacco.com*

*Local Counsel for Plaintiffs and the Proposed Classes*

**CERTIFICATE OF SERVICE**

I, Aaron Schwartz, hereby certify that, on November 9, 2026, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM/ECF system, which will send electronic notices of the filing to all counsel of record. Paper copies will promptly be served on newly added parties.

/s/ *Aaron Schwartz*
Aaron Schwartz